# Exhibit A

**ARIZONA SUPERIOR COURT, PIMA COUNTY**

Name of Person Filing Document:  Anthony Oliver, # 1002060648
Your Address:  3001 Gordon Highway
Your City, State, and Zip Code:  Grovetown Georgia 30813
Your Telephone Number:  520-300-1666
Attorney Bar Number (if applicable):  To Be Determined
Attorney E-mail Address:  Anthony.oliver222201@gmail.com
Representing ☒ Self (Without an Attorney) OR
☐ Attorney for ☐ Petitioner ☐ Respondent

**STATE OF ARIZONA** )
                              ) ss.
**COUNTY OF PIMA** )

Anthony Oliver
**Name of Petitioner/Plaintiff**

**Case Number: C20223184**

Santander Consumer USA, Inc.
**Name of Respondent/Defendant**

**APPLICATION FOR DEFERRAL OR WAIVER OF COURT FEES OR COSTS AND CONSENT TO ENTRY OF JUDGMENT**

RICHARD E. GORDON

**Notice.** A Fee Deferral is only a temporary postponement of the payment of the fees due. You may be required to make payments depending on your income. A Fee Waiver is usually permanent unless your financial circumstances change during the pendency of this court action.

I am requesting a deferral or waiver of all fees including: filing a case, issuance of a summons or subpoena, one certified copy of a temporary order in a family law case, one certified copy of the court's final order, preparation of the record on appeal, court reporter's fees of reporters or transcribers, service of process costs, and/or service by publication costs. (I have completed the separate Affidavit in Support of Application for Deferral or Waiver of Service of Process Fees form if I am asking for service of process costs, or service by publication costs.) I understand that if I request deferral or waiver because I am a participant in a government assistance program, I am required to provide proof at the time of filing. The document(s) submitted must show my name as the recipient of the benefit and the name of the agency awarding the benefit. **Note. All other applicants must complete the financial questionnaire beginning at section 3. If you are a participant in one of the programs in section 1 or 2 (below), you do not need to complete the financial questionnaire, and can proceed to the signature page.**

1. **[] DEFERRAL:** I receive government assistance from the state or federal program marked below or am represented by a not for profit legal aid program:

    [ ] Temporary Assistance to Needy Families (TANF)
    [ ] Food Stamps
    [ ] Legal Aid Services

2. **[ ] WAIVER:**

    [] I receive government assistance from the federal Supplemental Security Income (SSI) program.

3. **FINANCIAL QUESTIONNAIRE**
    **SUPPORT RESPONSIBILITIES.** List all persons you support (including those you pay child support and/or spousal maintenance/support for):

**NAME**                                    **RELATIONSHIP**

_____            _____
_____            _____
_____            _____

## STATEMENT OF INCOME AND EXPENSES

Employer name: _Incarcerated_____

Employer phone number:_____

[ ] I am unemployed (explain):_____

_____

My prior year's gross income:                           $_____

## MONTHLY INCOME

My total monthly gross income:                          $_____0.00_____

My spouse's monthly gross income (if available to me):  $_____

Other current monthly income, including spousal maintenance/support,
retirement, rental, interest, pensions, and lottery winnings:  $_____

### TOTAL MONTHLY INCOME                                $_____

**MONTHLY EXPENSES AND DEBTS:** My monthly expenses and debts are:

| | PAYMENT AMOUNT | LOAN BALANCE |
|---|---|---|
| Rent/Mortgage payment | $ 0.00 | $_____ |
| Car payment | $ 0.00 | $_____ |
| Credit card payments | $ 0.00 | $_____ |
| Explain:Other payments & debts | $ 0.00 | $_____ |
| Household | $ 0.00 | |
| Utilities/Telephone/Cable | $ 0.00 | |
| Medical/Dental/Drugs | $ 0.00 | |
| Health insurance | $ 0.00 | |
| Nursing care | $ 0.00 | |
| Tuition | $ 0.00 | |
| Child support | $ 0.00 | |
| Child care | $ 0.00 | |
| Spousal maintenance | $ 0.00 | |
| Car insurance | $ 0.00 | |
| Transportation | $ 0.00 | |
| Other expenses (explain) | $ 0.00 | |

### TOTAL MONTHLY EXPENSES                              $___0.00_____

**STATEMENT OF ASSETS:** List only those assets available to you and accessible without financial penalty.

| | ESTIMATED VALUE |
|---|---|
| Cash and bank accounts | $ 0.00 |
| Credit union accounts | $ 5.00 |
| Other liquid assets | $ 0.00 |

### TOTAL ASSETS                                       $ 5.00

**The basis for the request is:**

4. **[ ] DEFERRAL:**

   A. [ ] My income is insufficient or is barely sufficient to meet the daily essentials of life, and includes no allotment that could be budgeted for the fees and costs that are required to gain access to the court. My gross income as computed on a monthly basis is 150% or less of the current federal poverty level. (Note: Gross monthly income includes your share of community property income if available to you.)

   **OR**

   B. [ ] I do not have the money to pay court filing fees and/or costs now. I can pay the filing fees and/or costs at a later date. **Explain.**

   _____
   _____

   **OR**

   C. [ ] My income is greater than 150% of the poverty level, but have proof of extraordinary expenses (including medical expenses and costs of care for elderly or disabled family members) or other expenses that reduce my gross monthly income to 150% or below the poverty level.

   | DESCRIPTION OF EXPENSES | AMOUNT |
   |---|---|
   | _____ | $_____ |
   | _____ | $_____ |
   | _____ | $_____ |
   | **TOTAL EXTRAORDINARY EXPENSES** | $ 0.00 |

5. **[X] WAIVER:**

   I am permanently unable to pay. My income and liquid assets are insufficient or barely sufficient to meet the daily essentials of life and are unlikely to change in the foreseeable future.

---

**IMPORTANT**

This *"Application for Deferral or Waiver of Court Fees or Costs"* includes a *"Consent to Entry of Judgment."* By signing this Consent, you agree a judgment may be entered against you for all fees and costs that are deferred but remain unpaid thirty (30) calendar days after entry of final judgment. At the conclusion of the case you will receive a *Notice of Court Fees and Costs Due* indicating how much is owed and what steps you must take to avoid a judgment against you if you are still participating in a qualifying program. You may be ordered to repay any amounts that were waived if the court finds you were not eligible for the fee deferral or waiver. If your case is dismissed for any reason, the fees and costs are still due.

---

**CONSENT TO ENTRY OF JUDGMENT.** By signing this Application, I agree that a judgment may be entered against me for all fees or costs that are deferred but remain unpaid thirty (30) calendar days after entry of final judgment.

**OATH OR AFFIRMATION**

I declare under penalty of perjury that the foregoing is true and correct.

_____6 - 6 -22_____
Date

Signature
**Anthony Oliver, Pro Se**
Applicant's Printed Name

_6-6-2022_
Date

_March 06, 2022_
My Commission Expires: 03/06/26

Judicial Officer, Deputy Clerk or Notary Public

GA DEPT OF CORRECTIONS
SCRIBE

CENTRAL ACCT-OFFENDER TRUST

June   06, 2022   01:46 PM
Page:   1

**60   Day Account Statement**

**OLIVER, ANTHONY**

GDC ID: 1002060648

Printed By:   WILMOTH, LAURE





| Spendable Amount | Reserved Amount | Stimulus Amount | Receipts On Hold | Funds Balance | Obligations/Court Charges |
|---|---|---|---|---|---|
| $0.00 | $10.00 | $0.00 | $0.00 | $10.00 | $2,913.42 |

### RECEIPTS

No receipts for this offender in the past 60   days.

### WITHDRAWALS

No withdrawals for this offender in the past 60   days.

### OBLIGATIONS

Paid Status: P = Partially paid; Y = Paid in full; R = Reversed; W = Written off

| Date | Location Incurred | Obligation Type | Payable To | Obligation Detail | Amount | Paid |
|---|---|---|---|---|---|---|
| 08/01/2022 | CENTRAL ACCT-OFFENDER TRUST | MONTHLY PROCESSING FEE | GEORGIA DEPARTMENT OF CORRECTIONS | Monthly Processing Fee for 08/2022 | $1.00 | |
| 05/25/2022 | CENTRAL ACCT-OFFENDER TRUST | INDIGENT LOAN | AUGUSTA STATE MED. PRISON | RECORD ID = 31572980. 5/25/22 1NONLGL MJ | $0.58 | |
| 05/18/2022 | CENTRAL ACCT-OFFENDER TRUST | INDIGENT LOAN | AUGUSTA STATE MED. PRISON | RECORD ID = 31566329. 5/18/22 2LGL 7STAMPS SUP COURT SANTA ANA CA COURT APPEALS ATL GA MJ | $4.06 | |
| 05/16/2022 | CENTRAL ACCT-OFFENDER TRUST | INDIGENT LOAN | AUGUSTA STATE MED. PRISON | RECORD ID = 31562269. 5/16/22 3LGL US DISTRICT COURT MACON GA CITY CLERK POOLER GA CITY SAV MJ | $4.06 | |
| 05/05/2022 | CENTRAL ACCT-OFFENDER TRUST | INDIGENT LOAN | AUGUSTA STATE MED. PRISON | RECORD ID = 31551967. 5/5/22 3NONLGL 1LGL LAW OFFICE SAVANNAH GA MJ 6STAMPS | $3.48 | |
| 05/01/2022 | CENTRAL ACCT-OFFENDER TRUST | MONTHLY PROCESSING FEE | GEORGIA DEPARTMENT OF CORRECTIONS | Monthly Processing Fee for 05/2022 | $1.00 | W |
| 04/29/2022 | CENTRAL ACCT-OFFENDER TRUST | FEDERAL COURT FILING FEE | FEDERAL COURT - ATLANTA DIVISION | RECORD ID = 31451184. 1:21-CV-05151-TCB APPEAL# 22-11036-A | $505.00 | |
| 04/29/2022 | CENTRAL ACCT-OFFENDER TRUST | FEDERAL COURT FILING FEE - Reversal | FEDERAL COURT - ATLANTA DIVISION | RECORD ID = 31451182. 1:21-CV-05151-TCB | ($505.00) | R |
| 04/29/2022 | CENTRAL ACCT-OFFENDER TRUST | FEDERAL COURT FILING FEE | FEDERAL COURT - ATLANTA DIVISION | RECORD ID = 31451182. 1:21-CV-05151-TCB | $505.00 | R |
| 04/29/2022 | CENTRAL ACCT-OFFENDER TRUST | INDIGENT LOAN | AUGUSTA STATE MED. PRISON | RECORD ID = 31450815. 4/29/22 1LGL JUSTICE CENTER OF COURT SANTA ANA CAL MJ 5STAMPS | $2.90 | |
| 04/19/2022 | CENTRAL ACCT-OFFENDER TRUST | INDIGENT LOAN | AUGUSTA STATE MED. PRISON | RECORD ID = 31439558. 4/19/22 1LGL CIVIL CLERK OFF ATL GA 5STAMPS BIG ENV MJ | $2.90 | |
| 04/14/2022 | CENTRAL ACCT-OFFENDER TRUST | INDIGENT LOAN | AUGUSTA STATE MED. PRISON | RECORD ID = 31435928. 4/14/22 1LGL CHAIUAM SUP COURT SAVANNAH GA MJ | $2.90 | |

### COURT CHARGES

No court charges for this offender in the past 60   days.

Anthony Oliver, # 1002060648
Augusta State Medical Prison
3001 Gordon Highway
Grovetown Georgia 30813
Phone: (404) - 352 - 2188
Facsimile: (404) 200-5888
Email: Anthony.oliver222201@gmail.com

*Plaintiff Anthony Oliver*
*Appearing Pro Se,*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PIMA

ANTHONY OLIVER,

     Plaintiff,

vs.

SANTANDER CONSUMER USA, INC., an
Illinois Corporation; and DOES 1-20, inclusive.

     Defendants.

Case No.: _____

DECLARATION OF PLAINTIFF IN
SUPPORT OF DEFERRAL

## DECLARATION OF PLAINTIFF ANTHONY OLIVER

    I,     Anthony Oliver, state under the penalty of perjury that the foregoing is true and correct in support of the Plaintiff's deferral.

    1.     I am the Plaintiff in this case, appearing pro se, and without counsel in the above, and titled action. If called upon to testify, I would do so competently.

    2.     I am currently incarcerated in the Georgia Department of Corrections under criminal confinement. I am pending appeal to the Georgia Court of Appeal, and the Court has yet to enter an opinion reversing my conviction.

- 1 -

3.      The Georgia Department of Corrections, ("GDC"), does not pay it's inmates to work in the GDC facilities, or cow farms. I am currently without funds due to being a victim of identity theft. I have attached copies of my prison trust account, and is attached as an exhibit to the deferral. I ask the Court to waive the filing fee, and an additional order authorizing the Sheriff to serve the Summons, and give notice.

4.      I expect that this case will be removed to the Federal District Court, for the District of Arizona, the Tucson division. It is my belief that after removal, this case will be transferred to the Federal Court of Texas, the Northern District due to the choice-of-law clause in the agreement in this case.

5.      I am familiar with the Rules of this Court, and prior to incarceration, I was attending law school of the John Marshall School of Law in Georgia, and after completion, I was then planning to return to Tucson where I reside. I ask the Court to grant the deferral, and this case proceed on the merits.

I certify under the penalty of perjury that the foregoing is true and correct this __6TH__, day of __June__, 2022, in the County of Richmond, the State of Georgia.

Dated: __6-22  6-6-22__                    _____
                                                         Anthony Oliver, Declarant

NOTARY:
NAME: LaQuenah D'Juan Jackson
SIGN: LaQuenah D'Juan Jackson
DATE: 6-6-2022
EXPIRES: March 06, 2026


SEAL:

- 2 -

DECLARATION OF PLAINTIFF ANTHONY OLIVER
IN SUPPORT OF DEFERRAL

**In the Superior Court of the State of Arizona**
**In and For the County of** ___Pima County___

Case Number ___C20223184___

CIVIL COVER SHEET- NEW FILING ONLY
(Please Type or Print)

Plaintiff's Attorney ___Plaintiff Pro Se___

Attorney Bar Number ___To be determined___

Plaintiff's Name(s): (List all)

___Anthony Oliver___

AUG - 4 2022

RICHARD E. GORDON

Plaintiff's Address:
___# 1002060648, Augusta Medical Prison___

___3001 Gordon Highway, Grovetown GA 30813___

(List additional plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s): (List All) ___Santander Consumer USA, Inc.___

(List additional defendants on page two and/or attach a separate sheet)

### RULE 26.2 DISCOVERY TIER OR MONETARY RELIEF CLAIMED:

**IMPORTANT: Any case category that has an asterisk (\*) MUST have a dollar amount claimed or Tier selected.** State the monetary amount in controversy or place an "X" next to the discovery tier to which the pleadings allege the case would belong under Rule 26.2.

☒Amount Claimed $ ___$ 175,000___      ☐ Tier 1      ☐ Tier 2      ☒ Tier 3

### NATURE OF ACTION

Place an "X" next to the **one** case category that most accurately describes your primary case. Any case category that has an asterisk (\*) MUST have a dollar amount claimed or Tier selected as indicated above.

**TORT MOTOR VEHICLE:**
☐Non-Death/Personal Injury\*
☐Property Damage\*
☐Wrongful Death\*

**TORT NON-MOTOR VEHICLE:**
☐Negligence\*
☐Product Liability – Asbestos\*
☐Product Liability – Tobacco\*
☐Product Liability – Toxic/Other\*
☐Intentional Tort\*
☐Property Damage\*
☐Legal Malpractice\*

☐Malpractice – Other professional\*
☐Premises Liability\*
☐Slander/Libel/Defamation\*
☐Recovery of Damages under A.R.S. §12-514
(Please provide Plaintiff DOB:___/___/_____).
☐Other (Specify) _____\*

**MEDICAL MALPRACTICE:**
☐Physician M.D.\*        ☐Hospital\*
☐Physician D.O.\*        ☐Other\*

September 2, 2021                    Page 1                    AOCCV10F-092921

**CONTRACTS:**
- ☐ Account (Open or Stated)*
- ☐ Promissory Note*
- ☐ Foreclosure*
- ☐ Buyer-Plaintiff*
- ☐ Fraud*
- ☒ Other Contract (e.g., Breach of Contract)*
- ☐ Excess Proceeds – Sale*
- ☐ Construction Defects (Residential/Commercial)*
  - ☐ Six to Nineteen Structures*
  - ☐ Twenty or More Structures*
- ☐ Credit Card Debt (Maricopa County Filings Only)*

**OTHER CIVIL CASE TYPES:**
- ☐ Eminent Domain/Condemnation*
- ☐ Eviction Actions (Forcible and Special Detainers)*
- ☐ Change of Name
- ☐ Transcript of Judgment
- ☐ Foreign Judgment
- ☐ Quiet Title*
- ☐ Forfeiture*
- ☐ Election Challenge
- ☐ NCC – Employer Sanction Action (A.R.S. §23-212)*
- ☐ Injunction against Workplace Harassment
- ☐ Injunction against Harassment
- ☐ Civil Penalty
- ☐ Water Rights (Not General Stream Adjudication)*
- ☐ Real Property*
- ☐ Special Action
  - (See lower court appeal cover sheet in Maricopa)
- ☐ Immigration Enforcement Challenge (A.R.S. §§1-501, 1-502, 11-1051)
- ☐ Expungement

**UNCLASSIFIED CIVIL:**
- ☐ Administrative Review
  - (See lower court appeal cover sheet in Maricopa)
- ☐ Tax Appeal
- (All other tax matters must be filed in the AZ Tax Court)
- ☐ Declaratory Judgment
- ☐ Habeas Corpus
- ☐ Landlord Tenant Dispute – Other*
- ☐ Declaration of Factual Innocence (A.R.S. §12-771)
- ☐ Declaration of Factual Improper Party Status
- ☐ Vulnerable Adult (A.R.S. §46-451)*
- ☐ Tribal Judgment
- ☐ Structured Settlement (A.R.S. §12-2901)
- ☐ Attorney Conservatorships (State Bar)
- ☐ Unauthorized Practice of Law (State Bar)
- ☐ Out-of-State Deposition for Foreign Jurisdiction
- ☐ Secure Attendance of Prisoner
- ☐ Assurance of Discontinuance
- ☐ In-State Deposition for Foreign Jurisdiction
- ☐ Eminent Domain – Light Rail Only*
- ☐ Interpleader – Automobile Only*
- ☐ Delayed Birth Certificate (A.R.S. §36-333.03)
- ☐ Employment Dispute – Discrimination*
- ☐ Employment Dispute – Other*
- ☐ Verified Rule 27(a) Petition*
- ☐ Verified Rule 45.2 Petition
- ☐ Amendment of Birth Certificate
- ☐ Amendment of Marriage License (Maricopa County Filings Only)
- ☐ Application/Motion Objecting to Foreign Subpoena
- ☐ Other (Specify)* _____

## EMERGENCY ORDER SOUGHT:

☐ Temporary Restraining Order    ☐ Provisional Remedy    ☐ OSC    ☐ Election Challenge
☐ Employer Sanction    ☐ Other (Specify) _____

## COMMERCIAL COURT (Maricopa County Only)

☐ This case is eligible for the commercial court under Rule 8.1, and plaintiff requests assignment of this case to the commercial court. More information on the commercial court, including the most recent forms, are available on the court's website at https://www.superiorcourt.maricopa.gov/commercial-court/.

