1  Anthony Oliver, # 1002060648
2  Coffee Correctional Facility (Georgia)
   Post Office Box 650
3  Nicholls Georgia
   Phone: (520) - 300 - 1666
4  Facsimile: (520) 386 - 4310
   Email: Anthony.oliver222201@gmail.com
5
6  *Plaintiff Anthony Oliver*
   *Appearing Pro Se,*
7

8                    **UNITED STATES DISTRICT COURT**
9                         **DISTRICT OF ARIZONA**

10

11  ANTHONY OLIVER,                          | Case No.: 4:22-cv-00475-RCC

12          Plaintiff,                       | PLAINTIFF'S SECOND AMENDED
                                             | COMPLAINT FOR DAMAGES,
13  vs.                                      | DECLARATORY AND
                                             | INJUNCTIVE RELIEF
14
15  SANTANDER CONSUMER USA, INC., an
    Illinois Corporation; EXPERIAN INFORMATION   | DEMAND FOR JURY TRIAL
16  SOLUTIONS, INC., a Delaware Corporation;
    EQUIFAX INFORMATION SERVICES, L.L.C., a
17  Delaware Corporation; TRANSUNION, L.L.C., a
    Pennsylvania Corporation;
18
19          Defendants.

20

21       **PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES**
22            **DECLARATORY, AND INJUNCTIVE RELIEF**

23

24

25

26                              - 1 -

27  PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
    AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

1    Anthony Oliver, Plaintiff [1] herein, appearing *pro se*, brings this
2    complaint for breach of contract, and federal claims under the Fair Credit
3    Reporting Act, 15 U.S.C § 1681 *et seq.*, and other relevant State law claims for
4    damages, declaratory, and injunctive and states to the Honorable Raner C. Collins,
5    Chief United States District Judge, the following:

I.    **INTRODUCTION**

6    1.    The computerization of our society has resulted in a revolutionary
7    increase in the accumulation and processing of data concerning individual
8    American citizens. Data technology, whether it is used by businesses, banks, the
9    Internal Revenue Service or other institutions, allows information concerning
10   individual consumers to flow instantaneously to requesting parties. Such timely
11   information is intended to lead to faster and better decision-making by its
12   recipients, and all of society should ultimately benefit from the resulting
13   convenience, and efficiency.

14   2.    Unfortunately, however, this information has also become readily
15   available for, and subject to, mishandling and misuse. Individual consumers can
16   sustain substantial damage, both emotionally and economically, whenever
17   inaccurate or fraudulent information is disseminated and/or obtained about
18   them. In fact, Defendant acknowledge this potential for misuse and resulting
19   damage every time it solicits its credit monitoring service to a consumer.

20   3.    The ongoing technological advances in the area of data processing
21   have resulted in a boon for the companies that accumulate and sell data
22   concerning individuals' credit histories and other personal information. Such
23   companies are commonly known as consumer reporting agencies ("CRAs").
24   Defendant Santander Consumer USA, Inc., ("Defendant or SANTANDER"),

---

[1] The Plaintiff certifies to this Court that the his second amended complaint differes from his first amended complaint only by adding a seventh cause of action, all of which is in bold letters. None of the facts or allegations have changed.

- 2 -

---

PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

specializes in collecting it's own debts. Defendant is both a debt collector engaged in collecting debts, as well as being a CRA within the meaning of the Fair Credit Reporting Act, ("FCRA").

4.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private and financial information that they compile and sell about individual consumers.

5.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

6.   The preservation of one's good name is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home. *We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

- 3 -

*Bryant v. TRW*, Inc., 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

7.    To further the primary goal of greater accuracy, the FCRA has also required CRAs, as well as "furnishers" of credit information to the CRAs, to conduct "reasonable investigations" into bona fide disputes sent to CRAs by consumers claiming to have inaccurate or incomplete information appearing in their credit files, to correct or update any such errors or omissions, and to report back to the consumer the results of the investigation. SANTANDER is a furnisher of information.

8.    SANTANDER uses various tactics against it's own customer's. Plaintiff entered into a retail installment sales contract with SANTANDER to finance the purchase of a 2018 Jeep Cherokee equipped with a microwave in the rear of the vehicle. At various times, Plaintiff has made loan payments online, or over the phone, SANTANDER has charged him a fee of up to $10.95 ("Pay-To-Pay fees"). SANTANDER is prohibited by law from collecting these fees.

9.    One such law that applies to SANTANDER's form contract is the Texas Debt Collection Act ("TDCA"). SANTANDER is a debt collector as defined by the TDCA. The TDCA prohibits debt collectors from "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer[.]" Tex. Fin. Code § 392.303(a)(2) (emphases added). Pay-to-Pay fees are neither.

10.    Moreover, on information and belief, SANTANDER pockets nearly the entire amount of the Pay-to-Pay fees as profit. Nevertheless, SANTANDER represents them as pass-through fees to the payment processor: "A third party payment processing company may charge a fee to process your payment."

11.     During the course of his loan, Plaintiff has paid these fees multiple times. And SANTANDER pocketed all of the fees. With it's hand caught in the cookie jar, various attorney general's for over thirty-eight (38) states filed State and Federal lawsuits against SANTANDER for various allegations including the Pay-to-Pay fees in which numerous Federal Court's across the United States have found that SANTANDER violated the Fair Debt Collection Practice Act with their Pay-to-Pay scheme in place. The attorney general's also went on to go after SANTANDER for their unlawful business practices concerning loans to consumers like the Plaintiff. Once again, the attorneys general's of various States also sued SANTANDER concerning their lending practices. SANTANDER is one of the largest players in the subprime auto lending market. Since 2010, SANTANDER has consistently accounted for the largest share of the subprime auto lending market (as measured by total dollar value in ABS issuances) among companies that focus in subprime auto lending. In its subprime lending business, SANTANDER both makes direct loans to consumers and purchases installment contracts from dealers. SANTANDER's underwriting process relies on credit scoring models.

12.     One of the models incorporates the consumer's borrowing history and features of the loan the consumer has applied for (such as loan-to-value ratio, debt-to-income ratio, paymentto-income ratio, mileage, and term) and generates a probability that a consumer will become severely delinquent during a particular window of time within the term of the loan. This probability then is converted into a scaled score on proprietary, FICO-like scale. Because the above model only indicates how likely it is that a consumer will go delinquent within that particular window of time within the term of the loan, SANTANDER also uses a separate model to predict how likely a consumer with a given proprietary score will default over the full life

- 5 -

of the loan.

13.    The    life-of-the-loan    model    projects    that  consumers    with
proprietary  scores  below  a  given threshold have  an unreasonably heightened
chance  of  default  before  the  end  of  their  term, and  a  subset  of  those
consumers,  who have  some  of  the  lowest  proprietary  scores,  have  a
significantly  worse  probability  of default before  the  end  of their term.   For
example,  for  at  least part of  the  time  period  examined  by  the State of
Arizona,  SANTANDER  projected  that  these  consumers  with  the  lowest
proprietary  scores  had  a  greater than 70%  likelihood of default  over  the life
of the loan. In  a  typical  auto-financing  transaction,  car  dealers attempt  to
maximize the profits they earn on the  front-end and back-end of  an  individual
deal. The front-end of  a  transaction involves  the  negotiation  of  a sales price,
whereas the back-end refers  to  the  negotiation of ancillary products  included
as  part  of  the  financing  of  the  purchase  of the vehicle.

14.    Even when acting  as  an  "indirect"  auto lender  by purchasing
installment  contracts from  dealers, SANTANDER  has  significant  control  over
the  extension  of  credit  or  financing of a transaction, including the  "back-end"
of  a  transaction, such  as  whether  to  purchase a  contract  that includes
guaranteed-asset  protection  ("GAP")  insurance,  a  GAP  waiver  and/or  a
service contract. Through its  credit  policies, SANTANDER  asserts control  over
the  amount  dealers can  include  in  the back-end. The generous allowances for
dealers on the back-end  have  facilitated  SANTANDER obtaining more  market
share, but those same large back-end charges expose consumers to increased
risk in at least two ways: 1) significant back-end  charges increase the overall
amount financed, which increases the  loan-to-value  ratio on the  loan;  and 2)
high finance costs  increase either  the  consumer's monthly principal-to-interest
ratio or increase  the  term of  the loan. SANTANDER is aware that these loan

PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

1    features contribute to deteriorating loan quality but continues to make these
2    loans or purchase the underlying installment contracts. That's what also
3    occurred here. SANTANDER forced the Plaintiff into buying GAP insurance, all of
4    which was a prerequisite to the Plaintiff financing a new Jeep.