Additional Plaintiff(s)

_____

_____

Additional Defendant(s)

_____

_____

NAME: _Anthony Oliver, # 1002060648_
ADDRESS: _Augusta Medical Prison_
_3001 Gordon Highway, Grovetown GA, 30813_
TELEPHONE: _520-300-1666_
REPRESENTING: _Plaintiff, Pro Se_

*CLERK FILED*
*GARY L. HARRISON*
*'22 AUG -4 PM 2:28*

*J. ORR, DEPUTY*

## ARIZONA SUPERIOR COURT, PIMA COUNTY

| | |
|---|---|
| Anthony Oliver, | CASE NO: **C20223184** |
| Plaintiff, | |
| v. | **RULE 102(a) FASTAR CERTIFICATE** |
| Santander Consumer USA, Inc. | |
| Defendant. | **RICHARD E. GORDON** |

The undersigned certifies that he or she knows the eligibility criteria set by FASTAR Rule

101(b) and certifies that this case:

**(NOTE – YOU MUST CHECK ONE OF THE BOXES BELOW OR THE CLERK WILL NOT ACCEPT THIS FORM.)**

☐ **DOES** meet the eligibility criteria established by Rule 101(b); or

☒ **DOES NOT** meet the eligibility criteria established by Rule 101(b).

Dated: _6 - 6 - 22_

_____
SIGNATURE

**Page 19 of 21**

**ARIZONA SUPERIOR COURT, PIMA COUNTY**

Anthony Oliver
**Name of Petitioner/Plaintiff**

Case Number: **C20223184**

**ORDER REGARDING DEFERRAL OR WAIVER OF COURT FEES AND COSTS AND NOTICE REGARDING CONSENT JUDGMENT**

Santander Consumer USA, Inc.
**Name of Respondent/Defendant**

**RICHARD E. GORDON**

**THE COURT FINDS** that the applicant (print name)_____

1. [ ] IS NOT ELIGIBLE FOR A DEFERRAL of fees and costs.

**OR**

2. [ ] IS ELIGIBLE FOR A DEFERRAL of fees and costs based on financial eligibility. As required by state law, the applicant has signed a consent to entry of judgment.

3. [✓] IS ELIGIBLE FOR A DEFERRAL of fees and costs at the court's discretion (A.R.S. § 12-302(L)).

**OR**

4. [ ] IS ELIGIBLE FOR A DEFERRAL of fees and costs based on good cause shown. As required by state law, the applicant has signed a consent to entry of judgment.

**OR**

5. [ ] IS ELIGIBLE FOR A WAIVER of fees and costs because the applicant is permanently unable to pay.

**OR**

6. [ ] IS ELIGIBLE FOR A WAIVER of fees and costs at the court's discretion (A.R.S. § 12-302(L)).

**OR**

7. [ ] IS NOT ELIGIBLE FOR A WAIVER of fees and costs.

**IT IS ORDERED:**

[ ] **DEFERRAL IS DENIED** for the following reason(s):

[ ] The application is incomplete because _____
**You are encouraged to submit a complete application.**

[ ] The applicant does not meet the financial criteria for deferral because _____

**A deferral MUST BE granted if the applicant is receiving public assistance benefits from the Temporary Assistance to Needy Families (TANF) program or Food Stamps; has an income that is insufficient or barely sufficient to meet the daily essentials of life and that includes no allotment that could be budgeted to pay the fees and costs necessary to gain access to the court; or, if the applicant demonstrates other good cause.**

[✓] **DEFERRAL IS GRANTED** for the following fees and costs in this court:

[✓] Any or all filing fees; fees for the issuance of either a summons and subpoena; or fees for obtaining one certified copy of a temporary order in a domestic relations case or a final order, judgment or decree in all civil proceedings.
[ ] Fees for service of process by a sheriff, marshal, constable or law enforcement agency.
[ ] Fees for service by publication.
[ ] Filing fees and photocopy fees for the preparation of the record on appeal.
[ ] Court reporter or transcriber fees if employed by the court for the preparation of the transcript.
**IF A DEFERRAL IS GRANTED, PLEASE CHECK ONE OF THE FOLLOWING BOXES:**

[✓] **NO PAYMENTS WILL BE DUE UNTIL FURTHER NOTICE.**

JUN 3 0 2022

[ ]    **SCHEDULE OF PAYMENTS.**
The applicant shall pay $_____ each_____ (week, month etc.), one half to
the clerk's office and one half to the Sheriff's Department until paid in full, beginning _____

[ ] **WAIVER IS DENIED** for all fees and costs in this case.

[ ] **WAIVER IS GRANTED** for all fees and costs in this case that may be waived under A.R.S. § 12-302(H).
   [ ] Any or all filing fees; fees for the issuance of either a summons or subpoena; or fees for obtaining
       one certified copy of a temporary order in a domestic relations case or a final order, judgment or
       decree in all civil proceedings.
   [ ] Fees for service of process by a sheriff, marshal, constable or law enforcement agency.
   [ ] Fees for service by publication.
   [ ]    Filing fees and photocopy fees for the preparation of the record on appeal.
   [ ]    Court reporter or transcriber fees if employed by the court for the preparation of the transcript.

**RIGHT TO JUDICIAL REVIEW.** If the application is denied or a payment schedule is set by a special
commissioner, you may request the decision be reviewed by a judicial officer. The request must be made
within twenty (20) days of the day the order was mailed or delivered to you. If a schedule of payments
has been established, payments shall be suspended until a decision is made after judicial review.
Judicial review shall be held as soon as reasonably possible.

**NOTICE REGARDING CONSENT JUDGMENT.** Unless any of the following applies, a consent judgment
may be entered against the applicant for all fees and costs that are deferred and remain unpaid thirty (30)
days after entry of final judgment:

   A.  Fees and costs are taxed to another party;
   B.  The applicant has an established schedule of payments in effect and is current with those
       payments;
   C.  The applicant filed a supplemental application for waiver or further deferral of fees and costs and
       a decision by the court is pending;
   D.  In response to a supplemental application, the court orders that the fees and costs be waived or
       further deferred; or
   E.  Within twenty (20) days of the date the court denies the supplemental application, the applicant
       either:
         1.  Pays the fees and costs; or,
         2.  Requests a hearing on the court's order denying further deferral or waiver. If the applicant
             requests a hearing, the court cannot enter the consent judgment unless a hearing is held,
             further deferral or waiver is denied, and payment has not been made within the time
             prescribed by the court.

If an appeal is taken, a consent judgment for deferred fees and costs that remain unpaid in the lower court
shall not be entered until thirty (30) days after the appeals process is concluded. The procedures for
notice of court fees and costs and for entry of a consent judgment continue to apply.

If a consent judgment is signed and the applicant pays the fees and costs in full, the court is required to
comply with the provisions of A.R.S. § 33-964(C).

**DUTY TO REPORT CHANGE IN FINANCIAL CIRCUMSTANCES.** An applicant who is granted  a
deferral or waiver shall promptly notify the court of any change in financial circumstances during the
pendency of the case that would affect the applicant's ability to pay court fees and costs. Any time the
applicant appears before the court on this case, the court may inquire as to the applicant's financial
circumstances.

DATED: ___6/29/2022___                    _____
                                          [ ] Judicial Officer      [ ] Special Commissioner

FILED
GARY L. HARRISON
CLERK           COURT

22 AUG -4  PM 2: 28

J. ORR. DEPUTY

1 Anthony Oliver, # 1002060648
2 Augusta State Medical Prison (Georgia)
3001 Gordon Highway
3 Grovetown Georgia 30813
Phone: (404) - 352 - 2188
4 Facsimile: (404) 200-5888
Email: Anthony.oliver222201@gmail.com
5

6 *Plaintiff Anthony Oliver*
*Appearing Pro Se,*
7

8       **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
9            **IN AND FOR THE COUNTY OF PIMA**

10 ANTHONY OLIVER,                    Case No.: __C20223184__

11        Plaintiff,                  PLAINTIFF'S COMPLAINT FOR
12                                     DAMAGES, DECLARATORY AND
                                       INJUNCTIVE RELIEF
13 vs.

14                                     DEMAND FOR JURY TRIAL

15 SANTANDER CONSUMER USA, INC., an
   Illinois Corporation; and DOES 1-20, inclusive.
16                                     RICHARD E. GORDON

17        Defendants.

18

19            **COMPLAINT FOR DAMAGES**

20       Anthony Oliver, Plaintiff [1] herein, appearing *pro se*, brings this complaint for breach of

21 contract, and federal claims under the Fair Credit Reporting Act, 15 U.S.C § 1681 *et seq.*, and

22 other relevant State law claims for damages, declaratory, and injunctive and states to this

23 Honorable Court the following:

24 [1]   Plaintiff certifies to the Court that the Plaintiff will be released from incarceration in the next ninety
25       days, and will be a resident of Arizona. The Plaintiff was in Georgia attending law school prior to
         incarceration. see www.savannahnow.com /law-student-announces-run-for-savannah-mayor (front
26       page Jan. 15, 2019)

27                              - 1 -
28

## I.   **INTRODUCTION**

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American citizens. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients, and all of society should ultimately benefit from the resulting convenience, and efficiency.

2.     Unfortunately, however, this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can sustain substantial damage, both emotionally and economically, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledge this potential for misuse and resulting damage every time it solicits its credit monitoring service to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs"). Defendant Santander Consumer USA, Inc., ("Defendant or Santander"), specializes in collecting it's own debts. Defendant is both a debt collector engaged in collecting debts, as well as being a CRA within the meaning of the Fair Credit Reporting Act, ("FCRA").

4.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private and financial information that they compile and sell about individual consumers.

5.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting.
> Inaccurate credit reports directly impair the efficiency of the banking system and
> unfair credit reporting methods undermine the public confidence which is
> essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

6.   The preservation of one's good name is also at the heart of the FCRA's purposes:

[W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home. *We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason.* * * * *[A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW*, Inc., 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

7.   To further the primary goal of greater accuracy, the FCRA has also required CRAs, as well as "furnishers" of credit information to the CRAs, to conduct "reasonable investigations" into bona fide disputes sent to CRAs by consumers claiming to have inaccurate or incomplete information appearing in their credit files, to correct or update any such errors or omissions, and to report back to the consumer the results of the investigation. Santander is a furnisher of information.

8.   Santander uses various tactics against it's own customer's. Plaintiff entered into a retail installment sales contract with Santander to finance the purchase of a 2018 Jeep Cherokee equipped with a microwave in the rear of the vehicle. At various times, Plaintiff has made loan payments online, or over the phone, Santander has charged him a fee of up to $10.95 ("Pay-To-Pay fees"). Santander is prohibited by law from collecting these fees.

9.   One such law that applies to Santander's form contract is the Texas Debt Collection Act ("TDCA"). Santander is a debt collector as defined by the TDCA. The TDCA prohibits debt collectors from "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer[.]" Tex. Fin. Code § 392.303(a)(2) (emphases added). Pay-to-Pay fees are neither.

- 3 -

10.     Moreover, on information and belief, Santander pockets nearly the entire amount of the Pay-to-Pay fees as profit. Nevertheless, Santander represents them as pass-through fees to the payment processor: "A third party payment processing company may charge a fee to process your payment."

11.     During the course of his loan, Plaintiff has paid these fees multiple times. And Santander pocketed all of the fees. With it's hand caught in the cookie jar, various attorney general's for over thirty-eight (38) states filed State and Federal lawsuits against Santander for various allegations including the Pay-to-Pay fees in which numerous Federal Court's across the United States have found that Santander violated the Fair Debt Collection Practice Act with their Pay-to-Pay scheme in place. The attorney general's also went on to go after Santander for their unlawful business practices concerning loans to consumers like the Plaintiff. Once again, the attorneys general's of various States also sued Santander concerning their lending practices. Santander is one of the largest players in the subprime auto lending market. Since 2010, Santander has consistently accounted for the largest share of the subprime auto lending market (as measured by total dollar value in ABS issuances) among companies that focus in subprime auto lending. In its subprime lending business, Santander both makes direct loans to consumers and purchases installment contracts from dealers.  Santander's underwriting process relies on credit scoring models.

12.     One of the models incorporates the consumer's borrowing history and features of the loan the consumer has applied for (such as loan-to-value ratio, debt-to-income ratio, paymentto-income ratio, mileage, and term) and generates a probability that a consumer will become severely delinquent during a particular window of time within the term of the loan. This probability then is converted into a scaled score on proprietary, FICO-like scale. Because the above model only indicates how likely it is that a consumer will go delinquent within that particular window of time within the term of the loan, Santander also uses a separate model to predict how likely a consumer with a given proprietary score will default over the full life of the loan.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

13.    The life-of-the-loan model projects that consumers with proprietary scores below a given threshold have an unreasonably heightened chance of default before the end of their term, and a subset of those consumers, who have some of the lowest proprietary scores, have a significantly worse probability of default before the end of their term.   For example, for at least part of the time period examined by the State of Arizona, Santander projected that these consumers with the lowest proprietary scores had a greater than 70% likelihood of default over the life of the loan. In a typical auto-financing transaction, car dealers attempt to maximize the profits they earn on the front-end and back-end of an individual deal. The front-end of a transaction involves the negotiation of a sales price, whereas the back-end refers to the negotiation of ancillary products included as part of the financing of the purchase of the vehicle.

14.    Even when acting as an "indirect" auto lender by purchasing installment contracts from dealers, Santander has significant control over the extension of credit or financing of a transaction, including the "back-end" of a transaction, such as whether to purchase a contract that includes guaranteed-asset protection ("GAP") insurance, a GAP waiver and/or a service contract. Through its credit policies, Santander asserts control over the amount dealers can include in the back-end. The generous allowances for dealers on the back-end have facilitated Santander obtaining more market share, but those same large back-end charges expose consumers to increased risk in at least two ways: 1) significant back-end charges increase the overall amount financed, which increases the loan-to-value ratio on the loan; and 2) high finance costs increase either the consumer's monthly principal-to-interest ratio or increase the term of the loan. Santander is aware that these loan features contribute to deteriorating loan quality but continues to make these loans or purchase the underlying installment contracts. That's what also occurred here. Santander forced the Plaintiff into buying GAP insurance, all of which was a prerequisite to the Plaintiff financing a new Jeep.

15.    However, Santander concealed this fact from the Plaintiff. The consumer harm caused by the underwriting problems described above is compounded by Santander's servicing and collection practices, where Santander confuses, frustrates, and, in some cases, actively misleads consumers about their rights and the costs of taking certain actions.

Santander often requires that payments be made through methods that require consumers to pay additional third-party fees, such as money orders. These fees tend to most significantly affect consumers who are unbanked or underbanked. In servicing loans, Santander's employees routinely confuse consumers about the benefits and risks of extensions. Consumers routinely make partial payments or accept extensions without understanding that interest continues to accrue and future payments will likely go towards interest as opposed to paying down their principal balance. They also are unaware that their loan terms are lengthened to accommodate the extension, partial payment and interest accrual and that a payment may not stop a repossession. Additionally, Santander employees often mislead consumers about their ability to recover repossessed vehicles, including encouraging consumers to make significant payments to recover vehicles when Santander has no control over whether the vehicle can be recovered. Taken together, Santander's practices impose significant harm on Arizona consumers. These consumers obtain credit from Santander under the false pretense that they are acquiring a vehicle they will eventually own. In reality, these consumers agree to extremely costly leases, the terms of which are so onerous that consumers will almost certainly fail to perform, resulting in their loan default and likely repossession of the vehicles. As a direct result of these unlawful practices, Santander agreed to settle claims with over thirty-eight (38) states in which Santander agreed to: 1) total out any existing vehicle loan to zero dollars to any customer who had an existing loan with a FICO score of 400 or less; 2) agree not to repossess any vehicles that were in default as of the time of the settlement; 3) provide each customer with the title to the vehicle demonstrating that the customer is the rightful owner; 4) to remove any customer from collections; 5) to remove any loan that was written off from a customer's, or consumers credit trade line; and 6) stop it's illegal collection practice concerning it's Pay-to-Pay fees, and compensate any customer who paid to use Santander's Pay-to-Pay option. Despite all it's agreements, and contracts, Santander did the complete opposite, and breached every agreement, and contract Santander agreed to with the attorney general's, and through various class action settlements concerning the Plaintiff. Santander repossessed the Plaintiff's vehicle, wrote off the existing loan amount of approximately $ 18,000 plus dollars, placed the amount in collections

- 6 -

1    through its own collection department,  placed the $ 18,000 plus dollars on the Plaintiffs credit

2    trade line as of 2021, never provided the Plaintiff with the title despite knowing the Plaintiff's

3    FICO score was less then 400 point score, and based on it's own agreement with the attorney

4    general for the State of Arizona, and others, Santander refused to repay the Plaintiff the funds

5    that he spent on Santander's Pay-to-Pay scheme. To make matters far worse, when the Plaintiff

6    heard about the lawsuits against Santander, the Plaintiff submitted a FCRA demand for

     investigation letter to Santander, all of which was received by Santander from it's registered

7    agent. This action seeks compensatory, statutory and punitive damages, and costs for the Plaintiff,

8    Anthony Oliver, ("Plaintiff"), against the Defendant Santander Consumer USA, Inc.,  for it's

9    willful and/or negligent violations of the Fair Credit Reporting Act, other federal statutes, as well

10   as various State law claims as described herein.

11       **II. JURISDICTION AND VENUE**

12       16.    This Complaint is filed and these proceedings are instituted under the provisions of

13   the Arizona Breach of Contract statute, and 15 U.S.C. § 1681, et seq., of the Fair Credit

14   Reporting Act. In addition, the amount in controversy exceeds the amount of $ 75,000.

15       17.    The Superior Court has jurisdiction to enter appropriate orders both prior to and

     following a determination of liability pursuant to A.R.S. §§ 44-1528, 44-1531 and 44-1534.

16       18.    The violations alleged herein have been and are being committed in whole or in

17   part, and affect commerce in Pima County, the State of Arizona.  Venue is appropriate in Pima

18   County pursuant to A.R.S. § 12-401. Santander Consumers USA, Inc., ("SANTANDER or

19   Defendant"), can be served through its registered agent C.T. Corporation.

20       **III.    PARTIES**

21       19.    Plaintiff Anthony Oliver was, and still is, a resident and citizen of Arizona.

22       20.    Defendant Santander Consumer USA, Inc,. ("SANTANDER or Defendant"), is a

23   car lending loan company that specializes in new, and used vehicles loans, and collection of it's

24   own debts. Defendant SANTANDER is a debt collector for the purposes of the Fair Credit

     Reporting Act. Defendant SANTANDER maintains a registered agent in this Judicial District,

25   and can be served within this District.

26

27                                        - 7 -

28

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTIONS**

21.     On or about April 23, 2018, the Plaintiff signed a retail installment contract to purchase, and finance a new 2018 Jeep Cherokee fully equipped with a microwave installed in the rear of the Jeep. Plaintiff paid a down payment for the vehicle in the approximate amount of $ 4,000 to a local problematic dealership. The Plaintiff was ultimately financed through the Defendant Santander Consumer USA, Inc., ("Santander or Defendant"). The Plaintiff's monthly payment to Santander was exactly the amount of $ 612.00 a month.