5        15.    However, SANTANDER concealed this fact from the Plaintiff. The
6    consumer harm caused by the underwriting problems described above is
     compounded by SANTANDER's servicing and collection practices, where
7    SANTANDER confuses, frustrates, and, in some cases, actively misleads
8    consumers about their rights and the costs of taking certain actions.
9    SANTANDER often requires that payments be made through methods that
10   require consumers to pay additional third-party fees, such as money orders.
11   These fees tend to most significantly affect consumers who are unbanked or
12   underbanked. In servicing loans, SANTANDER's employees routinely confuse
13   consumers about the benefits and risks of extensions. Consumers routinely
     make partial payments or accept extensions without understanding that
14   interest continues to accrue and future payments will likely go towards
15   interest as opposed to paying down their principal balance. They also are
16   unaware that their loan terms are lengthened to accommodate the extension,
17   partial payment and interest accrual and that a payment may not stop a
18   repossession. Additionally, SANTANDER employees often mislead consumers
19   about their ability to recover repossessed vehicles, including encouraging
20   consumers to make significant payments to recover vehicles when
21   SANTANDER has no control over whether the vehicle can be recovered.
22   Taken together, SANTANDER's practices impose significant harm on Arizona
23   consumers. These consumers obtain credit from SANTANDER under the false
     pretense that they are acquiring a vehicle they will eventually own. In reality,
24   these consumers agree to extremely costly leases, the terms of which are so
25
26                                     - 7 -

27

1  onerous that consumers will almost certainly fail to perform, resulting in
2  their loan default and likely repossession of the vehicles. As a direct result of
3  these unlawful practices, SANTANDER agreed to settle claims with over
4  thirty-eight (38) states in which SANTANDER agreed to: 1) total out any existing
5  vehicle loan to zero dollars to any customer who had an existing loan with a FICO
   score of 400 or less; 2) agree not to repossess any vehicles that were in default as
6  of the time of the settlement; 3) provide each customer with the title to the
7  vehicle demonstrating that the customer is the rightful owner; 4) to remove any
8  customer from collections; 5) to remove any loan that was written off from a
9  customer's, or consumers credit trade line; and 6) stop it's illegal collection
10 practice concerning it's Pay-to-Pay fees, and compensate any customer who paid
11 to use SANTANDER's Pay-to-Pay option. Despite all it's agreements, and contracts,
12 SANTANDER did the complete opposite, and breached every agreement, and
13 contract SANTANDER agreed to with the attorney general's, and through various
14 class action settlements concerning the Plaintiff. SANTANDER repossessed the
15 Plaintiff's vehicle, wrote off the existing loan amount of approximately $ 18,000
16 plus dollars, placed the amount in collections through its own collection
17 department, placed the $ 18,000 plus dollars on the Plaintiffs credit trade line as
18 of 2021, never provided the Plaintiff with the title despite knowing the Plaintiff's
19 FICO score was less then 400 point score, and based on it's own agreement with
20 the attorney general for the State of Arizona, and others, SANTANDER refused to
21 repay the Plaintiff the funds that he spent on SANTANDER's Pay-to-Pay scheme.
22 To make matters far worse, when the Plaintiff heard about the lawsuits against
23 SANTANDER, the Plaintiff submitted a FCRA demand for investigation letter to
24 SANTANDER, all of which was received by SANTANDER from it's registered agent.
   This action seeks compensatory, statutory and punitive damages, and costs for
   the Plaintiff, Anthony Oliver, ("Plaintiff"), against the Defendant SANTANDER
25
26                                      - 8 -
27        PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
              AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.
28

Consumer USA, Inc., for it's willful and/or negligent violations of the Fair Credit Reporting Act, other federal statutes, as well as various State law claims as described herein.

## II.    JURISDICTION AND VENUE

16.    This Complaint is filed and these proceedings are instituted under the provisions of the Arizona Breach of Contract statute, and 15 U.S.C. § 1681, et seq., of the Fair Credit Reporting Act. In addition, the amount in controversy exceeds the amount of $ 75,000.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § Sections 1391 and 1402(b) because a substantial amount of the conduct complained of occurred in Pima County, Arizona.[2]

## III.    PARTIES

18.    Plaintiff Anthony Oliver was, and still is, a resident and citizen of Arizona.

19.    Defendant Santander Consumer USA, Inc.. ("SANTANDER or Defendant"), is a car lending loan company that specializes in new, and used vehicles loans, and collection of it's own debts. Defendant SANTANDER is a debt collector for the purposes of the Fair Credit Reporting Act. Defendants maintain a registered agent in this Judicial District, and can be served within this District.

20.    Defendant Experian Information Solutions, Inc., ("herefter EXPERIAN"), is a Delaware Corporation conducting business in the State of Arizona, existing under the laws of the State of Virginia, and will be mentioned herein at all times. EXPERIAN can be served through it's registered agent C.T. Corporation located at 3800 N. Central Ave, # 460, Phoenix Arizona 85012.

---

[2] Plaintiff is under a criminal conviction committment in Georgia, but will be returning to Tucson Arizona. On July 29, 2022, the Georgia Court of Appeals vacated in part, two of the Plaintiff's convictions. A Writ of Certiorari is pending before the Georgia Supreme Court and the time to grant, or deny review is nearly expired. Once review is denied, the Plaintiff must be re-sentenced, and then released which should occur in the next 60 to 70 days.

PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

1     21.    Defendant TransUnion, L.L.C., ("hereafter TRANSUNION"), is a
2  Delaware limited liability company, existing under the laws of the State's of
3  Arizona, and Pennsylvania, and will be mentioned herein at all times.
4  TRANSUNION can be served through it's registered agent, Corporation Service
5  Company 8825 N 23rd Avenue, Suite 100 Phoenix, AZ 85021.

6     22.    Defendant Equifax Information Services, L.L.C., ("EQUIFAX"), is a
7  Delaware limited liability company conducting business in the State of Arizona,
8  existing under the laws of the State of Virginia, and will be mentioned herein at
9  all times. EQUIFAX can be served through it's registered agent Corporation
   Service Company located at 8825 N 23rd Avenue, Suite 100 Phoenix, Arizona
10 85021.

11              **ALLEGATIONS COMMON TO ALL CAUSES OF ACTIONS**

12     23.    On or about April 23, 2018, the Plaintiff signed a retail installment
13 contract to purchase, and finance a new 2018 Jeep Cherokee fully equipped with
14 a microwave installed in the rear of the Jeep. Plaintiff paid a down payment for
   the vehicle in the approximate amount of $ 4,000 to a local problematic
15 dealership. The Plaintiff was ultimately financed through the Defendant
16 SANTANDER Consumer USA, Inc., ("SANTANDER"). The Plaintiff's monthly
17 payment to SANTANDER was exactly the amount of $ 612.00 a month.

18     24.    Following his vehicle purchase, the Plaintiff occasionally made his
19 loan payments over the Internet, or by telephone by way of calling the
20 1800-number that SANTANDER advertises on it's website, and elsewhere. In order
21 to do so, SANTANDER directed him to use Western Union's "Speedpay" service.
   SANTANDER often encouraged the use of Speedpay to allow customers to pay
22 immediately, and avoid late charges by using a credit, or debit card over the
23 telephone. To use "Speedpay", Plaintiff was charged a fee of $10.95 per
24 transaction, ostensibly by a third-party payment processor, Western Union, for

25
26                                    - 10 -

27        PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
             AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

the payment processing service. However, prior to April 2018, Western Union, and SANTANDER contractually agreed that Western Union would return a portion of all "Speedpay" fees collected to SANTANDER as profit.

25.    The amount of fees retained by SANTANDER varied based on the volume of transactions, and the method of payment customers used for "Speedpay", but at times, SANTANDER would retain over 99% of the $10.95 Speedpay fee. While Plaintiff was informed by Western Union of the fee when he used the "Speedpay" service, the Contract between SANTANDER, and Plaintiff did not, and still does not, expressly mention, or provide for a "Speedpay" fee. At the time Plaintiff paid the "Speedpay" fees, he was unaware that SANTANDER retained part of the fee charged by Western Union. Had the Plaintiff known this, the Plaintiff would have never used the "Speedpay" service offered by SANTANDER. Further, SANTANDER fraudulently concealed from the Plaintiff that SANTANDER was collecting a portion of the "Speedpay" fees, and informed the Plaintiff over the telephone several times that the "Speedpay" fee was nothing more then a convenience fee. SANTANDER further concealed the fact that it entered into a contract with Western Union for the "Speedpay" service. Had the Plaintiff known that SANTANDER entered into a contract with Western Union, the Plaintiff would have never used Western Union due to personal reasons, and the Plaintiff's choice of who to do business with.

26.    As a direct result of the processing, and retaining the "Speedpay" fees from the Plaintiff, SANTANDER is actively engaged in debt collection, and has violated § 1692f(1) of the Fair Debt Collections Practices Act. Under Section 1692f(1) makes it unlawful for a debt collector to collect "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

- 11 -

27.    Plaintiff later discovered that Western Union states on its website, "[o]ur services help you evaluate your payment strategy and find opportunities to help reduce costs, improve efficiency, migrate customers to more profitable payment channels and more." (Id. (emphasis added)). In other words, SANTANDER, with Western Union's help, made more profit by charging the customer for paying online or over the phone, and retaining or receiving a portion of that fee. On numerous occasions, when Plaintiff used, or attempted to use the telephone, or Internet to pay on his loan with SANTANDER, Western Union demanded an additional payment, in the form of a fee for using Speedpay. The payment processor collected this money from the Plaintiff, and then remitted a portion of it back to SANTANDER without the Plaintiff's knowledge.

28.    The plain instruction of § 1692f(1) is that the collection of any amount incidental to the principal obligation, unless expressly authorized by agreement creating the debt, or permitted by law, violates the FDCPA. Since the "Speedpay" scheme was exposed by various law firms across the United States, various Court's have interpreted the FDCPA broadly. See, e.g., Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d 22, 27 (2d Cir. 1989) ("It is clear that Congress painted with a broad brush in the FDCPA to protect consumers from abusive and deceptive debt collection practices, and courts are not at liberty to excuse violations where the language of the statute clearly comprehends them."). Accord; Acosta v. Credit Bureau, 2015 U.S. Dist. LEXIS 55870 (N.D. Ill., Apr. 29, 2015). And the phrase "permitted by law" means that "a debt collector may not collect any amount if either '(A) state law expressly prohibits collection of the amount or (B) the contract does not provide for collection of the amount and state law is silent.'" Acosta, 2015 Dist. LEXIS 55870 at *8 (quoting FTC Staff Commentary on the FDCPA, 53 Fed. Reg. 50,097, 50,108 (Dec. 13, 1988).

- 12 -

**Plaintiff is Incarcerated During the Pendency of His Loan with Santander**

29.    On April 4, 2019, the Plaintiff learned of an arrest warrant for Aggravated Stalking and later turned himself into law enforcement. Plaintiff was later held without bail at a local correctional facility. While incarcerated, the Plaintiff kept up his monthly payments to SANTANDER. With the Plaintiff incarcerated, and no access to run down, and purchase a money order to payment his monthly payment, the Plaintiff had to make his monthly payment to SANTANDER using it's "Speedpay" feature. From April of 2019, until August of 2019, the Plaintiff called SANTANDER from jail, and used his credit card on several occasions to make a payment to SANTANDER over the phone. In various phone calls, a representative of SANTANDER encouraged the Plaintiff to make his monthly payments by using the "Speedpay" feature offered by SANTANDER. The Plaintiff paid several "Speedpay" fees to SANTANDER, and, SANTANDER pocketed the cash.