22.     Following his vehicle purchase, the Plaintiff occasionally made his loan payments over the Internet, or by telephone by way of calling the 1800-number that Santander advertises on it's website, and elsewhere. In order to do so, Santander directed him to use Western Union's "Speedpay" service. Santander often encouraged the use of Speedpay to allow customers to pay immediately, and avoid late charges by using a credit, or debit card over the telephone. To use "Speedpay", Plaintiff was charged a fee of $10.95 per transaction, ostensibly by a third-party payment processor, Western Union, for the payment processing  service. However, prior to April 2018, Western Union, and Santander contractually agreed  that Western Union would return a portion of all "Speedpay" fees collected to Santander as profit.

23.     The amount of fees retained by Santander varied based on the volume of transactions, and the method of payment customers used for "Speedpay", but at times,  Santander would retain over 99% of the $10.95 Speedpay fee. While Plaintiff was informed by Western Union of the fee when he used the "Speedpay" service, the Contract between  Santander, and Plaintiff did not, and still does not, expressly mention, or provide for a "Speedpay" fee.  At the time Plaintiff paid the "Speedpay" fees, he was unaware that Santander retained part of the fee charged by Western Union. Had the Plaintiff known this, the Plaintiff would have never used the "Speedpay" service offered by Santander. Further, Santander fraudulently concealed from the Plaintiff that Santander was collecting a portion of the "Speedpay" fees, and informed the Plaintiff over the telephone several times that the "Speedpay" fee was nothing more then a convenience fee. Santander further concealed the fact that it entered into a contract with Western Union for the "Speedpay" service. Had the Plaintiff known that Santander entered into a contract with Western Union, the Plaintiff would have never used Western Union due to personal reasons,

- 8 -

and the Plaintiff's choice of who to do business with.

24. As a direct result of the processing, and retaining the "Speedpay" fees from the Plaintiff, Santander is actively engaged in debt collection, and has violated § 1692f(1) of the Fair Debt Collections Practices Act. Under Section 1692f(1) makes it unlawful for a debt collector to collect "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

25. Plaintiff later discovered that Western Union states on its website, "[o]ur services help you evaluate your payment strategy and find opportunities to help reduce costs, improve efficiency, migrate customers to more profitable payment channels and more." (Id. (emphasis added)). In other words, Santander, with Western Union's help, made more profit by charging the customer for paying online or over the phone, and retaining or receiving a portion of that fee. On numerous occasions, when Plaintiff used, or attempted to use the telephone, or Internet to pay on his loan with Santander, Western Union demanded an additional payment, in the form of a fee for using Speedpay. The payment processor collected this money from the Plaintiff, and then remitted a portion of it back to Santander without the Plaintiff's knowledge.

26. The plain instruction of § 1692f(1) is that the collection of any amount incidental to the principal obligation, unless expressly authorized by agreement creating the debt, or permitted by law, violates the FDCPA. Since the "Speedpay" scheme was exposed by various law firms across the United States, various Court's have interpreted the FDCPA broadly. See, e.g., Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d 22, 27 (2d Cir. 1989) ("It is clear that Congress painted with a broad brush in the FDCPA to protect consumers from abusive and deceptive debt collection practices, and courts are not at liberty to excuse violations where the language of the statute clearly comprehends them."). Accord; Acosta v. Credit Bureau, 2015 U.S. Dist. LEXIS 55870 (N.D. Ill., Apr. 29, 2015). And the phrase "permitted by law" means that "a debt collector may not collect any amount if either '(A) state law expressly prohibits collection of the amount or (B) the contract does not provide for collection of the amount and state law is silent.'" Acosta, 2015 Dist. LEXIS 55870 at *8 (quoting FTC Staff Commentary on the FDCPA, 53 Fed. Reg. 50,097, 50,108 (Dec. 13, 1988).

- 9 -

**Plaintiff is Incarcerated During the Pendency of His Loan with Santander**

27.     On April 4, 2019, the Plaintiff learned of an arrest warrant for Aggravated Stalking and later turned himself into law enforcement. Plaintiff was later held without bail at a local correctional facility. While incarcerated, the Plaintiff kept up his monthly payments to Santander. With the Plaintiff incarcerated, and no access to run down, and purchase a money order to payment his monthly payment, the Plaintiff had to make his monthly payment to Santander using it's "Speedpay" feature. From April of 2019, until August of 2019, the Plaintiff called Santander from jail, and used his credit card on several occasions to make a payment to Santander over the phone. In various phone calls, a representative of Santander encouraged the Plaintiff to make his monthly payments by using the "Speedpay" feature offered by Santander. In sum, the Plaintiff paid several "Speedpay" fees to Santander, and each time, Santander pocketed the cash.

**Santander's Illegal Business Practice's that Continue**

28.     Notwithstanding the violations being committed by Santander, the Defendant Santander struck again. It decided to engage in other tactics to dominate the car dealership industry, and seize control of the auto lending world.  Plaintiff recently discovered that since 2010, Santander has consistently accounted for the largest share of the subprime auto lending market (as measured by total  dollar value in ABS issuances) among companies that focus in subprime auto lending. In its  subprime lending business, Santander both makes direct loans to consumers, and purchases installment contracts from dealers across the U.S. and Arizona.

A.      Santander's underwriting and loss models project high defaults for
        Certain Segments of its consumer population

29.     Santander's underwriting  process relies on credit scoring models like the did with the Plaintiff. One of the models incorporates the consumer's borrowing history, and  features of the loan the consumer has applied for (such as loan-to-value ratio, debt-to-income  ratio, paymentto-income ratio, mileage, and term) and generates a probability that a consumer like the Plaintiff will become severely delinquent during a particular window of time within  the term of the loan. This probability then is converted into a scaled score on a proprietary, FICO like scale.

- 10 -

30.     Because the above model only indicates how likely it is that a consumer will go delinquent within that particular window of time within the term of the loan, Santander also uses a separate model to predict how likely a consumer with a given proprietary score will default over the full life of the loan. The life-of-the-loan model projects that consumers with proprietary scores below a given threshold have an unreasonably heightened chance of default before the end of their term, and a subset of those consumers, who have some of the lowest proprietary scores, have a significantly worse probability of default before the end of their term.   For example, for at least part of the time period examined by Arizona, Santander projected that these consumers with the lowest proprietary scores had a greater than 70% likelihood of default over the life of the loan.

B.      Santander exposes consumers to unnecessarily high levels of risk

31.     Santander is not only originating loans and purchasing installment contracts with a high likelihood of failure, but also exposing consumers to unnecessarily high levels of risk. In a typical auto-financing transaction, car dealers attempt to maximize the profits they earn on the front-end and back-end of an individual deal. The front-end of a transaction involves the negotiation of a sales price, whereas the back-end refers to the negotiation of ancillary products included as part of the financing of the purchase of the vehicle. Even when acting as an "indirect" auto lender by purchasing installment contracts from dealers, Santander has significant control over the extension of credit or financing of a transaction, including the "back-end" of a transaction, such as whether to purchase a contract that includes guaranteed-asset protection ("GAP") insurance, a GAP waiver and/or a service contract. Through its credit policies, Santander asserts control over the amount dealers can include in the back-end. The generous allowances for dealers on the back-end have facilitated Santander obtaining more market share, but those same large back-end charges expose consumers to increased risk in at least two ways: 1) significant back-end charges increase the overall amount financed, which increases the loan-to-value ratio on the loan; and 2) high finance costs increase either the consumer's monthly principal-to-interest ratio or increase the term of the loan.

32.     Santander was, and still is aware that these loan features contribute to deteriorating loan quality but continues to make these loans or purchase the underlying installment contracts especially with the contract between the Plaintiff, and Santander.

C.      Santander's aggressive pursuit of market share led it to underestimate risk associated with loans with stated income and expenses.

33.     Although Santander has sophisticated models that forecast consumer default, Santander's policies with respect to stated income and expenses allow it to underestimate default risk in important ways and to purchase loans from consumers who are unlikely to be able to pay for their loans. Santander also fails to meaningfully monitor dealer behavior to minimize the risk of receiving falsified information, including the amounts specified for consumers' income and expenses. One area where Santander's lack of verification as part of its underwriting exposes consumers to even riskier loans is with respect to the amounts alleged to represent a consumer's mortgage or rent. Housing costs are often a consumer's most significant monthly expense, and Santander uses consumers' monthly housing debt to calculate consumers' debt-to-income ratios. The debt-to-income ratio is important in underwriting because it measures the amount of disposable income a consumer has available to pay off an auto loan and meet nonrecurring monthly expenses. Santander generally allows consumers who apply for a loan to merely state their mortgage and rent expenses, as opposed to providing proof of a mortgage or rent payment, and Santander has no apparent measures in place to minimize the risk of falsified mortgage or rent income. Dealers routinely use a default amount for mortgage or rent that would not be reasonably sufficient to pay for mortgage or rent in the vast majority of localities, but regardless, those low amounts result in a higher acceptance rate from Santander. Housing costs, however, are not the only area in which Santander's forecasts are likely incorrect. Santander also made an aggressive push beginning in early 2013 to waive proof of income on most applications.

D.      Santander Turned a Blind Eye to Dealer Abuse.

34.     Since as early as 2010, Santander has been tracking problematic dealers across Santander's business. Although Santander had a process in place to evaluate problematic dealers, there was internal tension at Santander between punishing problematic dealers and retaining Santander's market share. As a result, Santander was reluctant to act against

- 12 -

flagged dealers so long as a sufficient amount of the installment contracts purchased from those dealers proved profitable for Santander. Shortly after the Plaintiff purchased his vehicle from one of the problematic dealerships, Santander entered into an agreement with Chrysler through which Santander would be the preferred lender on all Chrysler transactions, including the loan with the Plaintiff. And, to promote business under this new arrangement, Santander allowed problematic dealers to take advantage of Santander's new Chrysler relationship.

35.     Around the same time, as explained above, Santander dramatically changed its funding policy to accept increased numbers of stated-income loans. When Santander rolled out this change to its funding requirements, Santander did not bar those dealers identified as "problematic" by Santander from using stated income on loan applications. Santander's decision to broadly market its new stated-income policy, even to dealers with a history of misstating income, led to a significant spike in the number of early payment defaults. Although Santander later attempted to tighten its policy with respect to problematic dealers, the tension between Santander's business concerns and curbing dealer abuse persists, and Santander continues to purchase installment contracts from dealers which Santander itself identifies as problematic. As a result of Santander's policies with respect to stated income and expenses and the failure to adequately curb dealer abuse, Santander loans default at a higher rate.

E.     Santander's Servicing and Collection Practices

36.     The consumer harm caused by the underwriting problems described above is compounded by Santander's servicing and collection practices, where Santander confuses, frustrates, and, in some cases, actively misleads consumers about their rights and the costs of taking certain actions. Santander often requires that payments be made through methods that require consumers to pay additional third-party fees, such as money orders, and their infamous "Speedpay" feature. These fees tend to most significantly affect consumers, like the Plaintiff who are unbanked, or underbanked.

- 13 -

37.     In servicing loans, Santander's employees routinely confuse consumers about the benefits, and risks of extensions. Consumers, like the Plaintiff, routinely make partial payments or accept extensions without understanding that interest continues to accrue and future payments will likely go towards interest as opposed to paying down their principal balance. The consumers, like the Plaintiff, also are unaware that their loan terms are lengthened to accommodate the extension, partial payment, and interest accrual and that a payment may not stop a repossession, and this is what occurred to the Plaintiff.

38.     Additionally, Santander employees often mislead consumers about their ability to recover repossessed vehicles, including encouraging consumers to make significant payments to recover vehicles when Santander has no control over whether the vehicle can be recovered. Taken together, Santander's practices impose significant harm on Arizona consumers as Santander has done to the Plaintiff. These consumers obtain credit from Santander under the false pretense that they are acquiring a vehicle they will eventually own. In reality, these consumers agree to extremely costly leases, the terms of which are so onerous that consumers will almost certainly fail to perform, resulting in their loan default and likely repossession of the vehicles.

**Santander Settles Numerous Lawsuits with Attorney's General's**

39.     On or about May 19, 2020, the Defendant Santander Consumer USA, Inc., engaged in a multi-state lawsuit stemming from it's lending practices, to the "Speedpay" fees Santander imposed on consumers, to their illegally collection practices, and all allegations stemming from its gap insurance scheme. In settlement agreements with over thirty-eight (38) attorneys generals from around the Country, Santander agreed to pay a large amount of money to the State's.

40.     In particular, the settlement release with the State of Arizona, upon information, and belief, states that Santander agree to pay the State of Arizona the amount of $ 15,000,000.00 dollars to the Arizona Attorney General. As additional conditions of the settlement, the Multistate Executive Committee made up on the States of Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Arizona, Hawaii, Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Nebraska, New

- 14 -

Hampshire, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Virginia, Washington, West Virginia, and Wyoming shall have sole discretion concerning the consumers entitled to relief and, the nature and amounts of such relief except that any such relief shall include amounts to Mandatory Relief Consumers. Santander agreed to provide the Multistate Executive Committee with information the Multistate Executive Committee deems necessary to determine which Consumers are entitled to relief, the amount of such relief, and how to locate consumers entitled to relief including, but not necessarily limited to, providing the consumer's name, last known address, last known contact information, and loan identification number. The Settlement Administrator and/or Multistate Executive Committee shall provide all necessary tax reporting related to this agreement as required by law. Upon information, and belief, Santander never provided the Plaintiff's name, last known address, or any contact information despite the fact that the Plaintiff had a change of address put in with the United States Postal Service.

41.     As a further part of the settlement between Santander, and the Arizona Attorney General,, Santander agreed in writing for the Plaintiff's benefit to the following: (1) Santander shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for all Consumers who had a loss forecasting score of 401 or less and, as of December 31, 2019, have Defaulted but have not had their vehicle repossessed and (2) Santander shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for any Consumer with a loss forecasting score of 401 or less who defaults in the future. Santander shall implement the relief as described in (1) and (2) by providing the relief in (1) prior to the relief in (2). When the cumulative value of the outstanding Loan balances in (1) and (2) equals $45,000,000, Santander has met its obligations under this paragraph and does not need to provide additional relief pursuant to this paragraph. Santander shall waive the Deficiency on Loans it Owns for a) Mandatory Relief Consumers and b) to the extent not included in a), Defaulted Consumers who had a loss forecasting score of 401 or less at the time of origination, when the loan was originated between January 1, 2013 and December 31,

- 15 -

2019, and who Defaulted within 12 months of origination of the Loan.   In addition, Santander shall have an obligation to buy back such Loans originated between January 1, 2013 and December 31, 2017 in order to waive the Deficiency for those Loans, as set forth in paragraphs 14 and 15 below. The Consumers entitled to relief in this paragraph shall collectively be referred to as the "Deficiency Relief Consumers." If a Defaulted Consumer receives a payment under paragraph 10 but is not a Deficiency Relief Consumer, Santander agrees that it will not collect on or sell that Consumer's Loan for one year from when the Defaulted Consumer is sent payment.   The Multistate Working Group will send notice to the Company that payment has been sent to the Defaulted Consumer within 10 calendar days of such payment being sent. The moratorium on collecting or selling certain Consumer's Loans described in paragraph 12 does not prohibit Santander from repossessing those Consumers' vehicles, except for those Consumers entitled to relief under paragraph 11 which is reincorporated as stating :

(1) Santander shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for all Consumers who had a loss forecasting score of 401 or less and, as of December 31, 2019, have Defaulted but have not had their vehicle repossessed and (2) Santander shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for any Consumer with a loss forecasting score of 401 or less who defaults in the future. Santander shall implement the relief as described in (1) and (2) by providing the relief in (1) prior to the relief in (2).

42.     The agreement between the Santander, and the Arizona Attorney General was for the benefit of the Plaintiff, and therefore, establishes a valid contract between the Plaintiff, and Santander. Accordingly, the Arizona Attorney General was the attorney of record for the Plaintiff when Santander agreed to the terms of the settlement because the Plaintiff owned a Santander vehicle, and was a class member.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**Santander Violates the Settlement Agreement Terms and Conditions and**

**Repossess the Plaintiff's 2018 Jeep Cherokee with All his Property Inside the Vehicle**

43.    Despite knowing that the Plaintiff had a valid retail installment payment plan with Santander, and that it agreed in writing with the Arizona Attorney General, Santander contracted with a private repossession company to go out, locate, and repossess the Plaintiff's 2018 Jeep Cherokee with his property, and microwave inside the vehicle.

44.    On or about January 2020, the Plaintiff's vehicle was parked at his home, located by a private repossession company, seized, and returned to Santander. Inside the Plaintiff's vehicle was thousands of dollars in property in which in now in the hands of some other person, other then the Plaintiff.  Despite knowing that the Plaintiff was a class member, Santander still repossessed the Plaintiff's vehicle. Further, to make matters far worse, as mentioned above, the Plaintiff's FICO score was under, and negative 400 and therefore, pursuant to the conditions of the settlement, Santander agreed total out the amount owed, and provide the Plaintiff with the title. But none of this ever occured. The Plaintiff who was incarcerated at the time the vehicle was repossessed, provided Santander with his current, and temporary mailing address to the County Jail where Santander was required to mail the Plaintiff receipts for his "Speedpay" payments that he made to Santander for the months the Plaintiff was incarcerated, but at all relevant times, despite Santander had the Plaintiff's mailing address, and never mailed him the receipts, nor the title of his 2018 Jeep Cherokee, to the Plaintiff at the County Jail, and because the documents from Santander are considered to be documents that contain personal information, the County Jail would have logged in any mail from Santander as "legal mail" that would require the Plaintiff to have to sign a book that the County Jail keeps on file for a period of seven (7) years. The records of the County Jail will reflect that there was no mail from Santander during the Plaintiff's time of incarceration including to date.

**Plaintiff Obtains Copies of His Three Credit Reports**

45.    Santander struck again. As an additional part of the settlement with the Arizona Attorney General, Santander agreed to total out all loans for those consumers stated about in one, and two of the settlement terms, and not report any of the balances to any, and all credit reporting agencies, ("hereafter CRA's"), such as TransUnion, LLC., ("TransUnion"), Equifax Information

- 17 -

1   Solutions, Inc., ("EQUIFAX"), and Experian Information Solutions, Inc., ("Experian").

2       46.    Rather then comply with the very terms, and conditions Santander agreed to begin

3   with, Santander reported the Plaintiff to TransUnion, Equifax, and Experian for the amount of

4   approximately $ 18,000 plus dollars. In reviewing the Plaintiffs Equifax trade line, not only was

5   the amount that was supposed to be totaled out to zero dollars, but all three credit reports listed

6   inaccurate payment information concerning the Plaintiff. In addition, when all three credit

    bureaus listed the account with a partial account number as : **3000021023840\*\*\*\***, with a

7   balance allegedly owed by the Plaintiff in the amount of $ 19,809.00, but in reality what the

8   Plaintiff, if all said to be true, and correct, only owed Santander the amount of $ 16,452 with a

9   difference of $ 3,357.00 dollars that Santander could not account for, nor collect. Although

10   Santander is entitled to collect a debt that belongs to it, the FDCPA and FCRA does not permit

11   Santander from collecting a debt that it is not entitled to.

    **Plaintiff Sends a FCRA Demand For Investigation Letter to Santander**

12       47.    On or about February 5, 2021, the initiated, and mailed a dispute, and demand for

13   investigation letter pursuant to the Fair Credit Reporting Act to Santander, via it's registered

14   agent identified as C.T. Corporation located in both Lawrenceville, Arizona, as well as Los

15   Angeles, California, requesting an investigation into the allegations stated in the Plaintiff's

16   dispute letter. The Plaintiff also mailed copies of the dispute, and demand for investigation letter

17   pursuant to the Fair Credit Reporting Act to each of the three credit bureaus TransUnion,

18   Experian, and Equifax.

19       48.    In the letter, the Plaintiff points out to an inaccurate amount being reported on his

20   credit trade line, but also that Santander was actively collected a debt within the meaning of the

21   Fair Credit Report Act that Santander knew, and had reason to know that Santander did not have

22   a permissible purpose to try, and collect. Also included in the Plaintiff's dispute, and demand for

23   investigation, the Plaintiff also correctly pointed out that Santander agreed to numerous lawsuit

24   settlements with well over thirty-eight (38) states in the United States, and that as part of these

25   settlement agreements, among other things, Santander agreed to total all existing loans to zero

26   dollars, but that Santander refused to do so. Plaintiff also provided Santander, and the three credit

    bureaus TransUnion, Experian, and Equifax.