**Santander's Illegal Business Practice's that Continue**

30.    Notwithstanding the violations being committed by SANTANDER, the Defendant SANTANDER struck again. It decided to engage in other tactics to dominate the car dealership industry, and seize control of the auto lending world. Plaintiff recently discovered that since 2010, SANTANDER has consistently accounted for the largest share of the subprime auto lending market (as measured by total dollar value in ABS issuances) among companies that focus in subprime auto lending. In its  subprime lending business, SANTANDER both makes direct loans to consumers, and purchases installment contracts from dealers across the U.S. and Arizona.

A.    *Santander's underwriting and loss models project high defaults for Certain Segments of its consumer population*

29.    SANTANDER's underwriting  process relies on credit scoring models

- 13 -

like the did with the Plaintiff. One of the models incorporates the consumer's borrowing history, and features of the loan the consumer has applied for (such as loan-to-value ratio, debt-to-income ratio, payment to-income ratio, mileage, and term) and generates a probability that a consumer like the Plaintiff will become severely delinquent during a particular window of time within the term of the loan. This probability then is converted into a scaled score on a proprietary, FICO like scale.

30.    Because the above model only indicates how likely it is that a consumer will go delinquent within that particular window of time within the term of the loan, SANTANDER also uses a separate model to predict how likely a consumer with a given proprietary score will default over the full life of the loan. The life-of-the-loan model projects that consumers with proprietary scores below a given threshold have an unreasonably heightened chance of default before the end of their term, and a subset of those consumers, who have some of the lowest proprietary scores, have a significantly worse probability of default before the end of their term. For example, for at least part of the time period examined by Arizona, SANTANDER projected that these consumers with the lowest proprietary scores had a greater than 70% likelihood of default over the life of the loan.

B.    *Santander exposes consumers to unnecessarily high levels of risk*

31.    SANTANDER is not only originating loans and purchasing installment contracts with a high likelihood of failure, but also exposing consumers to unnecessarily high levels of risk. In a typical auto-financing transaction, car dealers attempt to maximize the profits they earn on the front-end and back-end of an individual deal. The front-end of a transaction involves the negotiation of a sales price, whereas the back-end refers to the

- 14 -

negotiation of ancillary products included as part of the financing of the purchase of the vehicle. Even when acting as an "indirect" auto lender by purchasing installment contracts from dealers, SANTANDER has significant control over the extension of credit or financing of a transaction, including the "back-end" of a transaction, such as whether to purchase a contract that includes guaranteed-asset protection ("GAP") insurance, a GAP waiver and/or a service contract. Through its credit policies, SANTANDER asserts control over the amount dealers can include in the back-end. The generous allowances for dealers on the back-end have facilitated SANTANDER obtaining more market share, but those same large back-end charges expose consumers to increased risk in at least two ways: 1) significant back-end charges increase the overall amount financed, which increases the loan-to-value ratio on the loan; and 2) high finance costs increase either the consumer's monthly principal-to-interest ratio or increase the term of the loan.

32.    SANTANDER was, and still is aware that these loan features contribute to deteriorating loan quality but continues to make these loans or purchase the underlying installment contracts especially with the contract between the Plaintiff, and SANTANDER.

C. *Santander's aggressive pursuit of market share led it to underestimate risk associated with loans with stated income and expenses.*

33.    Although SANTANDER has sophisticated models that forecast consumer default, SANTANDER's policies with respect to stated income and expenses allow it to underestimate default risk in important ways and to purchase loans from consumers who are unlikely to be able to pay for their loans. SANTANDER also fails to meaningfully monitor dealer behavior to minimize the risk of receiving falsified information, including the amounts specified for consumers' income and expenses. One area where SANTANDER's

lack of verification as part of its underwriting exposes consumers to even riskier loans is with respect to the amounts alleged to represent a consumer's mortgage or rent. Housing costs are often a consumer's most significant monthly expense, and SANTANDER uses consumers' monthly housing debt to calculate consumers' debt-to-income ratios. The debt-to-income ratio is important in underwriting because it measures the amount of disposable income a consumer has available to pay off an auto loan and meet nonrecurring monthly expenses. SANTANDER generally allows consumers who apply for a loan to merely state their mortgage and rent expenses, as opposed to providing proof of a mortgage or rent payment, and SANTANDER has no apparent measures in place to minimize the risk of falsified mortgage or rent income. Dealers routinely use a default amount for mortgage or rent that would not be reasonably sufficient to pay for mortgage or rent in the vast majority of localities, but regardless, those low amounts result in a higher acceptance rate from SANTANDER. Housing costs, however, are not the only area in which SANTANDER's forecasts are likely incorrect. SANTANDER also made an aggressive push beginning in early 2013 to waive proof of income on most applications.

### D.  *Santander Turned a Blind Eye to Dealer Abuse.*

34.   Since as early as 2010, SANTANDER has been tracking problematic dealers across SANTANDER's business. Although SANTANDER had a process in place to evaluate problematic dealers, there was internal tension at SANTANDER between punishing problematic dealers and retaining SANTANDER's market share. As a result, SANTANDER was reluctant to act against flagged dealers so long as a sufficient amount of the installment contracts purchased from those dealers proved profitable for SANTANDER. Shortly after the Plaintiff purchased his vehicle from one of the problematic

dealerships, SANTANDER entered into an agreement with Chrysler through which SANTANDER would be the preferred lender on all Chrysler transactions, including the loan with the Plaintiff. And, to promote business under this new arrangement, SANTANDER allowed problematic dealers to take advantage of SANTANDER's new Chrysler relationship.

35. Around the same time, as explained above, SANTANDER dramatically changed its funding policy to accept increased numbers of stated-income loans. When SANTANDER rolled out this change to its funding requirements, SANTANDER did not bar those dealers identified as "problematic" by SANTANDER from using stated income on loan applications. SANTANDER's decision to broadly market its new stated-income policy, even to dealers with a history of misstating income, led to a significant spike in the number of early payment defaults. Although SANTANDER later attempted to tighten its policy with respect to problematic dealers, the tension between SANTANDER's business concerns and curbing dealer abuse persists, and SANTANDER continues to purchase installment contracts from dealers which SANTANDER itself identifies as problematic. As a result of SANTANDER's policies with respect to stated income and expenses and the failure to adequately curb dealer abuse, SANTANDER loans default at a higher rate.

E.   *Santander's Servicing and Collection Practices*

36. The consumer harm caused by the underwriting problems described above is compounded by SANTANDER's servicing and collection practices, where SANTANDER confuses, frustrates, and, in some cases, actively misleads consumers about their rights and the costs of taking certain actions. SANTANDER often requires that payments be made through methods that require consumers to pay additional third-party fees, such as money orders, and their infamous "Speedpay" feature. These fees tend to most

- 17 -

significantly affect consumers, like the Plaintiff who are unbanked, or underbanked.

37.    In servicing loans, SANTANDER's employees routinely confuse consumers about the benefits, and risks of extensions. Consumers, like the Plaintiff, routinely make partial payments or accept extensions without understanding that interest continues to accrue and future payments will likely go towards interest as opposed to paying down their principal balance. The consumers, like the Plaintiff, also are unaware that their loan terms are lengthened to accommodate the extension, partial payment, and interest accrual and that a payment may not stop a repossession, and this is what occurred to the Plaintiff.

38.    Additionally, SANTANDER employees often mislead consumers about their ability to recover repossessed vehicles, including encouraging consumers to make significant payments to recover vehicles when SANTANDER has no control over whether the vehicle can be recovered. Taken together, SANTANDER's practices impose significant harm on Arizona consumers as SANTANDER has done to the Plaintiff. These consumers obtain credit from SANTANDER under the false pretense that they are acquiring a vehicle they will eventually own. In reality, these consumers agree to extremely costly leases, the terms of which are so onerous that consumers will almost certainly fail to perform, resulting in their loan default and likely repossession of the vehicles.

**Santander Settles Numerous Lawsuits with Attorney's General's**

39.    On or about May 19, 2020, the Defendant SANTANDER Consumer USA, Inc., engaged in a multi-state lawsuit stemming from it's lending practices, to the "Speedpay" fees SANTANDER imposed on consumers, to their illegally collection practices, and all allegations stemming from its gap insurance scheme.

- 18 -

In settlement agreements with over thirty-eight (38) attorneys generals from around the Country, SANTANDER agreed to pay a large amount of money to the State's.

40.    In particular, the settlement release with the State of Arizona, upon information, and belief, states that SANTANDER agree to pay the State of Arizona the amount of $ 15,000,000.00 dollars to the Arizona Attorney General. As additional conditions of the settlement, the Multistate Executive Committee made up on the States of **Arizona**, Arkansas, California, Connecticut, District of Columbia, Florida, Arizona, Hawaii, Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Virginia, Washington, West Virginia, and Wyoming shall have sole discretion concerning the consumers entitled to relief and, the nature and amounts of such relief except that any such relief shall include amounts to Mandatory Relief Consumers. SANTANDER agreed to provide the Multistate Executive Committee with information the Multistate Executive Committee deems necessary to determine which Consumers are entitled to relief, the amount of such relief, and how to locate consumers entitled to relief including, but not necessarily limited to, providing the consumer's name, last known address, last known contact information, and loan identification number. The Settlement Administrator and/or Multistate Executive Committee shall provide all necessary tax reporting related to this agreement as required by law. Upon information, and belief, SANTANDER never provided the Plaintiff's name, last known address, or any contact information despite the fact that the Plaintiff had a change of address put in with the United States Postal Service.

PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

41.     As a further part of the settlement between SANTANDER, and the
Arizona Attorney General,, SANTANDER agreed in writing for the Plaintiff's
benefit to the following: (1) SANTANDER shall not repossess and instead shall
provide the title to the vehicle and waive the outstanding Loan balance for
all Consumers who had a loss forecasting score of 401 or less and, as of
December 31, 2019, have Defaulted but have not had their vehicle
repossessed and (2) SANTANDER shall not repossess and instead shall
provide the title to the vehicle and waive the outstanding Loan balance for
any Consumer with a loss forecasting score of 401 or less who defaults in
the future. SANTANDER shall implement the relief as described in (1) and
(2) by providing the relief in (1) prior to the relief in (2). When the
cumulative value of the outstanding Loan balances in (1) and (2) equals
$45,000,000, SANTANDER has met its obligations under this paragraph and
does not need to provide additional relief pursuant to this paragraph.
SANTANDER shall waive the Deficiency on Loans it Owns for a) Mandatory
Relief Consumers and b) to the extent not included in a), Defaulted
Consumers who had a loss forecasting score of 401 or less at the time of
origination, when the loan was originated between January 1, 2013 and
December 31, 2019, and who Defaulted within 12 months of origination of
the Loan.   In addition, SANTANDER shall have an obligation to buy back
such Loans originated between January 1, 2013 and December 31, 2017 in
order to waive the Deficiency for those Loans, as set forth in paragraphs 14
and 15 below. The Consumers entitled to relief in this paragraph shall
collectively be referred to as the "Deficiency Relief Consumers." If a
Defaulted Consumer receives a payment under paragraph 10 but is not a
Deficiency Relief Consumer, SANTANDER agrees that it will not collect on or
sell that Consumer's Loan for one year from when the Defaulted Consumer

- 20 -

is sent payment. The Multistate Working Group will send notice to the Company that payment has been sent to the Defaulted Consumer within 10 calendar days of such payment being sent. The moratorium on collecting or selling certain Consumer's Loans described in paragraph 12 does not prohibit SANTANDER from repossessing those Consumers' vehicles, except for those Consumers entitled to relief under paragraph 11 which is reincorporated as stating :

(1) SANTANDER shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for all Consumers who had a loss forecasting score of 401 or less and, as of December 31, 2019, have Defaulted but have not had their vehicle repossessed and (2) SANTANDER shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for any Consumer with a loss forecasting score of 401 or less who defaults in the future. SANTANDER shall implement the relief as described in (1) and (2) by providing the relief in (1) prior to the relief in (2).

42.    The agreement between the SANTANDER, and the Arizona Attorney General was for the benefit of the Plaintiff, and therefore, establishes a valid contract between the Plaintiff, and SANTANDER. Accordingly, the Arizona Attorney General was the attorney of record for the Plaintiff when SANTANDER agreed to the terms of the settlement because the Plaintiff owned a SANTANDER vehicle, and was a class member.

**Santander Violates the Settlement Agreement Terms and Conditions and Repossess the Plaintiff's 2018 Jeep Cherokee with All his Property Inside the Vehicle And Refuses To Return It**

43.    Despite knowing that the Plaintiff had a valid retail installment payment plan with SANTANDER, and that it agreed in writing with the Arizona

1    Attorney General, SANTANDER contracted with a private repossession company

2    to go out, locate, and repossess the Plaintiff's 2018 Jeep Cherokee with his

3    property, and microwave inside the vehicle.

4         44.    On or about January 2020, the Plaintiff's vehicle was parked at his

5    home, located by a private repossession company, seized, and returned to

6    SANTANDER. Inside the Plaintiff's vehicle was thousands of dollars in property in

7    which in now in the hands of some other person, other then the Plaintiff. Despite

8    knowing that the Plaintiff was a class member, SANTANDER still repossessed the

9    Plaintiff's vehicle. Further, to make matters far worse, as mentioned above, the

10   Plaintiff's FICO score was under, and negative 400 and therefore, pursuant to the

11   conditions of the settlement, SANTANDER agreed total out the amount owed, and

12   provide the Plaintiff with the title. But none of this ever occured. The Plaintiff

13   who was incarcerated at the time the vehicle was repossessed, provided

14   SANTANDER with his current, and temporary mailing address to the County Jail

15   where SANTANDER was required to mail the Plaintiff receipts for his "Speedpay"

16   payments that he made to SANTANDER for the months the Plaintiff was

17   incarcerated, but at all relevant times, despite SANTANDER had the Plaintiff's

18   mailing address, and never mailed him the receipts, nor the title of his 2018 Jeep

19   Cherokee, to the Plaintiff at the County Jail, and because the documents from

20   SANTANDER are considered to be documents that contain personal information,

21   the County Jail would have logged in any mail from SANTANDER as "legal mail"

22   that would require the Plaintiff to have to sign a book that the County Jail keeps

23   on file for a period of seven (7) years. The records of the County Jail will reflect

24   that there was no mail from SANTANDER during the Plaintiff's time of

25   incarceration including to date.

**Plaintiff Obtains Copies of His Three Credit Reports**

45. SANTANDER struck again. As an additional part of the settlement with the Arizona Attorney General, SANTANDER agreed to total out all loans for those consumers stated about in one, and two of the settlement terms, and not report any of the balances to any, and all credit reporting agencies, ("hereafter CRA's"), such as TransUnion, LLC., ("TransUnion"), Equifax Information Solutions, Inc., ("EQUIFAX"), and Experian Information Solutions, Inc., ("Experian").

46. Rather then comply with the very terms, and conditions SANTANDER agreed to begin with, SANTANDER reported the Plaintiff to TransUnion, Equifax, and Experian for the amount of approximately $ 18,000 plus dollars. In reviewing the Plaintiffs Equifax trade line, not only was the amount that was supposed to be totaled out to zero dollars, but all three credit reports listed inaccurate payment information concerning the Plaintiff. In addition, when all three credit bureaus listed the account with a partial account number as : **3000021023840\*\*\*\***, with a balance allegedly owed by the Plaintiff in the amount of $ 19,809.00, but in reality what the Plaintiff, if all said to be true, and correct, only owed SANTANDER the amount of $ 16,452 with a difference of $ 3,357.00 dollars that SANTANDER could not account for, nor collect. Although SANTANDER is entitled to collect a debt that belongs to it, the FDCPA and FCRA does not permit SANTANDER from collecting a debt that it is not entitled to.

**Plaintiff Sends a FCRA Demand For Investigation Letter to Santander**

47. On or about February 5, 2021, the initiated, and mailed a dispute, and demand for investigation letter pursuant to the Fair Credit Reporting Act to SANTANDER, via it's registered agent identified as C.T. Corporation located in both Lawrenceville, Arizona, as well as Los Angeles, California, requesting an investigation into the allegations stated in the Plaintiffs dispute letter. The Plaintiff also mailed copies of the dispute, and demand for investigation letter

- 23 -

1  pursuant to the FCRA to each of the three credit bureaus TRANSUNION,
2  EXPERIAN, and EQUIFAX.

3      48.  In the letter, the Plaintiff points out to an inaccurate amount being
4  reported on his credit trade line, but also that SANTANDER was actively collected
5  a debt within the meaning of the Fair Credit Report Act that SANTANDER knew,
6  and had reason to know that SANTANDER did not have a permissible purpose to
7  try, and collect. Also included in the Plaintiff's dispute, and demand for
8  investigation, the Plaintiff also correctly pointed out that SANTANDER agreed to
9  numerous lawsuit settlements with well over thirty-eight (38) states in the United
10 States, and that as part of these settlement agreements, among other things,
11 SANTANDER agreed to total all existing loans to zero dollars, but that
12 SANTANDER refused to do so. Plaintiff also provided SANTANDER, and the three
13 credit bureaus TransUnion, Experian, and Equifax.

14     49.  SANTANDER received the Plaintiffs dispute, and demand for
15 investigation letter from its registered agent, C.T. Corporation, and SANTANDER
16 received a copy of the Plaintiffs dispute from each of the three credit bureaus.
17 Despite receiving the letters, SANTANDER adamantly refused to comply with its
18 mandatory, and statutory duties under the FCRA, and FDPCA to investigate,
19 delete, and cease, and desist in the debt. To date, SANTANDER, who is known for
20 thus far, for not comply with the terms of the attorney general settlement, didn't
21 even comply with its mandatory, and statutory duties by conducting an FCRA
22 investigation, much less respond to the Plaintiffs dispute letter as required under
23 15 U.S.C. § 1681s-2(b).

24     50.  SANTANDER owed a duty to the Plaintiff to conduct a reasonable
25 investigation after receiving the Plaintiffs proper FCRA dispute letter.
26 SANTANDER received copies of the Plaintiffs dispute letter from their registered
27 agents. SANTANDER is a furnisher of information, as the term is used in the

- 24 -

FCRA. As such, the FCRA imposes duties upon SANTANDER as found in relevant part in Section 1681s2(b) that SANTANDER must comply with, but SANTANDER choose not to. The Plaintiffs claims against SANTANDER is limited to a private cause of action against a furnisher of credit information to a violation of § 1681s-2(b).

51.    Pursuant to Section 1681s-2(b), furnishers of information are required to investigate and promptly respond to notices of any consumer disputes. Specifically, once a consumer reporting agency receives notice of the disputed information from a consumer, the agency must provide notice of the dispute "to any person who provided any item of information in dispute," and the notice must "include all relevant information regarding the dispute that the agency has received from the consumer.." 15 U.S.C. § 1681i(a)(2)(A).

52.    The person(s) who receives the notice from the consumer reporting agency must then investigate the disputed information, report the results of the investigation to the consumer reporting agency, and make any necessary modifications. 15 U.S.C. § s-2(b)(1). Equifax, Experian, and TransUnion are credit reporting agencies pursuant to 15 U.S.C. § 1681i(a)(2) within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681, p., who in turn transmitted the Plaintiff's dispute letter to SANTANDER. SANTANDER breached it's duty owed to the Plaintiff causing him injury. As a result of the actions of SANTANDER's willful, and intentional failure to comply with the FCRA, the Plaintiff will have to pay out of pocket money for a brand new vehicle with a higher APR per year. SANTANDER received the proper notice from the consumer reporting agency pursuant to the FCRA section 15 U.S.C. § 1681i(a)(2), and SANTANDER failed to uphold their mandatory duties pursuant to FCRA provisions of 15 U.S.C. § 1681 s-2(b).