27

28

- 18 -

49.     Santander received the Plaintiffs dispute, and demand for investigation letter from its registered agent, C.T. Corporation, and Santander received a copy of the Plaintiffs dispute from each of the three credit bureaus. Despite receiving the letters, Santander adamantly refused to comply with its mandatory, and statutory duties under the FCRA, and FDPCA to investigate, delete, and cease, and desist in the debt. To date, Santander, who is known for thus far, for not comply with the terms of the attorney general settlement, didn't even comply with its mandatory, and statutory duties by conducting an FCRA investigation, much less respond to the Plaintiffs dispute letter as required under 15 U.S.C. § 1681s-2(b).

50.     Santander owed a duty to the Plaintiff to conduct a reasonable investigation after receiving the Plaintiffs proper FCRA dispute letter. Santander received copies of the Plaintiffs dispute letter from their registered agents. Santander is a furnisher of information, as the term is used in the FCRA. As such, the FCRA imposes duties upon Santander as found in relevant part in Section 1681s2(b) that Santander must comply with, but Santander choose not to. The Plaintiffs claims against Santander is limited to a private cause of action against a furnisher of credit information to a violation of § 1681s-2(b).

51.     Pursuant to Section 1681s-2(b), furnishers of information are required to investigate and promptly respond to notices of any consumer disputes. Specifically, once a consumer reporting agency receives notice of the disputed information from a consumer, the agency must provide notice of the dispute "to any person who provided any item of information in dispute," and the notice must "include all relevant information regarding the dispute that the agency has received from the consumer.." 15 U.S.C. § 1681i(a)(2)(A).

52.     The person(s) who receives the notice from the consumer reporting agency must then investigate the disputed information, report the results of the investigation to the consumer reporting agency, and make any necessary modifications. 15 U.S.C. § s-2(b)(1). Equifax, Experian, and TransUnion are credit reporting agencies pursuant to 15 U.S.C. § 1681i(a)(2) within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681, p., who in turn transmitted the Plaintiff's dispute letter to Santander. Santander breached it's duty owed to the Plaintiff causing him injury. As a result of the actions of Santander's willful, and intentional failure to comply with the FCRA, the Plaintiff will not have to pay out of pocket money for a

- 19 -

brand new vehicle with an extremely higher annual percentage rate per year. Santander received the proper notice from the consumer reporting agency pursuant to the FCRA section 15 U.S.C. § 1681i(a)(2), and Santander failed to uphold their mandatory duties pursuant to FCRA provisions of 15 U.S.C. § 1681 s-2(b).

53.     The Plaintiff believes and thereon alleges that the Plaintiff will be required to pay a higher annual percentage rate on a new vehicle loan for a new car, higher then usual security deposit to pay for an apartment, or home, and once the Plaintiff is released from incarceration, the Plaintiff will be without a vehicle that Santander knew that it was not entitled to have repossessed.

### Plaintiff Is Entitled To Equitable Tolling On All Of His Claims

**A.     Equitable Tolling**

54.     Under the doctrine of equitable tolling, "plaintiffs may sue after the statutory time period has expired if they have been prevented from doing so due to any inequitable circumstances." Ellis v. GMAC, 160 F.3d 703, 706 (11th Cir. 2008). Tolling is "appropriate when a movant untimely files because of extraordinary circumstances that are both beyond his control, and unavoidable even with diligence." Sandvik v. United States, 177 F.3d 1269, 1271 (5th Cir. 1999). As the supreme court has stated, "[e]quitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." See Wallace v. Kato, 549 U.S. 384, 396, 127 s. Ct. 1091, 166 L. Ed. 2d 973 (2007).

**B.     The Coronavirus Pandemic**

55.     The current COVID19 is a rapidly evoling, and still evoling, public health crisis of an extraordinary magnitude. On the past weeks, and months, "the unprecedented and extraordinary dangerous nature of the COVID-19 pandemic has become apparant." United States v. Stephens, 2020 WL 1295155, at *1, F.Supp. 3d (S.D.N.Y. March 19, 2020). On March 13, 2020, the CDC declared the COVID-19 outbreak to constitute a national emergency stating: "In response to the public health experts' warnings about the virus' communicaility, and the severe health risk of the COVID19 disease that  the virus causes, officials at all levels of government have adopted dramatic and widespread social distancing measures to slow the spread of the virus and protect the Health of the nation. The CDC has "acknowledged that correction

- 20 -

and detention facilities present unique challenges for control of COVID19 transmission among incarcerated/detained persons, staff, and visitors." United States v. Kennedy, 2020 U.S. Dist. LEXIS 53359, 2020 WL 1493481, at * 2 E.D. Mich. March 27, 2020)(quoting Intermim Guidance on Management of Coronavirus Disease 2019 (COVID19) in correctional and detention facilities, CDC (Mar. 23, 2020). See also Stephens, 2020 U.S. Dist. LEXIS 47846, 2020 WL 1295155, at * 2 (citing Joseph A. Bick, Infection and control). Due to the current pandemic, the Plaintiff tested positive for COVID19 twice in the past two years preceding the filing of this lawsuit that prevented the filing of this Complaint sooner thereby entitling the Plaintiff to the benefit of equitable tolling. Presently, The Plaintiff has brought claims against Santander for FCRA, FDCPA, and various State law claims against Santander that would, or could arguably say that some of the Plaintiff's claims are time-barred about the doctrine of equitable tolling for some of the Plaintiff's claims. For instance, the Plaintiff brings a FDCPA cause of action for the Defendant Santander charging Speedpay fees using Western Union. The Plaintiff's last known payment made to Santander was in July, and August of 2019, thereby leaving the Plaintiff no later then July, and August of 2020, to bring his FDCPA claims, but the current pandemic hit, and the Plaintiff was unable to pursue his FDCPA claims. Likewise, the Plaintiff is entitled to equitable tolling on his claims. Because the balance of the Plaintiff's claims are not time barred, the Plaintiffs FCRA, FDCPA, and breach of contract claims are still within the applicable statute of limitations. Accordingly, the doctrine of equitable tolling does apply to these claims.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# FIRST CAUSE OF ACTION

**Fair Credit Reporting Act, 15 U.S.C. § 1681., et seq - Failure to Comply with FCRA**

**(Plaintiff v. Santander Consumer USA, Inc.)**

Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

> A "consumer reporting agency" is defined by the FCRA as follows:
> [A]ny person which, for monetary fees, dues, or on a cooperative
> nonprofit basis, regularly engages in whole or in part in the practice of
> assembling or evaluating consumer credit information or other information
> on consumers for the purpose of furnishing consumer reports to third
> parties, and which uses any means or facility of interstate commerce for
> the purpose of preparing or furnishing consumer reports. 15 U.S.C. §
> 1681a(f).

Santander is a "furnisher" as that term is used in Section 1681s-2 of the FCRA. Section 1681n of the FCRA imposes civil liability on any CRA or furnisher "who willfully fails to comply with any requirement" of the Act. See 15 U.S.C. § 1681n(a).

Section 1681o of the FCRA provides for civil liability against any CRA or furnisher which is negligent in failing to comply with any requirement imposed under the Act.

Santander owed a duty to the Plaintiff to conduct a reasonable investigation into a fraudulent debt that the Plaintiff complained about in his dispute letters, but Santander refused to do so pursuant to the FCRA causing the Plaintiff damages to his credit trade line.

Santander had, and still has, a mandatory and statutory duty to conduct a meaningful investigation, and breached it's mandatory duties causing damages to the Plaintiff.

Santander received a written notice of the dispute from the Plaintiff through its registered agent, as well as a copy of the Plaintiff's dispute letter from all three CRA's, and still failed and refused to conduct an investigation. As a direct result of Defendants actions, or inactions, the Plaintiff has been damaged in an amount to be determined at trial.

- 22 -

**SECOND CAUSE OF ACTION**

**Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)**

**(Plaintiff v. Santander Consumer USA, Inc.)**

Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

Under section 1681s-2(b), Defendant Santander owed a duty under this section of the Fair Credit Reporting Act to investigate any dispute upon receiving a proper dispute notice from the Plaintiff.

Santander received the Plaintiffs dispute notice from several consumer reporting agencies, and still refused to comply with their mandatory, and statutory duties owed to the Plaintiff.

Santander breached it's mandatory duty owed to the Plaintiff causing injury to the Plaintiff. Defendant Santander is a consumer reporting agencies within the meaning of the Fair Credit Reporting Act, and owed a duty to the Plaintiff under 15 U.S.C. § 1681 s-2(b) to conduct an investigation, but Santander refused to do so.

Santander failed to conduct a reasonable investigation into the accuracy of information related to the disputed trade line, in violation of Section 1681s-2(b)(1).

Santander is a "furnisher" of consumer credit information as that term is used in Section 1681s-2 of the FCRA.

Santander's failure to report that Plaintiff disputed the accuracy of the trade line was a failure to accurately update the information because it was "misleading in such a way and to such an extent that it [could] be expected to have an adverse effect" on Plaintiff. Gorman v. Wolpoff & Abramson, LLP, et al., 584 F.3d 1147 (9th Cir. 2009); See also Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142 (4th Cir. 2008).

As a direct result of the actions, inactions, and breach of the Defendants mandatory and statutory duties, the Plaintiff will now have to pay a higher APR, or deposit to benefit from any consumer loan on any future consumer accounts, home, or new car. Further, the Plaintiff has been damaged with additional damages in an amount to be proven at trial.

As a direct and proximate result of Santander's willful and/or negligent refusal to comply with the FCRA as outlined above, Plaintiff has suffered substantial loss and damage including, but not limited to: loss of opportunity to obtain credit, damage to reputation, expenditure of

- 23 -

1  considerable time and out-of pocket expenses, worry, fear, distress, frustration and

2  embarrassment, entitling him to an award of actual damages in amounts to be proved at trial,

3  together with the costs of this action pursuant to 15 U.S.C. § 1681o.

### THIRD CAUSE OF ACTION

4

5  **Fair Debt Collection Practice Act, 15 U.S.C. § 1692, et seq.**

**(Plaintiff v. Santander Consumer USA, Inc.**

6  Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

7  The FDCPA creates substantive rights for consumers like the Plaintiff; violations

8  cause injury to consumers like the Plaintiff, and such injuries are concrete and

9  particularized. Quinn v. Specialized Loan Servicing, LLC, No. 16 C 2021, 2016 U.S. Dist.

10  LEXIS 107299 *8-13 (N.D. Ill. Aug. 11, 2016) (rejecting challenge to Plaintiff's standing

11  based upon alleged FDCPA statutory violation); Lane v. Bayview Loan Servicing, LLC, No.

12  15 C 10446, 2016 U.S. Dist. LEXIS 89258 *9-10 (N.D. Ill. July 11, 2016) ("When a

13  federal statute is violated, and especially when Congress has created a cause of action for

14  its violation, by definition Congress has created a legally protected interest that it deems

15  important enough for a lawsuit."); Church v. Accretive Health, Inc., No. 15-15708, 2016

16  U.S. App. LEXIS 12414 *7-11 (9th Cir. July 6, 2016) (same); see also Mogg v. Jacobs,

17  No. 15-CV-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 33229, 2016 WL 1029396, at *5

18  (S.D. Ill. Mar. 15, 2016) ("Congress does have the power to enact statutes creating legal

19  rights, the invasion of which creates standing, even though no injury would exist without

20  the statute," (quoting Sterk v. Redbox Automated Retail, LLC, 770 F.3d 618, 623 (7th Cir.

21  2014)). For this reason, and to encourage consumers to bring FDCPA actions, Congress

authorized an award of statutory damages for violations. 15 U.S.C. § 1692k(a).

22  Santander entered into an agreement with the Arizona attorney general to total the

23  Plaintiff's loan balance to zero because he had, and still has, a 401 or lower FICO credit score,

24  and the Defendant is still collecting an outstanding balance of $ 18,000 plus dollars that

25  Santander knew, and had reason to know that the Plaintiff does not owe to Santander. Despite

26  also agreeing not to post any delinquent amount on the Plaintiff's trade line, Santander still

posted the Plaintiff's balance of his loan on his credit trade line Santander agreed not to post.

27

28  - 24 -

1   Santander is actively collecting, and attempting to collect, a debt that Plaintiff does not

2   actually owe to Santander. Although Santander is allowed to collect its own debts, Santander is

3   not allowed to collect a debt that is not legitimately owed by the Plaintiff. All three of Plaintiff's

4   credit reports are reflecting a balanced purportedly owed by the Plaintiff, to Santander. Therefore

5   Santander has violated, and continue to violate the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10),

6   1692f and 1692f(1).

### FOURTH CAUSE OF ACTION

7   Fair Debt Collection Practice Act, 15 U.S.C. § 1692f(1)

8   (Plaintiff v. Santander Consumer USA, Inc.

9   Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

10   The FDCPA applies to Santander because it regularly engages in debt collection as

11   defined by the statute.

12   By charging the Speedpay fee, a portion of which it retains, Santander acted in violation

13   of the federal Fair Debt Collection Practices Act, which prohibits "[t]he collection of any amount

14   (including any interest, fee, charge, or expense incidental to the principal obligation) unless such

15   amount is expressly authorized by the agreement creating the debt or permitted by law." 15

    U.S.C. § 1692f(1).

16   The plain instruction of § 1692f(1) is that the collection of any amount incidental to the

17   principal obligation, unless expressly authorized by agreement creating the debt or permitted by

18   law, violates the FDCPA. Courts have interpreted the FDCPA broadly. See, e.g., Pipiles v. Credit

19   Bureau of Lockport, Inc., 886 F.2d 22, 27 (2d Cir. 1989) ("It is clear that Congress painted with

20   a broad brush in the FDCPA to protect consumers from abusive and deceptive debt collection

21   practices, and courts are not at liberty to excuse violations where the language of the statute

22   clearly comprehends them."). Accord; Acosta v. Credit Bureau, 2015 U.S. Dist. LEXIS 55870

23   (N.D. Ill., Apr. 29, 2015). The phrase "permitted by law" means that "a debt collector may not

24   collect any amount if either '(A) state law expressly prohibits collection of the amount or (B) the

25   contract does not provide for collection of the amount and state law is silent.'" Acosta, 2015 Dist

26   LEXIS 55870 at *8 (quoting FTC Staff Commentary on the FDCPA, 53 Fed. Reg. 50,097,

    50,108 (Dec. 13, 1988).

27

28                                              - 25 -

1

**FIFTH CAUSE OF ACTION**

2

**Breach of Contract Under Arizona State Law**

3

**(Plaintiff v. Santander Consumer USA, Inc)**

4

Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

5

Santander entered into a contract with the Arizona Attorney general for the benefit of the

6

Plaintiff to provide the Plaintiff with the title to his vehicle, not to reposes his vehicle if he had a

FICO score under 401, and not pursue any outstanding debt by the Plaintiff.

7

Santander admittedly repossessed the Plaintiff's vehicle, never provided the Plaintiff with

8

the title to his vehicle, published a debt of $ 18,000 plus dollars on the Plaintiff's credit reports,

9

and then reposed his vehicle after the Defendant agreed not to do any of the above as outlined in

10

the settlement agreement with the Arizona Attorney General.

11

At all relevant times, the Arizona Attorney general was acting as the attorney for the

12

Plaintiff, and the Defendant Santander breached the contract. Santander had no intent to comply

13

with the agreement with the Arizona Attorney General. As a direct result of the actions, inactions,

14

and omissions of Santander, the Plaintiff has a repossession of his credit reports, an amount

15

owed of $ 18,000 plus dollars, and the Plaintiff is no longer is possession of his vehicle because

Santander repossessed it after their agreement with the Arizona Attorney general. As a direct

16

result, the Plaintiff will now have to pay a larger APR on a new or used vehicle in the future, will

17

lose economic advantage due to the fact that almost all vehicle finance lenders will not finance

18

someone like the Plaintiff with a repossession on his trade line, much less a debt of $ 18,000 plus

19

dollars. Accordingly, the said Plaintiff has sustained permanent damage to his credit, person,

20

business relations, contractual relations, and economic advantage. As such, the Plaintiff is

21

entitled to an award of punitive damages to make an example of Defendant SANTANDER.

22

23

24

25

26

27

28

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff Anthony Oliver respectfully requests the following relief:

1.    For an order awarding general damages according to proof;

2.    For an order awarding special damages according to proof if any;

3.    For an order declaring that the Defendants violated the FCRA, FDCPA, and their mandatory and statutory duties owed to the Plaintiff under these statutes;

4.    For an order declaring that the Defendant breached the contract with the Plaintiff by repossessing his vehicle;

5.    For an order directing the Defendants to correct, update or delete any inaccurate information on the Plaintiffs credit trade lines;

6.    For an order directing the Defendant to return the Plaintiff's vehicle, or if the vehicle no longer exists, to provide the Plaintiff with a new vehicle;

7.    For an order awarding all costs of suit against the Defendant pursuant to 28 U.S.C § 1920; and Fed.R.Civ.P. rule 54(d); and

8.    Any other relief as this Court deems just and proper.

Respectfully submitted,

Dated:   6 - 6 - 22

Anthony Oliver, # 1002060648
Augusta Medical Prison
3001 Gordon Highway
Grovetown Georgia 30813
Telephone : (404) 352 - 2144
Facsimile :  (404) 352 - 2331
Email:Anthony.oliver222201@gmail.com

*Attorney for Plaintiff,*
*Anthony Oliver*

- 27 -

PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1

## DEMAND FOR JURY TRIAL

2      The Plaintiff demands a jury trial on all issues so triable under all counts in this action.

3

4                                                    Respectfully submitted,

5   Dated:    6 - 6 - 22

6                                                    Anthony Oliver, # 1002060648
7                                                    Augusta Medical Prison
                                                     3001 Gordon Highway
8                                                    Grovetown Georgia 30813
                                                     Telephone : (404) 352 - 2144
9                                                    Facsimile :  (404) 352 - 2331
                                                     Email:Anthony.oliver222201@gmail.com
10

11                                                   *Attorney for Plaintiff,*
                                                     *Anthony Oliver*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                          - 28 -

28
_____
PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

NAME: Anthony Oliver, # 1002060648

ADDRESS: Augusta State Medical Prison
3001 Gordon Highway, Grovetown GA 30813
TELEPHONE: 520-300-1666
REPRESENTING: Plaintiff, Pro Se

*FILED*
GARY L. HARRISON
CLERK, SUPERIOR COURT

22 AUG -4 PM 2:28

J. ORR, DEPUTY

## ARIZONA SUPERIOR COURT, PIMA COUNTY

Anthony Oliver,

Plaintiff,

v.

Santander Consumer USA, Inc.

Defendant.