53.    The Plaintiff believes and thereon alleges that the Plaintiff will be required to pay a higher annual percentage rate on a new vehicle loan for a new car, higher then usual security deposit to pay for an apartment, or home, and once the Plaintiff is released from incarceration, the Plaintiff will be without a vehicle that SANTANDER knew that it was not entitled to have repossessed. Plaintiff also applied for a credit card, and was denied a line of credit as a direct result of the Defendants' actions.

**The Plaintiff Sends His Dispute Letter And Request For Investigation to Experian Information Solutions Requesting An Investigation Into His Credit Trade Line Whom Refuses To Respond To The Plaintiff's Letters**

54.    On January 30, 2022, the Plaintiff also sent a Fair Credit Reporting Act dispute letter to Defendant Experian Information Solutions, Inc., ("EXPERIAN"), to dispute an account that appeared on is trade line concerning an open account appearing under the name of SANTANDER, and how the Plaintiff allegedly owed SANTANDER $ 22,000 plus dollars.

55.    In the Plaintiff's FCRA dispute letter, the Plaintiff outlined to EXPERIAN concerning the allegations that the Plaintiff does not owe any funds, or money to Defendant SANTANDER as the Plaintiff's vehicle was not only illegally repossessed, and that Defendant SANTANDER entered into an agreement with the State of Arizona, and several other states to settle their claims brought by the attorney's general from thirty-seven (37) plus states in the United States for allegations stemming from bad lending practices. Also stated in the Plaintiff's FCRA dispute letter, the Plaintiff demanded an investigation by EXPERIAN into the validity of the debt allegedly owed by the Plaintiff, to Defendant SANTANDER.

56.    Further, the Plaintiff also informed Defendant EXPERIAN about inaccurate information being reported by EXPERIAN. For example, EXPERIAN was reporting that the Plaintiff owed SANTANDER the amount of $ 21,350, but

PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

1  then EXPERIAN changed that amount to a different amount of $ 19, 809.00, but
2  neither amount was correct, legitimate, or even properly owed by they Plaintiff to
3  the Defendant SANTANDER for the reasons outlined in the lawsuits brought by
4  the Arizona Attorney General.

5      57.    Pursuant to 15 U.S.C. § 1681., *et seq.*, the Plaintiff sent copies of his
6  FCRA dispute, and request for investigation letter to EXPERIAN through its
7  registered agent C.T. Corporation, and its registered agent then transmitted the
   Plaintiff's dispute letter to EXPERIAN.

8      58.    Further, the Defendant EXPERIAN also received copies from the
9  other three credit bureaus that the Plaintiff sent his FCRA dispute letter to, as well
10  as SANTANDER, and other entities. Despite receiving the Plaintiff's FCRA dispute
11  letter requesting an investigation, Defendant EXPERIAN never responded to the
12  Plaintiffs FCRA demand and dispute letter. The Defendant EXPERIAN owed a duty
13  to the Plaintiff to comply with its mandatory, and statutory duties by conducting
   an FCRA investigation, verifying the SANTANDER debt on the Plaintiffs credit
14  trade line, and furnishing a copy of its results, and findings to the Plaintiff, but
15  Defendant EXPERIAN refused to do so. As such, EXPERIAN is liable to the Plaintiff
16  for its failure to comply with the Fair Credit Reporting Act.

17      59.    The Plaintiffs claims against SANTANDER is limited to a private
18  cause of action against a furnisher of credit information to a violation of §
19  1681s-2(b).

20      60.    Pursuant to Section 1681s-2(b), furnishers of information are
21  required to investigate and promptly respond to notices of any consumer
22  disputes. Specifically, once a consumer, like the Plaintiff, files with the reporting
   agency, who then receives notice of the disputed information from a consumer,
23  the agency must then provide notice of the dispute,"to any person who provided
24  any item of information in dispute," and the notice must "include all relevant

25

26

27

1   information regarding the dispute that the agency has received from the
2   consumer.." 15 U.S.C. § 1681i(a)(2)(A). The person(s) who receives the notice from
3   the consumer reporting agency must then investigate the disputed information,
4   report the results of the investigation to the consumer reporting agency, make
5   any necessary modifications, and provide the Plaintiff a copy of its investigation.
6   15 U.S.C. § s-2(b)(1), but neither SANTANDER or EXPERIAN did so.

       61.    Defendant EXPERIAN is a credit reporting agencies pursuant to 15
7   U.S.C. § 1681i(a)(2) within the meaning of the Fair Credit Reporting Act, 15 U.S.C. §
8   1681, p.

9       62.    Defendants SANTANDER and EXPERIAN owed a duty to the Plaintiff
10  under FCRA section 15 U.S.C. §§ 1681 s-2(b) and 1681i to conduct an investigation,
11  and reinvestigation at the Plaintiffs request, and each of the Defendants
12  SANTANDER and EXPERIAN refused to uphold its mandatory and statutory
13  duties. Defendants SANTANDER and EXPERIAN breached their duty owed to the
14  Plaintiff causing damages.

15      63.    Defendants SANTANDER and EXPERIAN received the proper notice
16  from the consumer reporting agency pursuant to the FCRA section 15 U.S.C. §
17  1681i(a)(2), and Defendants SANTANDER and EXPERIAN failed to uphold their
    duties pursuant to FCRA provisions of 15 U.S.C. § 1681 s-2(b) and and 1681i.

18      64.    As of the date of this lawsuit, the Defendants SANTANDER and
19  EXPERIAN still not answered the Plaintiffs letters, conduct an investigation,
20  reinvestigation, or respond to the Plaintiff with the Defendants' results. As a
21  direct result of the actions, and inactions of Defendants SANTANDER and
22  EXPERIAN, the Plaintiff has been damaged in an amount to be determined at
23  trial. The Plaintiff believes and thereon alleges that the Plaintiff will be required
24  to pay a higher annual percentage rate on a new vehicle loan for a new car, and a
    higher then usual security deposit to pay for an apartment in once the Plaintiff is

25

26                          - 28 -

27       PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
          AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

28

released from his incarceration due to the highly inaccurate information that the Defendants SANTANDER and EXPERIAN are reporting, or causing to be reported on the Plaintiff's trade line. Plaintiff also applied for a credit card, and was denied a line of credit as a direct result of the Defendants' actions.

**The Plaintiff Sends His Dispute Letter And Request For Investigation to Equifax Information Services Requesting An Investigation Into His Credit Trade Line**

65.    On January 30, 2022, the Plaintiff also sent a Fair Credit Reporting Act dispute letter to Defendant Equifax Information Service, L.L.C., ("EQUIFAX"), to dispute an account that appeared on is trade line concerning an open account appearing under the name of SANTANDER, and how the Plaintiff allegedly owed SANTANDER $ 22,000 plus dollars.

66.    In the Plaintiff's FCRA dispute letter, the Plaintiff outlined to EQUIFAX concerning the allegations that the Plaintiff does not owe any funds, or money to Defendant SANTANDER as the Plaintiff's vehicle was not only illegally repossessed, and that Defendant SANTANDER entered into an agreement with the State of Arizona, and several other states to settle their claims brought by the attorney's general from thirty-seven (37) plus states in the United States for allegations stemming from bad lending practices. Also stated in the Plaintiff's FCRA dispute letter, the Plaintiff demanded an investigation by EQUIFAX into the validity of the debt allegedly owed by the Plaintiff, to Defendant SANTANDER.

67.    Further, the Plaintiff also informed Defendant EQUIFAX about inaccurate information being reported by EQUIFAX. For example, EQUIFAX was reporting that the Plaintiff owed SANTANDER the amount of $ 21,441, but then EQUIFAX changed that amount to a different amount of $ 19, 890.00, but neither amount was correct, legitimate, or even properly owed by they Plaintiff to the Defendant SANTANDER for the reasons outlined in the lawsuits brought by the

1    Arizona Attorney General.

2    68.    Pursuant to 15 U.S.C. § 1681., *et seq.*, the Plaintiff sent copies of his

3    FCRA dispute, and request for investigation letter to Defendant EXPERIAN

4    through its registered agent Corporation Service Company, ("CSC"), and its

5    registered agent then transmitted the Plaintiff's FCRA dispute letter to EQUIFAX.

6    69.    Further, the Defendant EQUIFAX also received copies from the other

     three credit bureaus that the Plaintiff sent his FCRA dispute letter to, as well as

7    SANTANDER, and other entities. Despite receiving the Plaintiff's FCRA dispute

8    letter requesting an investigation, Defendant EQUIFAX never responded to the

9    Plaintiffs FCRA demand and dispute letter. The Defendant EQUIFAX owed a duty

10   to the Plaintiff to comply with its mandatory, and statutory duties by conducting

11   an FCRA investigation, verifying the SANTANDER debt on the Plaintiffs credit

12   trade line, and furnishing a copy of its results, and findings to the Plaintiff, but

13   Defendant EQUIFAX refused to do so. As such, EQUIFAX is liable to the Plaintiff

14   for its failure to comply with the Fair Credit Reporting Act.

15   70.    The Plaintiffs claims against SANTANDER is limited to a private

16   cause of action against a furnisher of credit information to a violation of §
     1681s-2(b).