CASE NO: C20223184

**CHOICE CERTIFICATE:**
**FAST TRIAL OR**
**ALTERNATIVE RESOLUTION**

RICHARD E. GORDON

The undersigned certifies that he or she has read FASTAR Rule 103 and makes the

following choice regarding a Fast Trial or Alternative Resolution pursuant to FASTAR Rule 103

of the FASTAR Rules:

**(NOTE – YOU MUST CHECK ONE OF THE BOXES BELOW OR THIS FORM WILL
NOT BE ACCEPTED)**

[X] **Fast Trial**

[ ] **Alternative Resolution:** By checking this box and choosing Alternative Resolution, I

hereby knowingly and voluntarily waive Plaintiff(s)' constitutional and statutory rights to a trial

(jury or bench), including the right to appeal the Alternative Resolution result.

Dated: 6 - 6 - 22

_____
SIGNATURE

Page 21 of 21

NAME: Anthony Oliver, # 1002060648
ADDRESS: Augusta Medical State Prison
3001 Gordon Highway, Grovetown GA 30813
TELEPHONE: 520-300-1666
REPRESENTING: Plaintiff, Pro Se

FILED
GARY L. HARRISON
COURT

22 AUG -4 PM 2: 28

J. ORR. DEPUTY

## ARIZONA SUPERIOR COURT, PIMA COUNTY

CASE NO: **C20223184**

Anthony Oliver,
Plaintiff,

v.

Santander Consumer USA, Inc.
Defendant.

## RULE 102(b) FASTAR
## CONTROVERTING CERTIFICATE

**RICHARD E. GORDON**

The undersigned certifies that he or she has read and understands the Rules Applicable to the Fast Trial and Alternative Resolution Program ("FASTAR"), and hereby **CONTROVERTS** the Plaintiff(s)' Rule 102(a) FASTAR Certificate for the following reasons: This case is subject to removal to the United States District Court, District of Arizona because I have properly alleged a federal statute. Therefore, removal is compulsory. See 28 U.S.C. §§ 1332 and 1446(a).

Dated: 6 - 6 - 22

_____
SIGNATURE

FILED
GARY L. HARRISON
CLERK, SUPERIOR COURT

22 SEP -6 PM 7: 28

A. ROBLES, DEPUTY CLERK

1  Anthony Oliver, # 1002060648
2  Augusta State Medical Prison (Georgia)
   3001 Gordon Highway
3  Grovetown Georgia 30813
   Phone: (404) - 352 - 2188
4  Facsimile: (404) 200-5888
5  Email: Anthony.oliver222201@gmail.com

6  *Plaintiff Anthony Oliver*
   *Appearing Pro Se,*
7

8        **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
9              **IN AND FOR THE COUNTY OF PIMA**

10
11  ANTHONY OLIVER,                        Case No.: __C 2022 3184__

12        Plaintiff,                       PLAINTIFF'S FIRST AMENDED
                                           COMPLAINT FOR DAMAGES,
13  vs.                                    DECLARATORY AND INJUNCTIVE
                                           RELIEF
14
15  SANTANDER CONSUMER USA, INC., an       DEMAND FOR JURY TRIAL
    Illinois Corporation; EXPERIAN INFORMATION
16  SOLUTIONS, INC., a Delaware Corporation;
    EQUIFAX INFORMATION SERVICES, L.L.C., a
17  Delaware Corporation; TRANSUNION, L.L.C., a
18  Pennsylvania Corporation;
          Defendants.
19

20
           **PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES**
21
22       Anthony Oliver, Plaintiff herein, appearing *pro se*, brings this complaint for breach of

23  contract, and federal claims under the Fair Credit Reporting Act, 15 U.S.C § 1681 *et seq.*, and

24  other relevant State law claims for damages, declaratory, and injunctive and states to this

25  Honorable Court the following:

26
                                      - 1 -
27  _____
              PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
28           AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

## I.   **INTRODUCTION**

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American citizens. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients, and all of society should ultimately benefit from the resulting convenience, and efficiency.

2.    Unfortunately, however, this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can sustain substantial damage, both emotionally and economically, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledge this potential for misuse and resulting damage every time it solicits its credit monitoring service to a consumer.

3.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs"). Defendant SANTANDER Consumer USA, Inc., ("Defendant or SANTANDER"), specializes in collecting it's own debts. Defendant is both a debt collector engaged in collecting debts, as well as being a CRA within the meaning of the Fair Credit Reporting Act, ("FCRA").

4.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private and financial information that they compile and sell about individual consumers.

5.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

- 2 -

*See* 15 U.S.C. § 1681(a)(1).

6.   The preservation of one's good name is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home. *We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason.* * * * *[A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

7.   To further the primary goal of greater accuracy, the FCRA has also required CRAs, as well as "furnishers" of credit information to the CRAs, to conduct "reasonable investigations" into bona fide disputes sent to CRAs by consumers claiming to have inaccurate or incomplete information appearing in their credit files, to correct or update any such errors or omissions, and to report back to the consumer the results of the investigation. SANTANDER is a furnisher of information.

8.   SANTANDER uses various tactics against it's own customer's. Plaintiff entered into a retail installment sales contract with SANTANDER to finance the purchase of a 2018 Jeep Cherokee equipped with a microwave in the rear of the vehicle. At various times, Plaintiff has made loan payments online, or over the phone, SANTANDER has charged him a fee of up to $10.95 ("Pay-To-Pay fees"). SANTANDER is prohibited by law from collecting these fees.

9.   One such law that applies to SANTANDER's form contract is the Texas Debt Collection Act ("TDCA").   SANTANDER is a debt collector as defined by the TDCA. The TDCA prohibits debt collectors from "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer[.]" Tex. Fin. Code § 392.303(a)(2) (emphases added). Pay-to-Pay fees are neither.

- 3 -

10.     Moreover, on information and belief, SANTANDER pockets nearly the entire amount of the Pay-to-Pay fees as profit. Nevertheless, SANTANDER represents them as pass-through fees to the payment processor: "A third party payment processing company may charge a fee to process your payment."

11.     During the course of his loan, Plaintiff has paid these fees multiple times. And SANTANDER pocketed all of the fees. With it's hand caught in the cookie jar, various attorney general's for over thirty-eight (38) states filed State and Federal lawsuits against SANTANDER for various allegations including the Pay-to-Pay fees in which numerous Federal Court's across the United States have found that SANTANDER violated the Fair Debt Collection Practice Act with their Pay-to-Pay scheme in place. The attorney general's also went on to go after SANTANDER for their unlawful business practices concerning loans to consumers like the Plaintiff. Once again, the attorneys general's of various States also sued SANTANDER concerning their lending practices. SANTANDER is one of the largest players in the subprime auto lending market. Since 2010, SANTANDER has consistently accounted for the largest share of the subprime auto lending market (as measured by total dollar value in ABS issuances) among companies that focus in subprime auto lending. In its subprime lending business, SANTANDER both makes direct loans to consumers and purchases installment contracts from dealers. SANTANDER's underwriting process relies on credit scoring models.

12.     One of the models incorporates the consumer's borrowing history and features of the loan the consumer has applied for (such as loan-to-value ratio, debt-to-income ratio, paymentto-income ratio, mileage, and term) and generates a probability that a consumer will become severely delinquent during a particular window of time within the term of the loan. This probability then is converted into a scaled score on proprietary, FICO-like scale. Because the above model only indicates how likely it is that a consumer will go delinquent within that particular window of time within the term of the loan, SANTANDER also uses a separate model to predict how likely a consumer with a given proprietary score will default over the full life of the loan.

- 4 -

13.    The life-of-the-loan model projects that consumers with proprietary scores below a given threshold have an unreasonably heightened chance of default before the end of their term, and a subset of those consumers, who have some of the lowest proprietary scores, have a significantly worse probability of default before the end of their term.   For example, for at least part of the time period examined by the State of Arizona, SANTANDER projected that these consumers with the lowest proprietary scores had a greater than 70% likelihood of default over the life of the loan. In a typical auto-financing transaction, car dealers attempt to maximize the profits they earn on the front-end and back-end of an individual deal. The front-end of a transaction involves the negotiation of a sales price, whereas the back-end refers to the negotiation of ancillary products included as part of the financing of the purchase of the vehicle.

14.    Even when acting as an "indirect" auto lender by purchasing installment contracts from dealers, SANTANDER has significant control over the extension of credit or financing of a transaction, including the "back-end" of a transaction, such as whether to purchase a contract that includes guaranteed-asset protection ("GAP") insurance, a GAP waiver and/or a service contract. Through its credit policies, SANTANDER asserts control over the amount dealers can include in the back-end. The generous allowances for dealers on the back-end have facilitated SANTANDER obtaining more market share, but those same large back-end charges expose consumers to increased risk in at least two ways: 1) significant back-end charges increase the overall amount financed, which increases the loan-to-value ratio on the loan; and 2) high finance costs increase either the consumer's monthly principal-to-interest ratio or increase the term of the loan. SANTANDER is aware that these loan features contribute to deteriorating loan quality but continues to make these loans or purchase the underlying installment contracts. That's what also occurred here. SANTANDER forced the Plaintiff into buying GAP insurance, all of which was a prerequisite to the Plaintiff financing a new Jeep.

15.    However, SANTANDER concealed this fact from the Plaintiff. The consumer

- 5 -

harm caused by the underwriting problems described above is compounded by SANTANDER's servicing and collection practices, where SANTANDER confuses, frustrates and, in some cases, actively misleads consumers about their rights and the costs of taking certain actions. SANTANDER often requires that payments be made through methods that require consumers to pay additional third-party fees, such as money orders. These fees tend to most significantly affect consumers who are unbanked or underbanked. In servicing loans, SANTANDER's employees routinely confuse consumers about the benefits and risks of extensions. Consumers routinely make partial payments or accept extensions without understanding that interest continues to accrue and future payments will likely go towards interest as opposed to paying down their principal balance. They also are unaware that their loan terms are lengthened to accommodate the extension, partial payment and interest accrual and that a payment may not stop a repossession. Additionally, SANTANDER employees often mislead consumers about their ability to recover repossessed vehicles, including encouraging consumers to make significant payments to recover vehicles when SANTANDER has no control over whether the vehicle can be recovered. Taken together, SANTANDER's practices impose significant harm on Arizona consumers. These consumers obtain credit from SANTANDER under the false pretense that they are acquiring a vehicle they will eventually own. In reality, these consumers agree to extremely costly leases, the terms of which are so onerous that consumers will almost certainly fail to perform, resulting in their loan default and likely repossession of the vehicles. As a direct result of these unlawful practices, SANTANDER agreed to settle claims with over thirty-eight (38) states in which SANTANDER agreed to: 1) total out any existing vehicle loan to zero dollars to any customer who had an existing loan with a FICO score of 400 or less; 2) agree not to repossess any vehicles that were in default as of the time of the settlement; 3) provide each customer with the title to the vehicle demonstrating that the customer is the rightful owner; 4) to remove any customer from collections; 5) to remove any loan that was written off from a customer's, or consumers credit trade line; and 6) stop it's illegal collection practice concerning it's Pay-to-Pay fees, and compensate any customer who paid to use

- 6 -

SANTANDER's Pay-to-Pay option. Despite all it's agreements, and contracts, SANTANDER did the complete opposite, and breached every agreement, and contract SANTANDER agreed to with the attorney general's, and through various class action settlements concerning the Plaintiff. SANTANDER repossessed the Plaintiff's vehicle, wrote off the existing loan amount of approximately $ 18,000 plus dollars, placed the amount in collections through its own collection department, placed the $ 18,000 plus dollars on the Plaintiffs credit trade line as of 2021, never provided the Plaintiff with the title despite knowing the Plaintiff's FICO score was less then 400 point score, and based on it's own agreement with the attorney general for the State of Arizona, and others, SANTANDER refused to repay the Plaintiff the funds that he spent on SANTANDER's Pay-to-Pay scheme. To make matters far worse, when the Plaintiff heard about the lawsuits against SANTANDER, the Plaintiff submitted a FCRA demand for investigation letter to SANTANDER, all of which was received by SANTANDER from it's registered agent. This action seeks compensatory, statutory and punitive damages, and costs for the Plaintiff, Anthony Oliver, ("Plaintiff"), against the Defendant SANTANDER Consumer USA, Inc., for it's willful and/or negligent violations of the Fair Credit Reporting Act, other federal statutes, as well as various State law claims as described herein.

## II.      JURISDICTION AND VENUE

16.      This Complaint is filed and these proceedings are instituted under the provisions of the Arizona Breach of Contract statute, and 15 U.S.C. § 1681, et seq., of the Fair Credit Reporting Act. In addition, the amount in controversy exceeds the amount of $ 75,000.

17.      The Superior Court has jurisdiction to enter appropriate orders both prior to and following a determination of liability pursuant to A.R.S. §§ 44-1528, 44-1531 and 44-1534.

18.      The violations alleged herein have been and are being committed in whole or in part, and affect commerce in Pima County, the State of Arizona.  Venue is appropriate in Pima County pursuant to A.R.S. § 12-401. SANTANDER Consumers USA, Inc., ("SANTANDER or Defendant"), can be served through its registered agent C.T. Corporation.

## III.     PARTIES

- 7 -

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

19.     Plaintiff Anthony Oliver was, and still is, a resident and citizen of Arizona.

20.     Defendant Santander Consumer USA, Inc,. ("SANTANDER or Defendant"), is a car lending loan company that specializes in new, and used vehicles loans, and collection of it's own debts. Defendant SANTANDER is a debt collector for the purposes of the Fair Credit Reporting Act. Defendants maintain a registered agent in this Judicial District, and can be served within this District.

21.     Defendant Experian Information Solutions, Inc., ("herefter EXPERIAN"), is a Delaware Corporation conducting business in the State of Arizona, existing under the laws of the State of Virginia, and will be mentioned herein at all times. EXPERIAN can be served through it's registered agent C.T. Corporation.

22.     Defendant TransUnion, L.L.C., ("hereafter TRANSUNION"), is a Delaware limited liability company, existing under the laws of the State's of Arizona, and Pennsylvania, and will be mentioned herein at all times. TRANSUNION can be served through it's registered agent, Corporation Service Company 8825 N 23rd Avenue, Suite 100 Phoenix, AZ 85021.

23.     Defendant Equifax Information Services, L.L.C., ("EQUIFAX"), is a Delaware limited liability company conducting business in the State of Arizona, existing under the laws of the State of Virginia, and will be mentioned herein at all times. EQUIFAX can be served through it's registered agent Corporation Service Company located at 8825 N 23rd Avenue, Suite 100 Phoenix, Arizona 85021.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTIONS

21.     On or about April 23, 2018, the Plaintiff signed a retail installment contract to purchase, and finance a new 2018 Jeep Cherokee fully equipped with a microwave installed in the rear of the Jeep. Plaintiff paid a down payment for the vehicle in the approximate amount of $ 4,000 to a local problematic dealership. The Plaintiff was ultimately financed through the Defendant SANTANDER Consumer USA, Inc., ("SANTANDER"). The Plaintiff's monthly payment to SANTANDER was exactly the amount of $ 612.00 a month.

22.     Following his vehicle purchase, the Plaintiff occasionally made his loan payments

- 8 -

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681. et seq.

over the Internet, or by telephone by way of calling the 1800-number that SANTANDER advertises on it's website, and elsewhere. In order to do so, SANTANDER directed him to use Western Union's "Speedpay" service. SANTANDER often encouraged the use of Speedpay to allow customers to pay immediately, and avoid late charges by using a credit, or debit card over the telephone. To use "Speedpay", Plaintiff was charged a fee of $10.95 per transaction, ostensibly by a third-party payment processor, Western Union, for the payment processing service. However, prior to April 2018, Western Union, and SANTANDER contractually agreed that Western Union would return a portion of all "Speedpay" fees collected to SANTANDER as profit.

23.     The amount of fees retained by SANTANDER varied based on the volume of transactions, and the method of payment customers used for "Speedpay", but at times, SANTANDER would retain over 99% of the $10.95 Speedpay fee. While Plaintiff was informed by Western Union of the fee when he used the "Speedpay" service, the Contract between SANTANDER, and Plaintiff did not, and still does not, expressly mention, or provide for a "Speedpay" fee.   At the time Plaintiff paid the "Speedpay" fees, he was unaware that SANTANDER retained part of the fee charged by Western Union. Had the Plaintiff known this, the Plaintiff would have never used the "Speedpay" service offered by SANTANDER. Further, SANTANDER fraudulently concealed from the Plaintiff that SANTANDER was collecting a portion of the "Speedpay" fees, and informed the Plaintiff over the telephone several times that the "Speedpay" fee was nothing more then a convenience fee. SANTANDER further concealed the fact that it entered into a contract with Western Union for the "Speedpay" service. Had the Plaintiff known that SANTANDER entered into a contract with Western Union, the Plaintiff would have never used Western Union due to personal reasons, and the Plaintiff's choice of who to do business with.

24.     As a direct result of the processing, and retaining the "Speedpay" fees from the Plaintiff, SANTANDER is actively engaged in debt collection, and has violated § 1692f(1) of the Fair Debt Collections Practices Act. Under Section 1692f(1) makes it unlawful for a debt collector to collect "any amount (including any interest, fee, charge, or expense incidental to the

- 9 -

principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

25.    Plaintiff later discovered that Western Union states on its website, "[o]ur services help you evaluate your payment strategy and find opportunities to help reduce costs, improve efficiency, migrate customers to more profitable payment channels and more." (Id. (emphasis added)). In other words, SANTANDER, with Western Union's help, made more profit by charging the customer for paying online or over the phone, and retaining or receiving a portion of that fee. On numerous occasions, when Plaintiff used, or attempted to use the telephone, or Internet to pay on his loan with SANTANDER, Western Union demanded an additional payment, in the form of a fee for using Speedpay. The payment processor collected this money from the Plaintiff, and then remitted a portion of it back to SANTANDER without the Plaintiff's knowledge.

26.    The plain instruction of § 1692f(1) is that the collection of any amount incidental to the principal obligation, unless expressly authorized by agreement creating the debt, or permitted by law, violates the FDCPA. Since the "Speedpay" scheme was exposed by various law firms across the United States, various Court's have interpreted the FDCPA broadly. See, e.g., Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d 22, 27 (2d Cir. 1989) ("It is clear that Congress painted with a broad brush in the FDCPA to protect consumers from abusive and deceptive debt collection practices, and courts are not at liberty to excuse violations where the language of the statute clearly comprehends them."). Accord; Acosta v. Credit Bureau, 2015 U.S. Dist. LEXIS 55870 (N.D. Ill., Apr. 29, 2015). And the phrase "permitted by law" means that "a debt collector may not collect any amount if either '(A) state law expressly prohibits collection of the amount or (B) the contract does not provide for collection of the amount and state law is silent.'" Acosta, 2015 Dist. LEXIS 55870 at *8 (quoting FTC Staff Commentary on the FDCPA, 53 Fed. Reg. 50,097, 50,108 (Dec. 13, 1988).

**Plaintiff is Incarcerated During the Pendency of His Loan with Santander**

- 10 -

27.     On April 4, 2019, the Plaintiff learned of an arrest warrant for Aggravated Stalking and later turned himself into law enforcement. Plaintiff was later held without bail at a local correctional facility. While incarcerated, the Plaintiff kept up his monthly payments to SANTANDER. With the Plaintiff incarcerated, and no access to run down, and purchase a money order to payment his monthly payment, the Plaintiff had to make his monthly payment to SANTANDER using it's "Speedpay" feature. From April of 2019, until August of 2019, the Plaintiff called SANTANDER from jail, and used his credit card on several occasions to make a payment to SANTANDER over the phone. In various phone calls, a representative of SANTANDER encouraged the Plaintiff to make his monthly payments by using the "Speedpay" feature offered by SANTANDER. The Plaintiff paid several "Speedpay" fees to SANTANDER, and, SANTANDER pocketed the cash.