17   71.    Pursuant to Section 1681s-2(b), furnishers of information are

18   required to investigate and promptly respond to notices of any consumer

19   disputes. Specifically, once a consumer, like the Plaintiff, files with the reporting

20   agency, who then receives notice of the disputed information from a consumer,

21   the agency must then provide notice of the dispute "to any person who provided

22   any item of information in dispute," and the notice must "include all relevant

23   information regarding the dispute that the agency has received from the

24   consumer.." 15 U.S.C. § 1681i(a)(2)(A).  The person(s) who receives the notice

25   from the consumer reporting agency must then investigate the disputed

26                                    - 30 -

28

1    information, report the results of the investigation to the consumer reporting

2    agency, make any necessary modifications, and provide the Plaintiff a copy of its

3    investigation. 15 U.S.C. § s-2(b)(1), but neither SANTANDER or EQUIFAX did so.

4        72.    Defendant EQUIFAX is a credit reporting agencies pursuant to 15

5    U.S.C. § 1681i(a)(2) within the meaning of the Fair Credit Reporting Act, 15 U.S.C. §

6    1681, p.

7        73.    Defendants SANTANDER and EQUIFAX owed a duty to the Plaintiff

8    under FCRA section 15 U.S.C. §§ 1681 s-2(b) and 1681i to conduct an investigation,

9    and reinvestigation at the Plaintiffs request, and each of the Defendants

10   SANTANDER and EQUIFAX refused to uphold its mandatory and statutory duties.

11   Defendants SANTANDER and EQUIFAX breached their duty owed to the Plaintiff

12   causing damages.

13       74.    Defendants SANTANDER and EQUIFAX received the proper notice

14   from the consumer reporting agency pursuant to the FCRA section 15 U.S.C. §

15   1681i(a)(2), and Defendants SANTANDER and EQUIFAX failed to uphold their

16   duties pursuant to FCRA provisions of 15 U.S.C. § 1681 s-2(b) and and 1681i.

17       75.    As of the date of this lawsuit, the Defendants SANTANDER and

18   EQUIFAX    still have    not answered the Plaintiffs letters, conducted an

19   investigation, reinvestigation, or respond to the Plaintiff in writing with the

20   Defendants' results. As a direct result of the actions, and inactions of Defendants

21   SANTANDER and EQUIFAX, the Plaintiff has been damaged in an amount to be

22   determined at trial. The Plaintiff believes and thereon alleges that the Plaintiff

23   will be required to pay a higher annual percentage rate on a new vehicle loan for

24   a new car, and a higher then usual security deposit to pay for an apartment in

25   once the Plaintiff is released from his incarceration due to the highly inaccurate

     information that the Defendants SANTANDER and EQUIFAX are reporting, or

     causing to be reported on the Plaintiff's trade line.

- 31 -

76.     As a result of the actions of the Defendants, the Plaintiff has been damaged in an amount to be determined at trial. Plaintiff also applied for a credit card, and was denied a line of credit as a direct result of the Defendants' actions.

**The Plaintiff Sends His Dispute Letter And Request For Investigation to TransUnion Requesting An Investigation Into His Credit Trade Line**

77.     On January 30, 2022, the Plaintiff also sent a Fair Credit Reporting Act dispute letter to Defendant TransUnion, L.L.C., ("TRANSUNION"), to dispute an account that appeared on is trade line concerning an open account appearing under the name of SANTANDER, and how the Plaintiff allegedly owed SANTANDER $ 22,000 plus dollars.

78.     In the Plaintiff's FCRA dispute letter, the Plaintiff outlined to TRANSUNION concerning the allegations that the Plaintiff does not owe any funds, or money to Defendant SANTANDER as the Plaintiff's vehicle was not only illegally repossessed, and that Defendant SANTANDER entered into an agreement with the State of Arizona, and several other states to settle their claims brought by the attorney's general from thirty-seven (37) plus states in the United States for allegations stemming from bad lending practices. Also stated in the Plaintiff's FCRA dispute letter, the Plaintiff demanded an investigation by TRANSUNION into the validity of the debt allegedly owed by the Plaintiff, to Defendant SANTANDER.

79.     Further, the Plaintiff also informed Defendant TRANSUNION about inaccurate information being reported by TRANSUNION. For example, TRANSUNION was reporting that the Plaintiff owed SANTANDER the amount of $ 21,441, but then TRANSUNION changed that amount to a different amount of $ 19,890.00, but neither amount was correct, legitimate, or even properly owed by they Plaintiff to the Defendant SANTANDER for the reasons outlined in the

PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

1    lawsuits brought by the Arizona Attorney General.

2        80.    Pursuant to 15 U.S.C. § 1681., *et seq.*, the Plaintiff sent copies of his
3    FCRA dispute, and request for investigation letter to Defendant TRANSUNION
4    through its registered agent Prentice-Hall, and thereafter, its registered agent
5    then transmitted the Plaintiff's FCRA dispute letter to TRANSUNION who in turn
6    did nothing.

7        81.    Further, the Defendant TRANSUNION also received copies from the
8    other three credit bureaus that the Plaintiff sent his FCRA dispute letter to, as well
9    as SANTANDER, and other entities. Despite receiving the Plaintiff's FCRA dispute
10   letter requesting an investigation, Defendant TRANSUNION never responded to
11   the Plaintiffs FCRA demand and dispute letter. The Defendant TRANSUNION
12   owed a duty to the Plaintiff to comply with its mandatory, and statutory duties by
13   conducting an FCRA investigation, verifying the SANTANDER debt on the
14   Plaintiffs credit trade line, and furnishing a copy of its results, and findings to the
15   Plaintiff, but Defendant TRANSUNION refused to do so. As such, TRANSUNION is
16   liable to the Plaintiff for its failure to comply with the Fair Credit Reporting Act.

17       82.    The Plaintiffs claims against SANTANDER is limited to a private
18   cause of action against a furnisher of credit information to a violation of §
19   1681s-2(b).

20       83.    Pursuant to Section 1681s-2(b), furnishers of information are
21   required to investigate and promptly respond to notices of any consumer
22   disputes. Specifically, once a consumer, like the Plaintiff, files with the reporting
23   agency, who then receives notice of the disputed information from a consumer,
24   the agency must then provide notice of the dispute "to any person who provided
25   any item of information in dispute;" and the notice must "include all relevant
26   information regarding the dispute that the agency has received from the
27   consumer.." 15 U.S.C. § 1681i(a)(2)(A). The person(s) who receives the notice from

the consumer reporting agency must then investigate the disputed information, report the results of the investigation to the consumer reporting agency, make any necessary modifications, and provide the Plaintiff a copy of its investigation. 15 U.S.C. § s-2(b)(1), but SANTANDER or TRANSUNION did so.

84.    Defendant TRANSUNION is a credit reporting agencies pursuant to 15 U.S.C. § 1681i(a)(2) within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681, p.

85.    Defendants SANTANDER and TRANSUNION owed a duty to the Plaintiff under FCRA section 15 U.S.C. §§ 1681 s-2(b) and 1681i to conduct an investigation, and reinvestigation at the Plaintiffs request, and each of the Defendants SANTANDER and TRANSUNION refused to uphold its mandatory and statutory duties. Defendants SANTANDER and TRANSUNION breached their duty owed to the Plaintiff causing damages.

86.    SANTANDER and TRANSUNION received the proper notice from the consumer reporting agency pursuant to the FCRA section 15 U.S.C. § 1681i(a)(2), and SANTANDER and TRANSUNION failed to uphold their mandatory, and statutory duties pursuant to FCRA provisions of 15 U.S.C. § 1681 s-2(b) and and 1681i.

87.    As of the date of this lawsuit, the Defendants SANTANDER and TRANSUNION  still have  not answered the Plaintiffs letters, conducted an investigation, reinvestigation, or respond to the Plaintiff in writing with the Defendants' results. As a direct result of the actions, and inactions of Defendants SANTANDER and TRANSUNION, the Plaintiff has been damaged in an amount to be determined at trial. The Plaintiff believes and thereon alleges that the Plaintiff will be required to pay a higher annual percentage rate on a new vehicle loan for a new car, and a higher then usual security deposit to pay for an apartment in once the Plaintiff is released from his incarceration due to the highly inaccurate

PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

information that the Defendants SANTANDER and TRANSUNION are reporting, or causing to be reported on the Plaintiff's trade line. Plaintiff also applied for a credit card, and was denied a line of credit as a direct result of the Defendants' actions.

### Plaintiff Is Entitled To Equitable Tolling On All Of His Claims

#### A.    Equitable Tolling

88.    Under the doctrine of equitable tolling, "plaintiffs may sue after the statutory time period has expired if they have been prevented from doing so due to any inequitable circumstances." Ellis v. GMAC, 160 F.3d 703, 706 (11th Cir. 2008). Tolling is "appropriate when a movant untimely files because of extraordinary circumstances that are both beyond his control, and unavoidable even with diligence." Sandvik v. United States, 177 F.3d 1269, 1271 (5th Cir. 1999). As the supreme court has stated, "[e]quitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." See Wallace v. Kato, 549 U.S. 384, 396, 127 s. Ct. 1091, 166 L. Ed. 2d 973 (2007).