### Santander's Illegal Business Practice's that Continue

28.     Notwithstanding the violations being committed by SANTANDER, the Defendant SANTANDER struck again. It decided to engage in other tactics to dominate the car dealership industry, and seize control of the auto lending world.  Plaintiff recently discovered that since 2010, SANTANDER has consistently accounted for the largest share of the subprime auto lending market (as measured by total  dollar value in ABS issuances) among companies that focus in subprime auto lending. In its  subprime lending business, SANTANDER both makes direct loans to consumers, and purchases installment contracts from dealers across the U.S. and Arizona.

A.     Santander's underwriting and loss models project high defaults for
        Certain Segments of its consumer population

29.     SANTANDER's underwriting  process relies on credit scoring models like the did with the Plaintiff. One of the models incorporates the consumer's borrowing history, and features of the loan the consumer has applied for (such as loan-to-value ratio, debt-to-income ratio, paymentto-income ratio, mileage, and term) and generates a probability that a consumer like the Plaintiff will become severely delinquent during a particular window of time within  the term of the loan. This probability then is converted into a scaled score on a proprietary, FICO

- 11 -

1  like scale.

2      30.    Because the above model only indicates how likely it is that a consumer will go

3  delinquent within that particular window of time within the term of the loan, SANTANDER also

4  uses a separate model to predict how likely a consumer with a given proprietary score will

5  default over the full life of the loan. The life-of-the-loan model projects that consumers

6  with proprietary scores below a given threshold have an unreasonably heightened chance of

   default before the end of their term, and a subset of those consumers, who have some of

7  the lowest proprietary scores, have a significantly worse probability of default before the

8  end of their term. For example, for at least part of the time period examined by Arizona,

9  SANTANDER projected that these consumers with the lowest proprietary scores had a

10  greater than 70% likelihood of default over the life of the loan.

11     **B.    Santander exposes consumers to unnecessarily high levels of risk**

12     31.    SANTANDER is not only originating loans and purchasing installment

13  contracts with a high likelihood of failure, but also exposing consumers to unnecessarily high

14  levels of risk. In a typical auto-financing transaction, car dealers attempt to maximize the

15  profits they earn on the front-end and back-end of an individual deal. The front-end of a

   transaction involves the negotiation of a sales price, whereas the back-end refers to the

16  negotiation of ancillary products included as part of the financing of the purchase of the

17  vehicle. Even when acting as an "indirect" auto lender by purchasing installment contracts

18  from dealers, SANTANDER has significant control over the extension of credit or

19  financing of a transaction, including the "back-end" of a transaction, such as whether to

20  purchase a contract that includes guaranteed-asset protection ("GAP") insurance, a GAP

21  waiver and/or a service contract. Through its credit policies, SANTANDER asserts control

22  over the amount dealers can include in the back-end. The generous allowances for dealers

23  on the back-end have facilitated SANTANDER obtaining more market share, but those

24  same large back-end charges expose consumers to increased risk in at least two ways: 1)

25  significant back-end charges increase the overall amount financed, which increases the loan-to

   -value ratio on the loan; and 2) high finance costs increase either the consumer's monthly

26

                                    - 12 -

27

principal-to-interest ratio or increase the term of the loan.

32.  SANTANDER was, and still is aware that these loan features contribute to deteriorating loan quality but continues to make these loans or purchase the underlying installment contracts especially with the contract between the Plaintiff, and SANTANDER.

C.  Santander's aggressive pursuit of market share led it to underestimate risk associated with loans with stated income and expenses.

33.  Although SANTANDER has sophisticated models that forecast consumer default, SANTANDER's policies with respect to stated income and expenses allow it to underestimate default risk in important ways and to purchase loans from consumers who are unlikely to be able to pay for their loans. SANTANDER also fails to meaningfully monitor dealer behavior to minimize the risk of receiving falsified information, including the amounts specified for consumers' income and expenses. One area where SANTANDER's lack of verification as part of its underwriting exposes consumers to even riskier loans is with respect to the amounts alleged to represent a consumer's mortgage or rent. Housing costs are often a consumer's most significant monthly expense, and SANTANDER uses consumers' monthly housing debt to calculate consumers' debt-to-income ratios. The debt-to-income ratio is important in underwriting because it measures the amount of disposable income a consumer has available to pay off an auto loan and meet nonrecurring monthly expenses. SANTANDER generally allows consumers who apply for a loan to merely state their mortgage and rent expenses, as opposed to providing proof of a mortgage or rent payment, and SANTANDER has no apparent measures in place to minimize the risk of falsified mortgage or rent income. Dealers routinely use a default amount for mortgage or rent that would not be reasonably sufficient to pay for mortgage or rent in the vast majority of localities, but regardless, those low amounts result in a higher acceptance rate from SANTANDER. Housing costs, however, are not the only area in which SANTANDER's forecasts are likely incorrect. SANTANDER also made an aggressive push beginning in early 2013 to waive proof of income on most applications.

D.  Santander Turned a Blind Eye to Dealer Abuse.

- 13 -

34.     Since as early as 2010, SANTANDER has been tracking problematic dealers across SANTANDER's business. Although SANTANDER had a process in place to evaluate problematic dealers, there was internal tension at SANTANDER between punishing problematic dealers and retaining SANTANDER's market share. As a result, SANTANDER was reluctant to act against flagged dealers so long as a sufficient amount of the installment contracts purchased from those dealers proved profitable for SANTANDER. Shortly after the Plaintiff purchased his vehicle from one of the problematic dealerships, SANTANDER entered into an agreement with Chrysler through which SANTANDER would be the preferred lender on all Chrysler transactions, including the loan with the Plaintiff. And, to promote business under this new arrangement, SANTANDER allowed problematic dealers to take advantage of SANTANDER's new Chrysler relationship.

35.     Around the same time, as explained above, SANTANDER dramatically changed its funding policy to accept increased numbers of stated-income loans. When SANTANDER rolled out this change to its funding requirements, SANTANDER did not bar those dealers identified as "problematic" by SANTANDER from using stated income on loan applications. SANTANDER's decision to broadly market its new stated-income policy, even to dealers with a history of misstating income, led to a significant spike in the number of early payment defaults. Although SANTANDER later attempted to tighten its policy with respect to problematic dealers, the tension between SANTANDER's business concerns and curbing dealer abuse persists, and SANTANDER continues to purchase installment contracts from dealers which SANTANDER itself identifies as problematic. As a result of SANTANDER's policies with respect to stated income and expenses and the failure to adequately curb dealer abuse, SANTANDER loans default at a higher rate.

E.     Santander's Servicing and Collection Practices

36.     The consumer harm caused by the underwriting problems described above is compounded by SANTANDER's servicing and collection practices, where SANTANDER confuses, frustrates, and, in some cases, actively misleads consumers about their rights and the costs of taking certain actions. SANTANDER often requires that payments be

- 14 -

made through methods that require consumers to pay additional third-party fees, such as money orders, and their infamous "Speedpay" feature. These fees tend to most significantly affect consumers, like the Plaintiff who are unbanked, or underbanked.

37.     In servicing loans, SANTANDER's employees routinely confuse consumers about the benefits, and risks of extensions. Consumers, like the Plaintiff, routinely make partial payments or accept extensions without understanding that interest continues to accrue and future payments will likely go towards interest as opposed to paying down their principal balance. The consumers, like the Plaintiff, also are unaware that their loan terms are lengthened to accommodate the extension, partial payment, and interest accrual and that a payment may not stop a repossession, and this is what occurred to the Plaintiff.

38.     Additionally, SANTANDER employees often mislead consumers about their ability to recover repossessed vehicles, including encouraging consumers to make significant payments to recover vehicles when SANTANDER has no control over whether the vehicle can be recovered. Taken together, SANTANDER's practices impose significant harm on Arizona consumers as SANTANDER has done to the Plaintiff. These consumers obtain credit from SANTANDER under the false pretense that they are acquiring a vehicle they will eventually own. In reality, these consumers agree to extremely costly leases, the terms of which are so onerous that consumers will almost certainly fail to perform, resulting in their loan default and likely repossession of the vehicles.

**Santander Settles Numerous Lawsuits with Attorney's General's**

39.     On or about May 19, 2020, the Defendant SANTANDER Consumer USA, Inc. engaged in a multi-state lawsuit stemming from it's lending practices, to the "Speedpay" fees SANTANDER imposed on consumers, to their illegally collection practices, and all allegations stemming from its gap insurance scheme. In settlement agreements with over thirty-eight (38) attorneys generals from around the Country, SANTANDER agreed to pay a large amount of money to the State's.

40.     In particular, the settlement release with the State of Arizona, upon information,

- 15 -

and belief, states that SANTANDER agree to pay the State of Arizona the amount of $ 15,000,000.00 dollars to the Arizona Attorney General. As additional conditions of the settlement, the Multistate Executive Committee made up on the States of Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Arizona, Hawaii, Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Virginia, Washington, West Virginia, and Wyoming shall have sole discretion concerning the consumers entitled to relief and, the nature and amounts of such relief except that any such relief shall include amounts to Mandatory Relief Consumers. SANTANDER agreed to provide the Multistate Executive Committee with information the Multistate Executive Committee deems necessary to determine which Consumers are entitled to relief, the amount of such relief, and how to locate consumers entitled to relief including, but not necessarily limited to, providing the consumer's name, last known address, last known contact information, and loan identification number. The Settlement Administrator and/or Multistate Executive Committee shall provide all necessary tax reporting related to this agreement as required by law. Upon information, and belief, SANTANDER never provided the Plaintiff's name, last known address, or any contact information despite the fact that the Plaintiff had a change of address put in with the United States Postal Service.

41.    As a further part of the settlement between SANTANDER, and the Arizona Attorney General,, SANTANDER agreed in writing for the Plaintiff's benefit to the following: (1) SANTANDER shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for all Consumers who had a loss forecasting score of 401 or less and, as of December 31, 2019, have Defaulted but have not had their vehicle repossessed and (2) SANTANDER shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for any Consumer with a loss forecasting score of 401 or less who defaults in the future. SANTANDER shall implement the relief as described in (1) and (2) by providing the relief in (1) prior to

- 16 -

the relief in (2). When the cumulative value of the outstanding Loan balances in (1) and (2) equals $45,000,000, SANTANDER has met its obligations under this paragraph and does not need to provide additional relief pursuant to this paragraph. SANTANDER shall waive the Deficiency on Loans it Owns for a) Mandatory Relief Consumers and b) to the extent not included in a), Defaulted Consumers who had a loss forecasting score of 401 or less at the time of origination, when the loan was originated between January 1, 2013 and December 31, 2019, and who Defaulted within 12 months of origination of the Loan. In addition, SANTANDER shall have an obligation to buy back such Loans originated between January 1, 2013 and December 31, 2017 in order to waive the Deficiency for those Loans, as set forth in paragraphs 14 and 15 below. The Consumers entitled to relief in this paragraph shall collectively be referred to as the "Deficiency Relief Consumers." If a Defaulted Consumer receives a payment under paragraph 10 but is not a Deficiency Relief Consumer, SANTANDER agrees that it will not collect on or sell that Consumer's Loan for one year from when the Defaulted Consumer is sent payment. The Multistate Working Group will send notice to the Company that payment has been sent to the Defaulted Consumer within 10 calendar days of such payment being sent. The moratorium on collecting or selling certain Consumer's Loans described in paragraph 12 does not prohibit SANTANDER from repossessing those Consumers' vehicles, except for those Consumers entitled to relief under paragraph 11 which is reincorporated as stating :

(1) SANTANDER shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for all Consumers who had a loss forecasting score of 401 or less and, as of December 31, 2019, have Defaulted but have not had their vehicle repossessed and (2) SANTANDER shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for any Consumer with a loss forecasting score of 401 or less who defaults in the future. SANTANDER shall implement the relief as described in (1) and (2) by providing the relief in (1) prior to the relief in (2).

42.    The agreement between the SANTANDER, and the Arizona Attorney General

- 17 -

1   was for the benefit of the Plaintiff, and therefore, establishes a valid contract between the

2   Plaintiff, and SANTANDER. Accordingly, the Arizona Attorney General was the attorney of

3   record for the Plaintiff when SANTANDER agreed to the terms of the settlement because the

4   Plaintiff owned a

5   SANTANDER vehicle, and was a class member.

6   **Santander Violates the Settlement Agreement Terms and Conditions and**

    **Repossess the Plaintiff's 2018 Jeep Cherokee with All his Property Inside the Vehicle**

7         43.      Despite knowing that the Plaintiff had a valid retail installment payment plan with

8   SANTANDER, and that it agreed in writing with the Arizona Attorney General, SANTANDER

9   contracted with a private repossession company to go out, locate, and repossess the Plaintiff's

10  2018 Jeep Cherokee with his property, and microwave inside the vehicle.

11        44.      On or about January 2020, the Plaintiff's vehicle was parked at his home, located

12  by a private repossession company, seized, and returned to SANTANDER. Inside the Plaintiff's

13  vehicle was thousands of dollars in property in which in now in the hands of some other person,

14  other then the Plaintiff. Despite knowing that the Plaintiff was a class member, SANTANDER

15  still repossessed the Plaintiff's vehicle. Further, to make matters far worse, as mentioned above,

16  the Plaintiff's FICO score was under, and negative 400 and therefore, pursuant to the conditions

17  of the settlement, SANTANDER agreed total out the amount owed, and provide the Plaintiff

18  with the title. But none of this ever occured. The Plaintiff who was incarcerated at the time the

19  vehicle was repossessed, provided SANTANDER with his current, and temporary mailing

20  address to the County Jail where SANTANDER was required to mail the Plaintiff receipts for his

21  "Speedpay" payments that he made to SANTANDER for the months the Plaintiff was

22  incarcerated, but at all relevant times, despite SANTANDER had the Plaintiff's mailing address,

23  and never mailed him the receipts, nor the title of his 2018 Jeep Cherokee, to the Plaintiff at the

24  County Jail, and because the documents from SANTANDER are considered to be documents

25  that contain personal information, the County Jail would have logged in any mail from

26  SANTANDER as "legal mail" that would require the Plaintiff to have to sign a book that the

    County Jail keeps on file for a period of seven (7) years. The records of the County Jail will

- 18 -

27

28

1 reflect that there was no mail from SANTANDER during the Plaintiff's time of incarceration

2 including to date.

### Plaintiff Obtains Copies of His Three Credit Reports

3

4 45.    SANTANDER struck again. As an additional part of the settlement with the

5 Arizona Attorney General, SANTANDER agreed to total out all loans for those consumers stated

6 about in one, and two of the settlement terms, and not report any of the balances to any, and all

7 credit reporting agencies, ("hereafter CRA's"), such as TransUnion, LLC., ("TransUnion"),

8 Equifax Information Solutions, Inc., ("EQUIFAX"), and Experian Information Solutions, Inc.,

("Experian").

9 46.    Rather then comply with the very terms, and conditions SANTANDER agreed to

10 begin with, SANTANDER reported the Plaintiff to TransUnion, Equifax, and Experian for the

11 amount of approximately $ 18,000 plus dollars. In reviewing the Plaintiffs Equifax trade line, not

12 only was the amount that was supposed to be totaled out to zero dollars, but all three credit

13 reports listed inaccurate payment information concerning the Plaintiff. In addition, when all three

14 credit bureaus listed the account with a partial account number as : **3000021023840******, with a

15 balance allegedly owed by the Plaintiff in the amount of $ 19,809.00, but in reality what the

16 Plaintiff, if all said to be true, and correct, only owed SANTANDER the amount of $ 16,452

17 with a difference of $ 3,357.00 dollars that SANTANDER could not account for, nor collect.

18 Although SANTANDER is entitled to collect a debt that belongs to it, the FDCPA and FCRA

does not permit SANTANDER from collecting a debt that it is not entitled to.

### Plaintiff Sends a FCRA Demand For Investigation Letter to Santander

19

20  ,   47.    On or about February 5, 2021, the initiated, and mailed a dispute, and demand for

21 investigation letter pursuant to the Fair Credit Reporting Act to SANTANDER, via it's registered

22 agent identified as C.T. Corporation located in both Lawrenceville, Arizona, as well as Los

23 Angeles, California, requesting an investigation into the allegations stated in the Plaintiff's

24 dispute letter. The Plaintiff also mailed copies of the dispute, and demand for investigation letter

25 pursuant to the FCRA to each of the three credit bureaus TransUnion, Experian, and Equifax.

26 48.    In the letter, the Plaintiff points out to an inaccurate amount being reported on his

- 19 -

credit trade line, but also that SANTANDER was actively collected a debt within the meaning of the Fair Credit Report Act that SANTANDER knew, and had reason to know that SANTANDER did not have a permissible purpose to try, and collect. Also included in the Plaintiff's dispute, and demand for investigation, the Plaintiff also correctly pointed out that SANTANDER agreed to numerous lawsuit settlements with well over thirty-eight (38) states in the United States, and that as part of these settlement agreements, among other things, SANTANDER agreed to total all existing loans to zero dollars, but that SANTANDER refused to do so. Plaintiff also provided SANTANDER, and the three credit bureaus TransUnion, Experian, and Equifax.

49.    SANTANDER received the Plaintiffs dispute, and demand for investigation letter from its registered agent, C.T. Corporation, and SANTANDER received a copy of the Plaintiffs dispute from each of the three credit bureaus. Despite receiving the letters, SANTANDER adamantly refused to comply with its mandatory, and statutory duties under the FCRA, and FDPCA to investigate, delete, and cease, and desist in the debt. To date, SANTANDER, who is known for thus far, for not comply with the terms of the attorney general settlement, didn't even comply with its mandatory, and statutory duties by conducting an FCRA investigation, much less respond to the Plaintiffs dispute letter as required under 15 U.S.C. § 1681s-2(b).

50.    SANTANDER owed a duty to the Plaintiff to conduct a reasonable investigation after receiving the Plaintiffs proper FCRA dispute letter. SANTANDER received copies of the Plaintiffs dispute letter from their registered agents. SANTANDER is a furnisher of information, as the term is used in the FCRA. As such, the FCRA imposes duties upon SANTANDER as found in relevant part in Section 1681s2(b) that SANTANDER must comply with, but SANTANDER choose not to. The Plaintiffs claims against SANTANDER is limited to a private cause of action against a furnisher of credit information to a violation of § 1681s-2(b).

51.    Pursuant to Section 1681s-2(b), furnishers of information are required to investigate and promptly respond to notices of any consumer disputes. Specifically, once a consumer reporting agency receives notice of the disputed information from a consumer, the agency must provide notice of the dispute "to any person who provided any item of information

- 20 -

1   in dispute," and the notice must "include all relevant information regarding the dispute that the
2   agency has received from the consumer.." 15 U.S.C. § 1681i(a)(2)(A).