#### B.    The Coronavirus Pandemic

89.    The current COVID19 is a rapidly evoling, and still evoling, public health crisis of an extraordinary magnitude. On the past weeks, and months, "the unprecedented and extraordinary dangerous nature of the COVID-19 pandemic has become apparant." United States v. Stephens, 2020 WL 1295155, at *1, F.Supp. 3d (S.D.N.Y. March 19, 2020). On March 13, 2020, the CDC declared the COVID-19 outbreak to constitute a national emergency stating:

"In response to the public health experts' warnings about the virus' communicaility, and the severe health risk of the COVID19 disease that the virus causes, officials at all levels of government have adopted dramatic and widespread social distancing measures to slow the spread of the virus and protect

- 35 -

the Health of the nation. The CDC has "acknowledged that correction and detention facilities present unique challenges for control of COVID19 transmission among incarcerated/detained persons, staff, and visitors." United States v. Kennedy, 2020 U.S. Dist. LEXIS 53359, 2020 WL 1493481, at * 2 E.D. Mich. March 27, 2020)(quoting Intermim Guidance on Management of Coronavirus Disease 2019 (COVID19) in correctional and detention facilities, CDC (Mar. 23, 2020). See also Stephens, 2020 U.S. Dist. LEXIS 47846, 2020 WL 1295155, at * 2 (citing Joseph A. Bick, Infection and control). Due to the current pandemic, the Plaintiff tested positive for COVID19 twice in the past two years preceding the filing of this lawsuit that prevented the filing of this Complaint sooner thereby entitling the Plaintiff to the benefit of equitable tolling. Presently, The Plaintiff has brought claims against SANTANDER for FCRA, FDCPA, and various State law claims against SANTANDER that would, or could arguably say that some of the Plaintiff's claims are time-barred about the doctrine of equitable tolling for some of the Plaintiff's claims. For instance, the Plaintiff brings a FDCPA cause of action for SANTANDER charging Speedpay fees using Western Union. Plaintiff's last known payment made to SANTANDER was in July, and August of 2019, thereby leaving the Plaintiff no later then July, and August of 2020, to bring his FDCPA claims, but the current pandemic hit, and the Plaintiff was unable to pursue his FDCPA claims. Likewise, the Plaintiff is entitled to equitable tolling on his claims. Because the balance of the Plaintiff's claims are not time barred, the Plaintiffs FCRA, FDCPA, and breach of contract claims are still within the applicable statute of limitations. Accordingly, the doctrine of equitable tolling does apply to all of the Plaintiffs claims under both State, and Federal law.

### FIRST CAUSE OF ACTION

**Fair Credit Reporting Act, 15 U.S.C. § 1681., et seq - Failure to Comply with FCRA (Plaintiff v. All Defendants)**

- 36 -

90.   Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

A "consumer reporting agency" is defined by the FCRA as follows:

[A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. 15 U.S.C. § 1681a(f).

91.   SANTANDER is a "furnisher" as that term is used in Section 1681s-2 of the FCRA. Section 1681n of the FCRA imposes civil liability on any CRA or furnisher "who willfully fails to comply with any requirement" of the Act. See 15 U.S.C. § 1681n(a).

92.   Defendants EXPERIAN, EQUIFAX, and TRANSUNION are "consumer reporting agency" as defined by the FCRA.

93.   Defendant SANTANDER is a "furnisher" as that term is used in Section 1681s-2 of the FCRA. Section 1681n of the Fair Credit Reporting Act imposes civil liability on any CRA or furnisher "who willfully fails to comply with any requirement" of the FCRA. See 15 U.S.C. § 1681n(a).

94.   Section 1681o of the FCRA provides for civil liability against any CRA or furnisher which is negligent in failing to comply with any requirement imposed under the Act.

95.   Defendants SANTANDER, EXPERIAN, EQUIFAX, and TRANSUNION owed a duty to the Plaintiff to conduct a reasonable investigation into a fraudulent debt that the Plaintiff complained about in his dispute letters, however, Defendants refused to do so pursuant to the FCRA thereby breaching

- 37 -

1. their mandatory, and statutory duties outlined in the FCRA. Defendants had, and
2. still has a mandatory and statutory duty to conduct a meaningful investigation,
3. and breached their mandatory duties thereby causing damages to the Plaintiff.
4. SANTANDER, EXPERIAN, EQUIFAX, and TRANSUNION received a written notice
5. of the dispute from the Plaintiff through its registered agent, as well as a copy of
6. the Plaintiff's dispute letter from all three CRA's, and refused to conduct an
7. investigation. The Plaintiff has been damaged in an amount to be determined at
trial.

8. SECOND CAUSE OF ACTION

9. Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)

10. (Plaintiff v. Santander Consumer USA, Inc.)

11.     96.    Plaintiff re-alleges and reincorporates each of the paragraphs as
12. stated herein.

13.     97.    Under section 1681s-2(b), Defendant SANTANDER owed a duty under
14. this section of the Fair Credit Reporting Act to investigate any dispute upon
receiving a proper dispute notice from the Plaintiff.

15.     98.    SANTANDER received the Plaintiffs dispute notice from several
16. consumer reporting agencies, and still refused to comply with their mandatory,
17. and statutory duties owed to the Plaintiff.

18.     99.    SANTANDER breached it's mandatory duty owed to the Plaintiff
19. causing injury to the Plaintiff. Defendant SANTANDER is a consumer reporting
20. agencies within the meaning of the Fair Credit Reporting Act, and owed a duty to
21. the Plaintiff under 15 U.S.C. § 1681 s-2(b) to conduct an investigation, but
22. SANTANDER refused to do so.

23.     100.    SANTANDER failed to conduct a reasonable investigation into the
24. accuracy of information related to the disputed trade line, in violation of Section
1681s-2(b)(1).

25.

26. - 38 -

27. PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

101.  SANTANDER is a "furnisher" of consumer credit information as that term is used in Section 1681s-2 of the FCRA.

102.  SANTANDER's failure to report that Plaintiff disputed the accuracy of the trade line was a failure to accurately update the information because it was "misleading in such a way and to such an extent that it [could] be expected to have an adverse effect" on Plaintiff. Gorman v. Wolpoff & Abramson, LLP, et al., 584 F.3d 1147 (9th Cir. 2009); See also Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142 (4th Cir. 2008).

103.  As a direct result of the actions, inactions, and breach of the Defendants mandatory and statutory duties, the Plaintiff will now have to pay a higher APR, or deposit to benefit from any consumer loan on any future consumer accounts, home, or new car. Further, the Plaintiff has been damaged with additional damages in an amount to be proven at trial.

104.  As a direct and proximate result of SANTANDER's willful and/or negligent refusal to comply with the FCRA as outlined above, Plaintiff has suffered substantial loss and damage including, but not limited to: loss of opportunity to obtain credit, damage to reputation, expenditure of considerable time and out-of pocket expenses, worry, fear, distress, frustration and embarrassment, entitling him to an award of actual damages in amounts to be proved at trial, together with the costs of this action pursuant to 15 U.S.C. § 1681o.

### THIRD CAUSE OF ACTION

### Fair Debt Collection Practice Act, 15 U.S.C. § 1692, *et seq.*

### (Plaintiff v. Santander Consumer USA, Inc.)

105.  Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

- 39 -

106.   The FDCPA creates substantive rights for consumers like the Plaintiff; violations cause injury to consumers like the Plaintiff, and such injuries are concrete and particularized. Quinn v. Specialized Loan Servicing, LLC, No. 16 C 2021, 2016 U.S. Dist. LEXIS 107299 *8-13 (N.D. Ill. Aug. 11, 2016) (rejecting challenge to Plaintiff's standing based upon alleged FDCPA statutory violation); Lane v. Bayview Loan Servicing, LLC, No. 15 C 10446, 2016 U.S. Dist. LEXIS 89258 *9-10 (N.D. Ill. July 11, 2016) ("When a federal statute is violated, and especially when Congress has created a cause of action for its violation, by definition Congress has created a legally protected interest that it deems important enough for a lawsuit."); Church v. Accretive Health, Inc., No. 15-15708, 2016 U.S. App. LEXIS 12414 *7-11 (9th Cir. July 6, 2016) (same); see also Mogg v. Jacobs, No. 15-CV-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 33229, 2016 WL 1029396, at *5 (S.D. Ill. Mar. 15, 2016) ("Congress does have the power to enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute," (quoting Sterk v. Redbox Automated Retail, LLC, 770 F.3d 618, 623 (7th Cir. 2014)). For this reason, and to encourage consumers to bring FDCPA actions, Congress authorized an award of statutory damages for violations. 15 U.S.C. § 1692k(a).

107.   SANTANDER entered into an agreement with the Arizona attorney general to total the Plaintiff's loan balance to zero because he had, and still has, a 401 or lower FICO credit score, and the Defendant is still collecting an outstanding balance of $ 18,000 plus dollars that SANTANDER knew, and had reason to know that the Plaintiff does not owe to SANTANDER. Despite also agreeing not to post any delinquent amount on the Plaintiff's trade line, SANTANDER still posted the Plaintiff's balance of his loan on his credit trade line SANTANDER agreed not to post.

108.    SANTANDER is actively collecting, and attempting to collect, a debt that Plaintiff does not actually owe to SANTANDER. Although SANTANDER is allowed to collect its own debts, SANTANDER is not allowed to collect a debt that is not legitimately owed by the Plaintiff. All three of Plaintiff's credit reports are reflecting a balanced purportedly owed by the Plaintiff, to SANTANDER. Therefore, SANTANDER has violated, and continue to violate the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10), 1692f and 1692f(1).

### FOURTH CAUSE OF ACTION

**Fair Debt Collection Practice Act, 15 U.S.C. § 1692f(1)**

**(Plaintiff v. Santander Consumer USA, Inc.)**

109.    Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

110.    The FDCPA applies to SANTANDER because it regularly engages in debt collection as defined by the statute.

111.    By charging the Speedpay fee, a portion of which it retains, SANTANDER acted in violation of the federal Fair Debt Collection Practices Act, which prohibits "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

112.    The plain instruction of § 1692f(1) is that the collection of any amount incidental to the principal obligation, unless expressly authorized by agreement creating the debt or permitted by law, violates the FDCPA. Courts have interpreted the FDCPA broadly. See, e.g., Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d 22, 27 (2d Cir. 1989) ("It is clear that Congress painted with a broad brush in the FDCPA to protect consumers from abusive and deceptive debt collection practices, and courts are not at liberty to excuse violations where the language of

- 41 -

the statute clearly comprehends them."). Accord; <u>Acosta v. Credit Bureau</u>, 2015 U.S. Dist. LEXIS 55870 (N.D. Ill., Apr. 29, 2015). The phrase "permitted by law" means that "a debt collector may not collect any amount if either '(A) state law expressly prohibits collection of the amount or (B) the contract does not provide for collection of the amount and state law is silent.'" <u>Acosta</u>, 2015 Dist. LEXIS 55870 at *8 (quoting FTC Staff Commentary on the FDCPA, 53 Fed. Reg. 50,097, 50,108 (Dec. 13, 1988).