3          52.     The person(s) who receives the notice from the consumer reporting agency must
4   then investigate the disputed information, report the results of the investigation to the consumer
5   reporting agency, and make any necessary modifications. 15 U.S.C. § s-2(b)(1). Equifax,
6   Experian, and TransUnion are credit reporting agencies pursuant to 15 U.S.C. § 1681i(a)(2)
    within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681, p., who in turn
7   transmitted the Plaintiff's dispute letter to SANTANDER. SANTANDER breached it's duty
8   owed to the Plaintiff causing him injury. As a result of the actions of SANTANDER's willful,
9   and intentional failure to comply with the FCRA, the Plaintiff will have to pay out of pocket
10  money for a brand new vehicle with a higher APR per year. SANTANDER received the proper
11  notice from the consumer reporting agency pursuant to the FCRA section 15 U.S.C. §
12  1681i(a)(2), and SANTANDER failed to uphold their mandatory duties pursuant to FCRA
13  provisions of 15 U.S.C. § 1681 s-2(b).

           53.     The Plaintiff believes and thereon alleges that the Plaintiff will be required to pay
14  a higher annual percentage rate on a new vehicle loan for a new car, higher then usual security
15  deposit to pay for an apartment, or home, and once the Plaintiff is released from incarceration,
16  the Plaintiff will be without a vehicle that SANTANDER knew that it was not entitled to have
17  repossessed.

18          **The Plaintiff Sends His Dispute Letter And Request For Investigation to Experian**
19          **Information Solutions Requesting An Investigation Into His Credit Trade Line**

20          54.     On January 30, 2022, the Plaintiff also sent a Fair Credit Reporting Act dispute
21  letter to Defendant Experian Information Solutions, Inc., ("EXPERIAN"), to dispute an account
22  that appeared on is trade line concerning an open account appearing under the name of
23  SANTANDER, and how the Plaintiff allegedly owed SANTANDER $ 22,000 plus dollars.

24          55.     In the Plaintiff's FCRA dispute letter, the Plaintiff outlined to EXPERIAN
25  concerning the allegations that the Plaintiff does not owe any funds, or money to Defendant
    SANTANDER as the Plaintiff's vehicle was not only illegally repossessed, and that Defendant
26
                                              - 21 -
27

SANTANDER entered into an agreement with the State of Arizona, and several other states to settle their claims brought by the attorney's general from thirty-seven (37) plus states in the United States for allegations stemming from bad lending practices. Also stated in the Plaintiff's FCRA dispute letter, the Plaintiff demanded an investigation by EXPERIAN into the validity of the debt allegedly owed by the Plaintiff, to Defendant SANTANDER.

56.     Further, the Plaintiff also informed Defendant EXPERIAN about inaccurate information being reported by EXPERIAN. For example, EXPERIAN was reporting that the Plaintiff owed SANTANDER the amount of $ 21,350, but then EXPERIAN changed that amount to a different amount of $ 19, 809.00, but neither amount was correct, legitimate, or even properly owed by they Plaintiff to the Defendant SANTANDER for the reasons outlined in the lawsuits brought by the Arizona Attorney General.

57.     Pursuant to 15 U.S.C. § 1681., *et seq.*, the Plaintiff sent copies of his FCRA dispute, and request for investigation letter to EXPERIAN through its registered agent C.T. Corporation, and its registered agent then transmitted the Plaintiff's dispute letter to EXPERIAN.

58.     Further, the Defendant EXPERIAN also received copies from the other three credit bureaus that the Plaintiff sent his FCRA dispute letter to, as well as SANTANDER, and other entities. Despite receiving the Plaintiff's FCRA dispute letter requesting an investigation, Defendant EXPERIAN never responded to the Plaintiffs FCRA demand and dispute letter. The Defendant EXPERIAN owed a duty to the Plaintiff to comply with its mandatory, and statutory duties by conducting an FCRA investigation, verifying the SANTANDER debt on the Plaintiffs credit trade line, and furnishing a copy of its results, and findings to the Plaintiff, but Defendant EXPERIAN refused to do so. As such, EXPERIAN is liable to the Plaintiff for its failure to comply with the Fair Credit Reporting Act.

59.     The Plaintiffs claims against SANTANDER is limited to a private cause of action against a furnisher of credit information to a violation of § 1681s-2(b).

60.     Pursuant to Section 1681s-2(b), furnishers of information are required to investigate and promptly respond to notices of any consumer disputes. Specifically, once a consumer, like the Plaintiff, files with the reporting agency, who then receives notice of the

- 22 -

disputed information from a consumer, the agency must then provide notice of the dispute "to any person who provided any item of information in dispute," and the notice must "include all relevant information regarding the dispute that the agency has received from the consumer.."

15 U.S.C. § 1681i(a)(2)(A). The person(s) who receives the notice from the consumer reporting agency must then investigate the disputed information, report the results of the investigation to the consumer reporting agency, make any necessary modifications, and provide the Plaintiff a copy of its investigation. 15 U.S.C. § s-2(b)(1), but neither SANTANDER or EXPERIAN did so.

61.     Defendant EXPERIAN is a credit reporting agencies pursuant to 15 U.S.C. § 1681i(a)(2) within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681, p.

62.     Defendants SANTANDER and EXPERIAN owed a duty to the Plaintiff under FCRA section 15 U.S.C. §§ 1681 s-2(b) and 1681i to conduct an investigation, and reinvestigation at the Plaintiffs request, and each of the Defendants SANTANDER and EXPERIAN refused to uphold its mandatory and statutory duties. Defendants SANTANDER and EXPERIAN breached their duty owed to the Plaintiff causing damages.

63.     Defendants SANTANDER and EXPERIAN received the proper notice from the consumer reporting agency pursuant to the FCRA section 15 U.S.C. § 1681i(a)(2), and Defendants SANTANDER and EXPERIAN failed to uphold their duties pursuant to FCRA provisions of 15 U.S.C. § 1681 s-2(b) and and 1681i.

64.     As of the date of this lawsuit, the Defendants SANTANDER and EXPERIAN still not answered the Plaintiffs letters, conduct an investigation, reinvestigation, or respond to the Plaintiff with the Defendants' results. As a direct result of the actions, and inactions of Defendants SANTANDER and EXPERIAN, the Plaintiff has been damaged in an amount to be determined at trial. The Plaintiff believes and thereon alleges that the Plaintiff will be required to pay a higher annual percentage rate on a new vehicle loan for a new car, and a higher then usual security deposit to pay for an apartment in once the Plaintiff is released from his incarceration due to the highly inaccurate information that the Defendants SANTANDER and EXPERIAN are reporting, or causing to be reported on the Plaintiff's trade line.

**The Plaintiff Sends His Dispute Letter And Request For Investigation to Equifax**

- 23 -

**Information Services Requesting An Investigation Into His Credit Trade Line**

65.     On January 30, 2022, the Plaintiff also sent a Fair Credit Reporting Act dispute letter to Defendant Equifax Information Service, L.L.C., ("EQUIFAX"), to dispute an account that appeared on is trade line concerning an open account appearing under the name of SANTANDER, and how the Plaintiff allegedly owed SANTANDER $ 22,000 plus dollars.

66.     In the Plaintiff's FCRA dispute letter, the Plaintiff outlined to EQUIFAX concerning the allegations that the Plaintiff does not owe any funds, or money to Defendant SANTANDER as the Plaintiff's vehicle was not only illegally repossessed, and that Defendant SANTANDER entered into an agreement with the State of Arizona, and several other states to settle their claims brought by the attorney's general from thirty-seven (37) plus states in the United States for allegations stemming from bad lending practices. Also stated in the Plaintiff's FCRA dispute letter, the Plaintiff demanded an investigation by EQUIFAX into the validity of the debt allegedly owed by the Plaintiff, to Defendant SANTANDER.

67.     Further, the Plaintiff also informed Defendant EQUIFAX about inaccurate information being reported by EQUIFAX. For example, EQUIFAX was reporting that the Plaintiff owed SANTANDER the amount of $ 21,441, but then EQUIFAX changed that amount to a different amount of $ 19, 890.00, but neither amount was correct, legitimate, or even properly owed by they Plaintiff to the Defendant SANTANDER for the reasons outlined in the lawsuits brought by the Arizona Attorney General.

68.     Pursuant to 15 U.S.C. § 1681., *et seq.*, the Plaintiff sent copies of his FCRA dispute, and request for investigation letter to Defendant EXPERIAN through its registered agent Corporation Service Company, ("CSC"), and its registered agent then transmitted the Plaintiff's FCRA dispute letter to EQUIFAX.

69.     Further, the Defendant EQUIFAX also received copies from the other three credit bureaus that the Plaintiff sent his FCRA dispute letter to, as well as SANTANDER, and other entities. Despite receiving the Plaintiff's FCRA dispute letter requesting an investigation, Defendant EQUIFAX never responded to the Plaintiffs FCRA demand and dispute letter. The Defendant EQUIFAX owed a duty to the Plaintiff to comply with its mandatory, and statutory

- 24 -

duties by conducting an FCRA investigation, verifying the SANTANDER debt on the Plaintiffs credit trade line, and furnishing a copy of its results, and findings to the Plaintiff, but Defendant EQUIFAX refused to do so. As such, EQUIFAX is liable to the Plaintiff for its failure to comply with the Fair Credit Reporting Act.

70.     The Plaintiffs claims against SANTANDER is limited to a private cause of action against a furnisher of credit information to a violation of § 1681s-2(b).

71.     Pursuant to Section 1681s-2(b), furnishers of information are required to investigate and promptly respond to notices of any consumer disputes. Specifically, once a consumer, like the Plaintiff, files with the reporting agency, who then receives notice of the disputed information from a consumer, the agency must then provide notice of the dispute "to any person who provided any item of information in dispute," and the notice must "include all relevant information regarding the dispute that the agency has received from the consumer.." 15 U.S.C. § 1681i(a)(2)(A).  The person(s) who receives the notice from the consumer reporting agency must then investigate the disputed information, report the results of the investigation to the consumer reporting agency, make any necessary modifications, and provide the Plaintiff a copy of its investigation. 15 U.S.C. § s-2(b)(1), but neither SANTANDER or EQUIFAX did so.

72.     Defendant EQUIFAX is a credit reporting agencies pursuant to 15 U.S.C. § 1681i(a)(2) within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681, p.

73.     Defendants SANTANDER and EQUIFAX owed a duty to the Plaintiff under FCRA section 15 U.S.C. §§ 1681 s-2(b) and 1681i to conduct an investigation, and reinvestigation at the Plaintiffs request, and each of the Defendants SANTANDER and EQUIFAX refused to uphold its mandatory and statutory duties. Defendants SANTANDER and EQUIFAX breached their duty owed to the Plaintiff causing damages.

74.     Defendants SANTANDER and EQUIFAX received the proper notice from the consumer reporting agency pursuant to the FCRA section 15 U.S.C. § 1681i(a)(2), and Defendants SANTANDER and EQUIFAX failed to uphold their duties pursuant to FCRA provisions of 15 U.S.C. § 1681 s-2(b) and and 1681i.

75.     As of the date of this lawsuit, the Defendants SANTANDER and EQUIFAX still

- 25 -

have not answered the Plaintiffs letters, conducted an investigation, reinvestigation, or respond to the Plaintiff in writing with the Defendants' results. As a direct result of the actions, and inactions of Defendants SANTANDER and EQUIFAX, the Plaintiff has been damaged in an amount to be determined at trial. The Plaintiff believes and thereon alleges that the Plaintiff will be required to pay a higher annual percentage rate on a new vehicle loan for a new car, and a higher then usual security deposit to pay for an apartment in once the Plaintiff is released from his incarceration due to the highly inaccurate information that the Defendants SANTANDER and EQUIFAX are reporting, or causing to be reported on the Plaintiff's trade line.

76.      As a result of the actions of the Defendants, the Plaintiff has been damaged in an amount to be determined at trial.

**The Plaintiff Sends His Dispute Letter And Request For Investigation to TransUnion Requesting An Investigation Into His Credit Trade Line**

77.      On January 30, 2022, the Plaintiff also sent a Fair Credit Reporting Act dispute letter to Defendant TransUnion, L.L.C., ("TRANSUNION"), to dispute an account that appeared on is trade line concerning an open account appearing under the name of SANTANDER, and how the Plaintiff allegedly owed SANTANDER $ 22,000 plus dollars.

78.      In the Plaintiff's FCRA dispute letter, the Plaintiff outlined to TRANSUNION concerning the allegations that the Plaintiff does not owe any funds, or money to Defendant SANTANDER as the Plaintiff's vehicle was not only illegally repossessed, and that Defendant SANTANDER entered into an agreement with the State of Arizona, and several other states to settle their claims brought by the attorney's general from thirty-seven (37) plus states in the United States for allegations stemming from bad lending practices. Also stated in the Plaintiff's FCRA dispute letter, the Plaintiff demanded an investigation by TRANSUNION into the validity of the debt allegedly owed by the Plaintiff, to Defendant SANTANDER.

79.      Further, the Plaintiff also informed Defendant TRANSUNION about inaccurate information being reported by TRANSUNION. For example, TRANSUNION was reporting that the Plaintiff owed SANTANDER the amount of $ 21,441, but then TRANSUNION changed that amount to a different amount of $ 19, 890.00, but neither amount was correct, legitimate, or even

- 26 -

properly owed by they Plaintiff to the Defendant SANTANDER for the reasons outlined in the lawsuits brought by the Arizona Attorney General.

80.     Pursuant to 15 U.S.C. § 1681., *et seq.*, the Plaintiff sent copies of his FCRA dispute, and request for investigation letter to Defendant TRANSUNION through its registered agent Prentice-Hall, and thereafter, its registered agent then transmitted the Plaintiff's FCRA dispute letter to TRANSUNION who in turn did nothing.

81.     Further, the Defendant TRANSUNION also received copies from the other three credit bureaus that the Plaintiff sent his FCRA dispute letter to, as well as SANTANDER, and other entities. Despite receiving the Plaintiff's FCRA dispute letter requesting an investigation, Defendant TRANSUNION never responded to the Plaintiffs FCRA demand and dispute letter. The Defendant TRANSUNION owed a duty to the Plaintiff to comply with its mandatory, and statutory duties by conducting an FCRA investigation, verifying the SANTANDER debt on the Plaintiffs credit trade line, and furnishing a copy of its results, and findings to the Plaintiff, but Defendant TRANSUNION refused to do so. As such, TRANSUNION is liable to the Plaintiff for its failure to comply with the Fair Credit Reporting Act.

82.     The Plaintiffs claims against SANTANDER is limited to a private cause of action against a furnisher of credit information to a violation of § 1681s-2(b).

83.     Pursuant to Section 1681s-2(b), furnishers of information are required to investigate and promptly respond to notices of any consumer disputes. Specifically, once a consumer, like the Plaintiff, files with the reporting agency, who then receives notice of the disputed information from a consumer, the agency must then provide notice of the dispute "to any person who provided any item of information in dispute," and the notice must "include all relevant information regarding the dispute that the agency has received from the consumer.." 15 U.S.C. § 1681i(a)(2)(A).  The person(s) who receives the notice from the consumer reporting agency must then investigate the disputed information, report the results of the investigation to the consumer reporting agency, make any necessary modifications, and provide the Plaintiff a copy of its investigation. 15 U.S.C. § s-2(b)(1), but SANTANDER or TRANSUNION did so.

84.     Defendant TRANSUNION is a credit reporting agencies pursuant to 15 U.S.C. §

- 27 -

1681i(a)(2) within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681, p.

85.     Defendants SANTANDER and TRANSUNION owed a duty to the Plaintiff under FCRA section 15 U.S.C. §§ 1681 s-2(b) and 1681i to conduct an investigation, and reinvestigation at the Plaintiffs request, and each of the Defendants SANTANDER and TRANSUNION refused to uphold its mandatory and statutory duties. Defendants SANTANDER and TRANSUNION breached their duty owed to the Plaintiff causing damages.

86.     SANTANDER and TRANSUNION received the proper notice from the consumer reporting agency pursuant to the FCRA section 15 U.S.C. § 1681i(a)(2), and SANTANDER and TRANSUNION failed to uphold their mandatory, and statutory duties pursuant to FCRA provisions of 15 U.S.C. § 1681 s-2(b) and and 1681i.

87.     As of the date of this lawsuit, the Defendants SANTANDER and TRANSUNION still have  not answered the Plaintiffs letters, conducted an investigation, reinvestigation, or respond to the Plaintiff in writing with the Defendants' results.  As a direct result of the actions, and inactions of Defendants SANTANDER and TRANSUNION, the Plaintiff has been damaged in an amount to be determined at trial. The Plaintiff believes and thereon alleges that the Plaintiff will be required to pay a higher annual percentage rate on a new vehicle loan for a new car, and a higher then usual security deposit to pay for an apartment in once the Plaintiff is released from his incarceration due to the highly inaccurate information that the Defendants SANTANDER and TRANSUNION are reporting, or causing to be reported on the Plaintiff's trade line.

**Plaintiff Is Entitled To Equitable Tolling On All Of His Claims**

**A.     Equitable Tolling**

88.     Under the doctrine of equitable tolling, "plaintiffs may sue after the statutory time period has expired if they have been prevented from doing so due to any inequitable circumstances." Ellis v. GMAC, 160 F.3d 703, 706 (11th Cir. 2008). Tolling is "appropriate when a movant untimely files because of extraordinary circumstances that are both beyond his control, and unavoidable even with diligence." Sandvik v. United States, 177 F.3d 1269, 1271 (5th Cir. 1999). As the supreme court has stated, "[e]quitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." See

- 28 -

Wallace v. Kato, 549 U.S. 384, 396, 127 s. Ct. 1091, 166 L. Ed. 2d 973 (2007).

**B.    The Coronavirus Pandemic**

89.    The current COVID19 is a rapidly evoling, and still evoling, public health crisis of an extraordinary magnitude. On the past weeks, and months, "the unprecedented and extraordinary dangerous nature of the COVID-19 pandemic has become apparant." United States v. Stephens, 2020 WL 1295155, at *1, F.Supp. 3d (S.D.N.Y. March 19; 2020). On March 13, 2020, the CDC declared the COVID-19 outbreak to constitute a national emergency stating: "In response to the public health experts' warnings about the virus' communicaility, and the severe health risk of the COVID19 disease that  the virus causes, officials at all levels of government have adopted dramatic and widespread social distancing measures to slow the spread of the virus and protect the Health of the nation. The CDC has "acknowledged that correction and detention facilities present unique challenges for control of COVID19 transmission among incarcerated/detained persons, staff, and visitors." United States v. Kennedy, 2020 U.S. Dist. LEXIS 53359, 2020 WL 1493481, at * 2 E.D. Mich. March 27, 2020)(quoting Intermim Guidance on Management of Coronavirus Disease 2019 (COVID19) in correctional and detention facilities, CDC (Mar. 23, 2020). See also Stephens, 2020 U.S. Dist. LEXIS 47846, 2020 WL 1295155, at * 2 (citing Joseph A. Bick, Infection and control). Due to the current pandemic, the Plaintiff tested positive for COVID19  twice in the past two years preceding the filing of this lawsuit that prevented the filing of this Complaint sooner thereby entitling the Plaintiff to the benefit of equitable tolling. Presently, The Plaintiff has brought claims against SANTANDER for FCRA, FDCPA, and various State law claims against SANTANDER that would, or could arguably say that some of the Plaintiff's claims are time-barred about the doctrine of equitable tolling for some of the Plaintiff's claims. For instance, the Plaintiff brings a FDCPA cause of action for SANTANDER charging Speedpay fees using Western Union. Plaintiff's last known payment made to SANTANDER was in July, and August of 2019, thereby leaving the Plaintiff no later then July, and August of 2020, to bring his FDCPA claims, but the current pandemic hit, and the Plaintiff was unable to pursue his FDCPA claims. Likewise, the Plaintiff is entitled to equitable tolling on his claims. Because the balance of the Plaintiff's claims

- 29 -

1    are not time barred, the Plaintiffs FCRA, FDCPA, and breach of contract claims are still within

2    the applicable statute of limitations. Accordingly, the doctrine of equitable tolling does apply to

3    all of the Plaintiffs claims under both State, and Federal law.