**FIFTH CAUSE OF ACTION**

**Fair Credit Reporting Act, 15 U.S.C. § 1681i**

**(Plaintiff v. EXPERIAN, EQUIFAX and TRANSUNION)**

113.    Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

114.    Under section 1681i, Defendants EXPERIAN, EQUIFAX, and TRANSUNION owed a duty under this section of the Fair Credit Reporting Act to investigate any dispute upon receiving a proper dispute notice from the Plaintiff.

115.    Defendants EXPERIAN, EQUIFAX, and TRANSUNION received the Plaintiffs dispute notice from several consumer reporting agencies, and still refused to comply with their mandatory, and statutory duties owed to the Plaintiff.

116.    Defendants EXPERIAN, EQUIFAX, and TRANSUNION breached their mandatory duties owed to the Plaintiff causing injury to the Plaintiff. Defendants EXPERIAN, EQUIFAX, and TRANSUNION are credit reporting agencies pursuant to 15 U.S.C. § 1681i(a)(2) within the meaning of the Fair Credit Reporting Act.

117.    By failing to conduct a reasonable investigation into Plaintiff's disputes in this regard, Defendants EXPERIAN, EQUIFAX, and TRANSUNION willfully and/or negligently violated 15  U.S.C. § 1681i(a)(1) with respect to each dispute lodged by the Plaintiff.

- 42 -

118.   As a direct and proximate result of EXPERIAN, EQUIFAX, and
TRANSUNION repeatedly disregard for each of Plaintiff's disputes as outlined
above, the Plaintiff has suffered a significant loss of trust in the credit reporting
system and its accountability to the average consumer. As a further direct and
proximate result of EXPERIAN, EQUIFAX, and TRANSUNION's willful and/or
negligent refusal to conduct reasonable investigations as mandated by the FCRA
as outlined above, Plaintiff has suffered loss and damage including, but not
limited to: loss of opportunity to obtain credit, damage to reputation, expenditure
of considerable time and out-of-pocket expenses, worry, fear, distress, frustration
and embarrassment, entitling him to an award of actual damages in amounts to
be proved at trial, together with the costs of this action pursuant to 15 U.S.C. §
1681o.

119.   Upon information and belief, EXPERIAN, EQUIFAX, and
TRANSUNION have exhibited a pattern of refusing to correct consumer credit
files despite being on notice of patently false information contained in such files,
ultimately valuing its own bottom line above its "grave responsibility" to report
accurate data on consumers. EXPERIAN, EQUIFAX, and TRANSUNION's pattern of
refusal to correct patently false information as mandated by the FCRA reveals a
conscious disregard of the rights of Plaintiff. The injuries suffered by Plaintiff are
attended by circumstances of fraud, malice, and/or willful and wanton
misconduct, calling for statutory damages, an assessment of punitive damages
against EXPERIAN, EQUIFAX, and TRANSUNION, plus costs of this suit pursuant to
15 U.S.C. § 1681n.

120.   EXPERIAN, EQUIFAX, and TRANSUNION are consumer reporting
agencies within the meaning of the Fair Credit Reporting Act and owed a duty to
the Plaintiff under 15 U.S.C. § 1681i to conduct an investigation, but they refused
to do so. As a direct result of the actions, inactions, and breach of the EXPERIAN,

1  EQUIFAX, and TRANSUNION's mandatory and statutory duties, the Plaintiff will
2  now have to pay a higher APR, or deposit to benefit from any consumer loan on
3  any future consumer accounts, home, or new car. Plaintiff has been damaged in
4  an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**

**Breach of Contract Under Arizona State Law**

**(Plaintiff v. Santander Consumer USA, Inc.)**

7  121.  Plaintiff re-alleges and reincorporates each of the paragraphs as
8  stated herein.

9  122.  SANTANDER entered into a contract with the Arizona Attorney
10 general for the benefit of the Plaintiff to provide the Plaintiff with the title to his
11 vehicle, not to reposes his vehicle if he had a FICO score under 401, and not
12 pursue any outstanding debt by the Plaintiff.

13 123.  SANTANDER admittedly repossessed the Plaintiff's vehicle, never
14 provided the Plaintiff with the title to his vehicle, published a debt of $ 18,000
15 plus dollars on the Plaintiff's credit reports, and then reposed his vehicle after the
16 Defendant agreed not to do any of the above as outlined in the settlement
   agreement with the Arizona Attorney General.

17 124.  At all relevant times, the Arizona Attorney general was acting as the
18 attorney for the Plaintiff, and the Defendant SANTANDER breached the contract.
19 SANTANDER had no intent to comply with the agreement with the Arizona
20 Attorney General. As a direct result of the actions, inactions, and omissions of
21 SANTANDER, the Plaintiff has a repossession of his credit reports, an amount
22 owed of $ 18,000 plus dollars, and the Plaintiff is no longer is possession of his
23 vehicle because SANTANDER repossessed it after their agreement with the
24 Arizona Attorney general. As a direct result, the Plaintiff will now have to pay a
   larger APR on a new or used vehicle in the future, will lose economic advantage

- 44 -

1    due to the fact that almost all vehicle finance lenders will not finance someone

2    like the Plaintiff with a repossession on his trade line, much less a debt of $18,000

3    plus dollars. Accordingly, the said Plaintiff has sustained permanent damage to

4    his credit, person, business relations, contractual relations, and economic

5    advantage. As such, the Plaintiff is entitled to an award of punitive damages to

6    make an example of Defendant SANTANDER.

                         SEVENTH CAUSE OF ACTION

7                    Violations of the Texas Debt Collection Act

8                    (Plaintiff v. Santander Consumer USA, Inc)

9        130.   Plaintiff re-alleges and reincorporates each of the paragraphs as

10   stated herein.

11       131.   Plaintiff believes and thereon alleges that he executed

12   Santander's standard loan agreement, which contains a Texas choice-of-law

13   provision without an arbitration clause.

14       132.   Plaintiff took out his 2018 Jeep Cherokee loan to purchase a car

15   for personal, family, or household use with the primary purpose of

     transportation, and having it for employment purposes.

16       133.   Plaintiff is therefore, under the TDCA, a "consumer" who took

17   out a "consumer debt."

18       134.   Santander is a "debt collector" under the TDCA, as well as the

19   FDCPA.

20       135.   In the process of "debt collection," by collecting or attempting to

21   collect Speedpay fees, Santander engaged in "unfair or unconscionable

22   means" of "collecting or attempting to collect . . . a charge, fee, or expense

23   incidental to the obligation" that was not "expressly authorized by the

24   agreement creating the obligation or legally chargeable to the" Plaintiff. As

     such, Santander has violated the Texas TDCA by putting such Speedpay fees

25

26                                      - 45 -

27

28

in place, and then subjecting its customers to such fees. Moreover, Santander has misrepresented, and continues to misrepresent, to its borrowers that Speedpay fees are fees charged and collected by third-party payment processors. In truth, Santander collects and retains nearly the entire amount of each Speedpay fee a borrower pays, as the Plaintiff has paid numerous fees for the Speedpay policy by Santander.

136.    These continual misrepresentations demonstrate the Santander's violations of the TDCA were made with ill will or gross negligence to the rights of Plaintiff as to amount to willful and wanton acts. Plaintiff seeks actual damages and an injunction restraining Santander from collecting and attempting to collect Speedpay fees.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Anthony Oliver respectfully requests the following relief:

1.    For an order awarding general damages according to proof;

2.    For an order awarding special damages according to proof if any;

3.    For an order declaring that the Defendants violated the FCRA, FDCPA, and their mandatory and statutory duties owed to the Plaintiff under these statutes;

4.    For an order declaring that the Defendant breached the contract with the Plaintiff by repossessing his vehicle;

5.    For an order directing the Defendants to correct, update or delete any inaccurate information on the Plaintiffs credit trade lines;

6.    For an order directing the Defendant to return the Plaintiff's vehicle, or if the vehicle no longer exists, to provide the Plaintiff with a new vehicle;

7.    For an order declaring that Defendant Santander Consumer USA, Inc., breached its contract with the Plaintiff;

- 46 -

PLAINTIFF'S SEECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
AND INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 1681, et seq.

8.    For an order declaring that Santander Consumer USA, Inc., violated the terms of the settlement agreement between the Arizona Attorney General, and Santander;

9.    For an order recommending that the Arizona Attorney General, and the United States Attorney for the District of Arizona open a criminal investigation into the actions, and inactions of Santander Consumer USA, Inc.;

10.    For an order of this Court directing that Arizona Secretary of State, Corporations Commission to revoke and/or suspend Defendant Santander Consumer USA, Inc.'s Corporation business license;

11.    For an order awarding all costs of suit against the Defendants pursuant to 28 U.S.C. § 1920; and Fed.R.Civ.P.rule 54(d);

12.    For an award of punitive damages against Defendant Santander Consumer USA, Inc., to make an example of the Defendants; and

13.    Any other relief as this Court deems just and proper.

Respectfully submitted,

Dated: NOVEMBER 2, 2022

Anthony Oliver, # 1002060648
Coffee Correctional Facility
Post Office Box 650
Nicholls Georgia 31554
Telephone : (520) 300 - 1666
Facsimile : (404) 352 - 2331

- 47 -

1

2

3 ### DEMAND FOR JURY TRIAL

4     The Plaintiff demands a jury trial pursuant to the Seventh Amendment to

5 the United States Constitution on all issues so triable under all counts in this

6 action.

7                                        Respectfully submitted,

8

9 Dated: NOVEMBER 2, 2022

10                                         Anthony Oliver, # 1002060648

11                                         Coffee Correctional Facility

Post Office Box 650

12                                         Nicholls Georgia 31554

Telephone : (520) 300 - 1666

13                                         Facsimile :  (404) 352 - 2331

14

15

16

17

18

19

20

21

22

23

24

25

26                                   - 48 -

27

28