### FIRST CAUSE OF ACTION

**Fair Credit Reporting Act, 15 U.S.C. § 1681., et seq - Failure to Comply with FCRA**

**(Plaintiff v. All Defendants)**

90.    Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

> A "consumer reporting agency" is defined by the FCRA as follows:
> [A]ny person which, for monetary fees, dues, or on a cooperative
> nonprofit basis, regularly engages in whole or in part in the practice of
> assembling or evaluating consumer credit information or other information
> on consumers for the purpose of furnishing consumer reports to third
> parties, and which uses any means or facility of interstate commerce for
> the purpose of preparing or furnishing consumer reports. 15 U.S.C. §
> 1681a(f).

91.    SANTANDER is a  "furnisher" as that term is used in Section 1681s-2 of the

FCRA. Section 1681n of the FCRA imposes civil liability on any CRA or furnisher  "who

willfully fails to comply with any requirement" of the Act. See 15 U.S.C. § 1681n(a).

92.    Defendants EXPERIAN, EQUIFAX, and TRANSUNION are "consumer

reporting agency" as defined by the FCRA.

93.    Defendant SANTANDER is a  "furnisher" as that term is used in Section 1681s-2

of the FCRA. Section 1681n of the Fair Credit Reporting Act imposes civil liability on any CRA

or furnisher "who willfully fails to comply with any requirement" of the FCRA. See 15 U.S.C. §

1681n(a).

94.    Section 1681o of the FCRA provides for civil liability against any CRA or

furnisher which is negligent in failing to comply with any requirement imposed under the Act.

95.    Defendants SANTANDER, EXPERIAN, EQUIFAX, and TRANSUNION owed a

duty to the Plaintiff to conduct a reasonable investigation into a fraudulent debt that the Plaintiff

complained about in his dispute letters, however, Defendants refused to do so pursuant to the

FCRA thereby breaching their mandatory, and statutory duties outlined in the FCRA. Defendants

had, and still has a mandatory and statutory duty to conduct a meaningful investigation, and

- 30 -

breached their mandatory duties thereby causing damages to the Plaintiff. SANTANDER, EXPERIAN, EQUIFAX, and TRANSUNION  received a written notice of the dispute from the Plaintiff through its registered agent, as well as a copy of the Plaintiff's dispute letter from all three CRA's, and refused to conduct an investigation. The Plaintiff has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)

### (Plaintiff v. Santander Consumer USA, Inc.)

96.    Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

97.    Under section 1681s-2(b), Defendant SANTANDER owed a duty under this section of the Fair Credit Reporting Act to investigate any dispute upon receiving a proper dispute notice from the Plaintiff.

98.    SANTANDER received the Plaintiffs dispute notice from several consumer reporting agencies, and still refused to comply with their mandatory, and statutory duties owed to the Plaintiff.

99.    SANTANDER breached it's mandatory duty owed to the Plaintiff causing injury to the Plaintiff. Defendant SANTANDER is a consumer reporting agencies within the meaning of the Fair Credit Reporting Act, and owed a duty to the Plaintiff under 15 U.S.C. § 1681 s-2(b) to conduct an investigation, but SANTANDER refused to do so.

100.    SANTANDER failed to conduct a reasonable investigation into the accuracy of information related to the disputed trade line, in violation of Section 1681s-2(b)(1).

101.    SANTANDER is a "furnisher" of consumer credit information as  that term is used in Section 1681s-2 of the FCRA.

102.    SANTANDER's  failure  to report that Plaintiff disputed the accuracy of the trade line was a failure to accurately update the information because it was "misleading in such a way and to such an extent that it [could] be expected to have an adverse effect" on Plaintiff. Gorman v. Wolpoff & Abramson, LLP, et al., 584 F.3d 1147 (9th Cir. 2009); See also Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142 (4th Cir. 2008).

- 31 -

103.   As a direct result of the actions, inactions, and breach of the Defendants mandatory and statutory duties, the Plaintiff will now have to pay a higher APR, or deposit to benefit from any consumer loan on any future consumer accounts, home, or new car. Further, the Plaintiff has been damaged with additional damages in an amount to be proven at trial.

104.   As a direct and proximate result of SANTANDER's willful and/or negligent refusal to comply with the FCRA as outlined above, Plaintiff has suffered substantial loss and damage including, but not limited to: loss of opportunity to obtain credit, damage to reputation, expenditure of considerable time and out-of pocket expenses, worry, fear, distress, frustration and embarrassment, entitling him to an award of actual damages in amounts to be proved at trial, together with the costs of this action pursuant to 15 U.S.C. § 1681o.

## THIRD CAUSE OF ACTION

### Fair Debt Collection Practice Act, 15 U.S.C. § 1692, et seq.

### (Plaintiff v. Santander Consumer USA, Inc.)

105.   Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

106.   The FDCPA creates substantive rights for consumers like the Plaintiff; violations cause injury to consumers like the Plaintiff, and such injuries are concrete and particularized. Quinn v. Specialized Loan Servicing, LLC, No. 16 C 2021, 2016 U.S. Dist. LEXIS 107299 *8-13 (N.D. Ill. Aug. 11, 2016) (rejecting challenge to Plaintiff's standing based upon alleged FDCPA statutory violation); Lane v. Bayview Loan Servicing, LLC, No. 15 C 10446, 2016 U.S. Dist. LEXIS 89258 *9-10 (N.D. Ill. July 11, 2016) ("When a federal statute is violated, and especially when Congress has created a cause of action for its violation, by definition Congress has created a legally protected interest that it deems important enough for a lawsuit."); Church v. Accretive Health, Inc., No. 15-15708, 2016 U.S. App. LEXIS 12414 *7-11 (9th Cir. July 6, 2016) (same); see also Mogg v. Jacobs, No. 15-CV-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 33229, 2016 WL 1029396, at *5 (S.D. Ill. Mar. 15, 2016) ("Congress does have the power to enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute," (quoting Sterk v. Redbox Automated Retail, LLC, 770 F.3d 618, 623 (7th Cir.

- 32 -

2014)). For this reason, and to encourage consumers to bring FDCPA actions, Congress authorized an award of statutory damages for violations. 15 U.S.C. § 1692k(a).

107. SANTANDER entered into an agreement with the Arizona attorney general to total the Plaintiff's loan balance to zero because he had, and still has, a 401 or lower FICO credit score, and the Defendant is still collecting an outstanding balance of $ 18,000 plus dollars that SANTANDER knew, and had reason to know that the Plaintiff does not owe to SANTANDER. Despite also agreeing not to post any delinquent amount on the Plaintiff's trade line, SANTANDER still posted the Plaintiff's balance of his loan on his credit trade line SANTANDER agreed not to post.

108. SANTANDER is actively collecting, and attempting to collect, a debt that Plaintiff does not actually owe to SANTANDER. Although SANTANDER is allowed to collect its own debts, SANTANDER is not allowed to collect a debt that is not legitimately owed by the Plaintiff. All three of Plaintiff's credit reports are reflecting a balanced purportedly owed by the Plaintiff, to SANTANDER. Therefore, SANTANDER has violated, and continue to violate the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10), 1692f and 1692f(1).

### FOURTH CAUSE OF ACTION

### Fair Debt Collection Practice Act, 15 U.S.C. § 1692f(1)

### (Plaintiff v. Santander Consumer USA, Inc.)

109. Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

110. The FDCPA applies to SANTANDER because it regularly engages in debt collection as defined by the statute.

111. By charging the Speedpay fee, a portion of which it retains, SANTANDER acted in violation of the federal Fair Debt Collection Practices Act, which prohibits "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

112. The plain instruction of § 1692f(1) is that the collection of any amount incidental

- 33 -

to the principal obligation, unless expressly authorized by agreement creating the debt or permitted by law, violates the FDCPA. Courts have interpreted the FDCPA broadly. See, e.g., Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d 22, 27 (2d Cir. 1989) ("It is clear that Congress painted with a broad brush in the FDCPA to protect consumers from abusive and deceptive debt collection practices, and courts are not at liberty to excuse violations where the language of the statute clearly comprehends them."). Accord; Acosta v. Credit Bureau, 2015 U.S. Dist. LEXIS 55870 (N.D. Ill., Apr. 29, 2015). The phrase "permitted by law" means that "a debt collector may not collect any amount if either '(A) state law expressly prohibits collection of the amount or (B) the contract does not provide for collection of the amount and state law is silent.'" Acosta, 2015 Dist. LEXIS 55870 at *8 (quoting FTC Staff Commentary on the FDCPA, 53 Fed. Reg. 50,097, 50,108 (Dec. 13, 1988).

### FIFTH CAUSE OF ACTION

### Fair Credit Reporting Act, 15 U.S.C. § 1681i

### (Plaintiff v. EXPERIAN, EQUIFAX and TRANSUNION)

113.    Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

114.    Under section 1681i, Defendants EXPERIAN, EQUIFAX, and TRANSUNION owed a duty under this section of the Fair Credit Reporting Act to investigate any dispute upon receiving a proper dispute notice from the Plaintiff.

115.    Defendants EXPERIAN, EQUIFAX, and TRANSUNION received the Plaintiffs dispute notice from several consumer reporting agencies, and still refused to comply with their mandatory, and statutory duties owed to the Plaintiff.

116.    Defendants EXPERIAN, EQUIFAX, and TRANSUNION breached their mandatory duties owed to the Plaintiff causing injury to the Plaintiff. Defendants EXPERIAN, EQUIFAX, and TRANSUNION are credit reporting agencies pursuant to 15 U.S.C. § 1681i(a)(2) within the meaning of the Fair Credit Reporting Act.

117.    By failing to conduct a reasonable investigation into Plaintiff's disputes in this

- 34 -

regard, Defendants EXPERIAN, EQUIFAX, and TRANSUNION willfully and/or negligently violated 15 U.S.C. § 1681i(a)(1) with respect to each dispute lodged by the Plaintiff.

118.   As a direct and proximate result of Defendants EXPERIAN, EQUIFAX, and TRANSUNION repeatedly disregard for each of Plaintiff's disputes as outlined above, the Plaintiff has suffered a significant loss of trust in the credit reporting system and its accountability to the average consumer. As a further direct and proximate result of Defendants EXPERIAN, EQUIFAX, and TRANSUNION's willful and/or negligent refusal to conduct reasonable investigations as  mandated by the FCRA as outlined above, Plaintiff has suffered loss and damage including,  but not limited to: loss of opportunity to obtain credit, damage to reputation, expenditure of considerable time and out-of-pocket expenses, worry, fear, distress, frustration and embarrassment, entitling him to an award of actual damages in amounts to be proved at trial, together with the costs of this action pursuant to 15 U.S.C. § 1681o.

119.   Upon information and belief, Defendants EXPERIAN, EQUIFAX, and TRANSUNION  have exhibited a pattern of refusing to correct consumer credit files despite being on notice of  patently false information contained in such files, ultimately valuing its own bottom line  above its "grave responsibility" to report accurate data on consumers. Defendant Defendants EXPERIAN, EQUIFAX, and TRANSUNION's pattern of refusal to correct patently false information as mandated by the FCRA reveals a conscious disregard of the rights of Plaintiff.  The injuries suffered by Plaintiff are attended by circumstances of fraud,  malice, and/or willful and wanton misconduct, calling for statutory damages, an assessment of punitive damages against Defendants EXPERIAN, EQUIFAX, and TRANSUNION, plus costs of this suit pursuant to 15 U.S.C. § 1681n.

120.   Defendants EXPERIAN, EQUIFAX, and TRANSUNION are consumer reporting agencies within the meaning of the Fair Credit Reporting Act and owed a duty to the Plaintiff under 15 U.S.C. § 1681i to conduct an investigation, but they refused to·do so.  As a direct result of the actions, inactions, and breach of the Defendants EXPERIAN, EQUIFAX, and TRANSUNION's mandatory and statutory duties, the Plaintiff will now have to pay a higher APR, or deposit to benefit from any consumer loan on any future consumer accounts, home, or

- 35 -

new car. Plaintiff has been damaged in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION

### Breach of Contract Under Arizona State Law

### (Plaintiff v. Santander Consumer USA, Inc.)

121.    Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

122.    SANTANDER entered into a contract with the Arizona Attorney general for the benefit of the Plaintiff to provide the Plaintiff with the title to his vehicle, not to reposes his vehicle if he had a FICO score under 401, and not pursue any outstanding debt by the Plaintiff.

123.    SANTANDER admittedly repossessed the Plaintiff's vehicle, never provided the Plaintiff with the title to his vehicle, published a debt of $ 18,000 plus dollars on the Plaintiff's credit reports, and then reposed his vehicle after the Defendant agreed not to do any of the above as outlined in the settlement agreement with the Arizona Attorney General.

124.    At all relevant times, the Arizona Attorney general was acting as the attorney for the Plaintiff, and the Defendant SANTANDER breached the contract. SANTANDER had no intent to comply with the agreement with the Arizona Attorney General. As a direct result of the actions, inactions, and omissions of SANTANDER, the Plaintiff has a repossession of his credit reports, an amount owed of $ 18,000 plus dollars, and the Plaintiff is no longer is possession of his vehicle because SANTANDER repossessed it after their agreement with the Arizona Attorney general. As a direct result, the Plaintiff will now have to pay a larger APR on a new or used vehicle in the future, will lose economic advantage due to the fact that almost all vehicle finance lenders will not finance someone like the Plaintiff with a repossession on his trade line, much less a debt of $ 18,000 plus dollars. Accordingly, the said Plaintiff has sustained permanent damage to his credit, person, business relations, contractual relations, and economic advantage. As such, the Plaintiff is entitled to an award of punitive damages to make an example of Defendant SANTANDER.

### PRAYER FOR RELIEF

- 36 -

1 | **WHEREFORE**, the Plaintiff Anthony Oliver respectfully requests the following relief:

2 |     1.     For an order awarding general damages according to proof;

3 |     2.     For an order awarding special damages according to proof if any;

4 |     3.     For an order declaring that the Defendants violated the FCRA, FDCPA, and their

5 | mandatory and statutory duties owed to the Plaintiff under these statutes;

6 |     4.     For an order declaring that the Defendant breached the contract with the Plaintiff by repossessing his vehicle;

7 |     5.     For an order directing the Defendants to correct, update or delete any inaccurate

8 | information on the Plaintiffs credit trade lines;

9 |     6.     For an order directing the Defendant to return the Plaintiff's vehicle, or if the

10 | vehicle no longer exists, to provide the Plaintiff with a new vehicle;

11 |     7.     For an order declaring that Defendant SANTANDER Consumer USA, Inc.

12 | breached its contract with the Plaintiff;

13 |     8.     For an order declaring that SANTANDER Consumer USA, Inc., violated the

14 | terms of the settlement agreement between the Arizona Attorney General, and SANTANDER;

15 |     9.     For an order recommending that the Arizona Attorney General, and the United

16 | States Attorney for the District of Arizona open a criminal investigation into the actions, and inactions of SANTANDER Consumer USA, Inc.;

17 |     10.    For an order of this Court directing that Arizona Secretary of State, Corporations

18 | Commission to revoke and/or suspend Defendant SANTANDER Consumer USA, Inc.'s

19 | Corporation business license;

20 |     11.    For an order awarding all costs of suit against the Defendants pursuant to 28

21 | U.S.C. § 1920; and Fed.R.Civ.P. rule 54(d);

22 |

23 |

24 |

25 |     12.    For an award of punitive damages against Defendant Santander Consumer USA,

26 | - 37 -

27 |

28 | PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

1    Inc., to make an example of the Defendants; and

2        13.    Any other relief as this Court deems just and proper.

3

4                                          Respectfully submitted,

5    Dated: August 24, 2022

6                                          Anthony Oliver, # 1002060648

7                                          Augusta Medical Prison

8                                          3001 Gordon Highway
                                           Grovetown Georgia 30813

9                                          Telephone : (404) 352 - 2144

10                                         Facsimile :  (404) 352 - 2331
                                           Email:Anthony.oliver222201@gmail.com

11

12                        **DEMAND FOR JURY TRIAL**

13        The Plaintiff demands a jury trial pursuant to the Seventh Amendment to the United

14   States Constitution on all issues so triable under all counts in this action.

15

16                                         Respectfully submitted,

17   Dated: August 24, 2022

18                                         Anthony Oliver, # 1002060648

19                                         Augusta Medical Prison

20                                         3001 Gordon Highway
                                           Grovetown Georgia 30813

21                                         Telephone : (404) 352 - 2144

22                                         Facsimile :  (404) 352 - 2331
                                           Email:Anthony.oliver222201@gmail.com

23

24

25

26                                   - 38 -

27   ─────────────────────────────────────────────────
     PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
28   AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

# Exhibit B

<u>VERIFICATION</u>

I, Emily Gildar Wagner, declare under penalty of perjury that the following is true and correct.

1.      I am an attorney with the law firm Snell & Wilmer LLP and have been admitted to practice law in the State of Arizona since 2011. I am one of the attorneys for Defendant Experian Information Solutions, Inc. ("Experian") in connection with the litigation captioned *Oliver v. Santander Consumer USA, Inc., et al.*, which is currently pending in the Pima County Superior Court, Case No. C20223184 (the "State Court Action"). I am competent to testify to the matters contained in this Verification.

2.      The pleadings and other documents filed in the State Court Action and contained in <u>Exhibit A</u> to the Notice of Removal are true and complete copies of all the pleadings and other documents that I am aware of filed in the State Court Action as of October 7, 2022.

Executed this 10th day of October, 2022.

_____
Emily Gildar Wagner

4884-1054-1368

# Exhibit C

1
2
3
4
5
6

Emily Gildar Wagner (#028811)
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren Street, Suite 1900
Phoenix, AZ 85004-2202
Telephone: (602) 382-6000
Facsimile: (602) 382-6070
Email: ewagner@swlaw.com

Attorneys for Defendant
Experian Information Solutions, Inc.

7

8    **IN THE UNITED STATES DISTRICT COURT**

9    **FOR THE DISTRICT OF ARIZONA**

10

| | |
|---|---|
| Anthony Oliver, | Case No.: |
| Plaintiff, | **TRANS UNION, LLC'S JOINDER AND CONSENT TO REMOVAL** |
| v. | |
| Santander Consumer USA, Inc., an Illinois corporation; Experian Information Solutions, Inc., a Delaware corporation; Equifax Information Services, L.L.C., a Delaware corporation; and TransUnion, L.L.C., a Pennsylvania corporation, | |
| Defendants. | |

11
12
13
14
15
16
17
18
19

20        Without waiving any defenses, Defendant Trans Union, LLC, hereby joins in

21   and consents to the removal of this action from Pima County Superior Court to the

22   United States District Court for the District of Arizona.

23
24
25
26
27
28

1  Dated:  October 10, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Authorized Representative for Trans Union, LLC*

By: */s/ James Acosta*
James Acosta
QUILLING, SELANDER,
LOWNDS, WINSLETT & MOSER,
P.C.
6900 N. Dallas Parkway, Suite 800
Plano, Arizona 75024
jacosta@qslwm.com
*Attorneys for Trans Union, LLC*

4859-7975-6343